THE HONORABLE RICARDO S. MARTINEZ

1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

| | |
|---|---|
| SENIOR HOUSING ASSISTANCE GROUP, | No. 2:17-cv-01115-RSM |
| Plaintiff/Counter-Defendant, | **SENIOR HOUSING ASSISTANCE GROUP'S AND SENIOR HOUSING ASSISTANCE CORPORATION'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| AMTAX HOLDINGS 260, LLC, et al. | |
| Defendants/Counter-Plaintiffs. | **NOTE ON MOTION CALENDAR: DECEMBER 21, 2018** |
| AMTAX HOLDINGS 260, LLC, et al., | **ORAL ARGUMENT REQUESTED** |
| Third-Party Plaintiffs, | |
| v. | |
| SENIOR HOUSING ASSISTANCE CORPORATION, et al. | |
| Third-Party Defendants. | |

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

*Senior Housing Assistance Group's and Senior Housing Assistance Corporation's Motion for Summary Judgment (2:17-cv-01115-RSM)*

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, Washington  98104
Tel: (206) 623-1745 Fax: (206) 623-7789

# I.   INTRODUCTION

This is a contract dispute between Plaintiff Senior Housing Assistance Group ("SHAG"), a Washington nonprofit corporation focused on providing affordable housing for seniors, and its investor partners (the "AMTAX" defendant entities) in seven Low-Income Housing Tax Credit ("LIHTC") apartment projects in the Puget Sound region.

Each LIHTC project is owned by a limited partnership in which AMTAX is the investor limited partner. Each partnership agreement grants SHAG a unilaterally-exercisable special right of first refusal (called the "Special ROFR" in the partnership agreements) to buy the housing projects at a pre-established, below-market statutory purchase price after AMTAX has realized all the tax credits generated by the projects. By their express terms, the Special ROFRs permit SHAG to purchase the housing projects during a pre-agreed two-year window if SHAG meets certain criteria explicitly set forth in the contract (*e.g.*, that SHAG is the lessee and operator of the project and is a qualified nonprofit organization). SHAG has met those criteria, and has attempted to exercise its Special ROFR rights. AMTAX has objected, and is trying to renege on the deals it made in 2001 and 2002 with its nonprofit partner.

AMTAX claims SHAG's Special ROFRs operate like common law rights of first refusal, and that SHAG is not entitled to exercise its Special ROFRs without bona fide third-party offers to buy the projects, and without a partnership decision to sell (which, AMTAX claims, requires its consent). AMTAX is wrong. The plain language of the partnership agreements sets forth the only criteria SHAG must meet to exercise its Special ROFRs. No unwritten criteria exist. These are not common law rights of first refusal. The sale price is pre-determined (so there are no terms for SHAG to meet in response to a third-party offer), and the Special ROFR's short exercise window would make the Special ROFR valueless to SHAG if its exercise during those two years were to

*Senior Housing Assistance Group's and Senior Housing Assistance Corporation's Motion for Summary Judgment (2:17-cv-01115-RSM) - 1*

**HILLIS CLARK MARTIN & PETERSON P.S.**
999 Third Avenue, Suite 4600
Seattle, Washington   98104
Tel: (206) 623-1745 Fax: (206) 623-7789

depend on (1) a third party making a bona fide offer to buy despite SHAG's Special ROFR rights, and (2) AMTAX's consent to a third-party sale during the window, knowing it would permit SHAG to buy at a below-market rate. Neither condition is required by the partnership agreements.

SHAG filed this action for declaratory judgment to confirm that SHAG has the right to exercise its Special ROFRs (1) without prior written consent from AMTAX, and (2) without a bona fide third-party offer to buy the project or an intention to accept such an offer, requiring AMTAX's consent. Because the contracts are clear and are consistent with the parties' intent, the Court should enter summary judgment for SHAG.

## II.       BACKGROUND

### A.       26 U.S.C. § 42 — the Low-Income Housing Tax Credit Statute

The LIHTC program, 26 U.S.C. § 42 ("Section 42"), is a federal tax credit program designed to promote the development of affordable rental housing for low-income households. *E.g.*, *Homeowner's Rehab, Inc. v. Related Corp. V SLP, L.P.*, 479 Mass. 741, 743 (2018). It is the most important source of financing for affordable housing nationwide. *Id.* LIHTC tax credits are allocated to "qualified low-income housing projects" that are rent restricted and have set aside a minimum share of rental units for low- and moderate-income households. *Id.*

The tax credits are key to the LIHTC program's success. In conventional multifamily housing developments, investors expect to achieve returns from three sources: cash flow (from operations after deducting expenses), resale value, and tax benefits (*e.g.*, depreciation). *E.g.*, J. Khadduri, et al., *What Happens to Low-Income Housing Tax Credit Properties at Year 15 and Beyond?*, U.S. Dep't of Hous. and Urban Dev., Office of Policy Dev. and Research at 23 (Aug. 2012).[1] In these conventional multifamily housing developments, the bulk of an investor's

---

[1] Available at https://www.huduser.gov/publications/pdf/what_happens_lihtc_v2.pdf.

**HILLIS CLARK MARTIN & PETERSON P.S.**
999 Third Avenue, Suite 4600
Seattle, Washington   98104
Tel: (206) 623-1745 Fax: (206) 623-7789

profits are expected to come from cash flow and profits on sale. *Id.* at 24. Under the LIHTC

program, however, the restricted rents reduce both cash flow and any likely resale value. *Id.* The

LIHTC program offsets this by offering large federal tax credits to investors. *Id.* These tax credits

last for 10 years and directly reduce—dollar-for-dollar—the federal tax obligations of the investors

claiming the credits. *Id.* In the seven LIHTC projects at issue here, the investors received hundreds

of thousands of dollars in tax credits yearly for each project. First Decl. of Bryan Park, filed with

the LLC General Partners' Mot. for Summ. J. ("Park Decl.") ¶ 40.

      In a typical LIHTC project, an investor enters into a limited partnership agreement with a

developer partner. *Homeowner's Rehab*, 479 Mass. at 744. The investor is commonly a limited

partner assigned a 99 percent interest in the partnership (to ensure it receives a commensurate

share of the tax benefits), and the developer—often, but not necessarily, a nonprofit—is the

general partner typically assigned a one percent interest in the partnership. *Id.* The general partner

is responsible for day-to-day management of the property, and the investor limited partners

contribute capital in exchange for the tax benefits generated by the project. *Id.*

      After the 10 years' worth of tax credits have been claimed, the project must continue to

comply with rent restrictions for another five years to avoid IRS recapture of the tax credits. *Id.*

at 743. This 15-year period is called the "compliance period." *Id.* at 743. At the end of the 15-year

compliance period, when all the tax credits have been claimed and are no longer subject to

recapture, "most investor limited partners will seek to leave the project, usually—but not always—

by selling their interest to the nonprofit general partner." *Id.* at 744. Section 42 permits such sales

to nonprofits (whether acting as the general partner or in some other capacity), expressly allowing

nonprofit organizations a statutory "right of 1st refusal" to buy the projects at a statutorily

prescribed minimum price:

*Senior Housing Assistance Group's and Senior Housing
Assistance Corporation's Motion for Summary Judgment
(2:17-cv-01115-RSM) - 3*

**HILLIS CLARK MARTIN & PETERSON P.S.**
999 Third Avenue, Suite 4600
Seattle, Washington   98104
Tel: (206) 623-1745 Fax: (206) 623-7789

No Federal income tax benefit shall fail to be allowable to the taxpayer with respect to any qualified low-income building merely be reason of a right of 1st refusal held by . . . a qualified nonprofit organization . . . to purchase the property after the close of the compliance period for a price which is not less than the minimum purchase price.

26 U.S.C. § 42(i)(7)(A). The statute does not define "right of 1st refusal." *See id.* The statutory "minimum purchase price" is typically below fair market value, and is the sum of the outstanding debt on the property plus any taxes that might be owed by the investor limited partner upon exiting the partnership (a price commonly described as "debt plus exit taxes"). *Homeowner's Rehab*, 479 Mass. at 745 (citing 26 U.S.C. § 42(i)(7)(B)). Congress authorized this below-market purchase right because Congress wanted LIHTC properties to end up in the hands of nonprofits that would keep the units affordable. *Id.* at 754-55.

## B.      The LIHTC Projects at Issue

The seven LIHTC housing projects at issue are owned by limited partnerships. Each project dedicates 100 percent of its units to low- and moderate-income elderly and disabled people. Decl. of Jay Woolford in Supp. of SHAG's Mot. for Summ. J. ("Woolford Decl.") ¶ 10.

Paragraph 12 of the Park Declaration features a table listing the commonly-used names of the apartment projects, the names of the limited partnerships that own the projects (the "project partnerships"), the dates on which each partnership agreement became effective, the expiration date for each compliance period, and the names of the various partners in the limited partnerships.

### 1.      The Partners in the Limited Partnerships

#### a.      *SHAG and SHAC*

The Plaintiff, SHAG, is a Puget Sound-based nonprofit 501(c)(3) corporation, exempt from tax under Section 501(a), with the mission of fostering low-income housing, particularly for seniors. Woolford Decl. ¶¶ 4-5. Over nearly 30 years SHAG has been involved in the construction and operation of approximately 40 low-income housing developments in the Puget Sound region,

*Senior Housing Assistance Group's and Senior Housing Assistance Corporation's Motion for Summary Judgment (2:17-cv-01115-RSM) - 4*

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, Washington  98104
Tel: (206) 623-1745 Fax: (206) 623-7789

comprising more than 6000 units of affordable housing. *Id.* ¶ 6. The Washington State Housing Finance Commission has determined SHAG to be a qualified nonprofit organization as defined under 26 U.S.C. § 42(h)(5)(C). *Id.* ¶ 7 Exs. C-D. Third-party defendant Senior Housing Assistance Corporation ("SHAC") is SHAG's wholly-owned for-profit subsidiary. *Id.* ¶ 8.

SHAG is involved in all seven of the LIHTC projects at issue, and SHAC is involved in five. SHAG, the nonprofit, holds a Special ROFR in each project. *Id.* ¶ 16. Through contracts with the various limited partnerships, SHAG is also each project's lessee and operator. *Id.* ¶ 14. Because of SHAG's role as a nonprofit lessee and operator, each project enjoys a continuing real estate tax exemption from the State of Washington. *Id.* ¶ 15. This was by design, and is required under the limited partnership agreements. *E.g.*, *id.* Exs. E-F at § 2.3.

SHAG is also the general partner in the Auburn Court partnership. *Id.* ¶ 12. SHAC is the general partner in the Boardwalk and WoodRose partnerships, and is a member in the LLC general partners for Lakewood, Alderwood, and Woodlands. *Id.*

### b.    AMTAX

The AMTAX and Protech entities listed in the chart above (collectively, "AMTAX") were formed by Paramount Financial Group (or its affiliates), the original "syndicator" that acted for the investor limited partners at the time the limited partnership agreements were signed.[2] Park Decl. ¶ 15. Each limited partnership agreement was signed, on behalf of AMTAX, by a person affiliated with Paramount. *Id.* Paramount no longer acts for AMTAX. The interests in the AMTAX entities were sold or transferred more than once after the partnership agreements were signed, and a firm called Alden Torch Financial, LLC, based in Denver, currently manages, controls, and represents

---

[2] LIHTC tax credits are often sold to equity investors through a "syndicator." Syndicators serve "as matchmakers between developers and tax credit investors, who are generally corporations with substantial and predictable federal tax obligations." J. Khadduri, et al., *supra*, at 23.

*Senior Housing Assistance Group's and Senior Housing Assistance Corporation's Motion for Summary Judgment (2:17-cv-01115-RSM)* - 5

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, Washington  98104
Tel: (206) 623-1745 Fax: (206) 623-7789

AMTAX. *Id.* Alden Torch claims to be the "largest affordable housing asset management platform in the industry." (*See* https://aldentorch.com.) Despite changes in the ownership and control of AMTAX, AMTAX has been the limited partner in each partnership since the partnership agreements were signed. *Id.* AMTAX holds approximately a 99 percent interest in each partnership tax item to ensure it receives a commensurate percentage of the tax benefits generated by each project. *Id.* ¶ 16. The other partners divide up the remaining one percent (or less). *Id.* AMTAX does not, however, receive 99 percent of the projects' economic benefits (*e.g.*, cash flows), which go largely to other project participants. *Id.*

### c. The LLC General Partners

The general partners in four of the project partnerships are limited liability companies (the "LLC general partners"). Those limited liability companies are third-party defendants in this action, along with SHAC. SHAC is a co-manager of, and has a one percent interest in, the LLC general partners for Lakewood, Alderwood, and Woodlands. Woolford Decl. ¶ 12. Neither SHAG nor SHAC has any role in the LLC general partner for Meridian. *Id.*

The largest percentage owner of the LLC general partners for Lakewood, Alderwood, and Woodlands is Pacific Northern Construction Company ("PNCC"). Park Decl. ¶¶ 4, 13. PNCC is a local for-profit developer. *Id.* ¶ 3. Bryan M. Park is PNCC's controlling shareholder and president. *Id.* Mr. Park also has a financial interest in Meridian's LLC general partner, and acts on that LLC general partner's behalf. *Id.* ¶¶ 4, 13. Mr. Park, PNCC, and PNCC's affiliates are longtime for-profit developer partners of SHAG. *Id.* ¶ 3. Entities in which PNCC has some interest were the developers of each of the seven LIHTC projects at issue, either directly or by contracting to perform development work on another party's behalf. *Id.* ¶ 5.

*Senior Housing Assistance Group's and Senior Housing Assistance Corporation's Motion for Summary Judgment (2:17-cv-01115-RSM) - 6*

**HILLIS CLARK MARTIN & PETERSON P.S.**
999 Third Avenue, Suite 4600
Seattle, Washington  98104
Tel: (206) 623-1745 Fax: (206) 623-7789

## 2.    The Terms of the Limited Partnership Agreements

The seven limited partnership agreements have only slight differences. The first two that were negotiated and signed, Woodlands and Alderwood, have, for purposes of this motion, the same relevant terms. The other five partnership agreements are slightly different from the first two, but each agreement in that group of five has the same relevant terms as the other agreements in that group of five. For this motion, we will cite, as examples from each group, the Woodlands and Lakewood Meadows limited partnership agreements. Woolford Decl. ¶¶ 17-18, Exs. E-F.

The partnership agreements have two stated purposes: (1) to develop, operate, and "otherwise deal with" the projects; and (2) to enter into operating use lease agreements with SHAG to ensure favorable treatment under federal and state tax laws. *Id.* Exs. E-F § 2.3. The General Partners "have the exclusive right to manage the business of the Partnership." *Id.* Exs. E-F § 7.3A. The Investor Limited Partners do not have management rights, *id.*, and have only limited rights outlined in Section 4.5 and elsewhere in the agreement, *Id.* Exs. E-F § 4.5.

This dispute centers on SHAG's right under the partnership agreements to buy the properties at the end of the 15-year compliance period. Beginning at the end of the compliance period, the partnership agreements authorize three ways in which the individual project participants—including SHAG—can force a purchase or sale of the property. They are outlined in Sections 7.4J, K, and L of the partnership agreements. Each right is exercisable for only two years after the close of the compliance period.

Section 7.4J provides an "option" held by the Managing General Partner[3] of each partnership. Pursuant to the terms of that option, the Managing General Partner has two years after

---

[3] Each partnership at issue has only one General Partner, so the term "Managing General Partner" is, for our purposes, synonymous with "General Partner."

*Senior Housing Assistance Group's and Senior Housing Assistance Corporation's Motion for Summary Judgment (2:17-cv-01115-RSM) - 7*

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, Washington  98104
Tel: (206) 623-1745 Fax: (206) 623-7789

the close of the compliance period to exercise its right to buy the project at the *greater of* fair

market value or debt plus exit taxes. *Id.* Exs. E-F § 7.4J.

Under Section 7.4K of each agreement, the Investor Limited Partner has the right to "force

a sale" of the apartment complex, at fair market value, for two years after the close of the

compliance period. *Id.* Exs. E-F § 7.4K. That right is expressly "[s]ubject to the option" in

Section 7.4J. *Id.* In the Woodlands and Alderwood agreements, the partnership agreements

reiterate that point by also giving the General Partner (the option holder) a "Right of First Refusal"

to purchase the project in the event the Investor Limited Partner forces a sale under Section 7.4K.

*Id.* Ex. E § 7.4K. In the other five agreements, Section 7.4K confirms that any forced sale will also

be subordinate to SHAG's right to exercise its Special ROFR "in accordance with the provisions of

Section 7.4L." *Id.* Ex. F § 7.4K.

Notwithstanding the option and forced sale rights given to the General Partner and the

Investor Limited Partner in Sections 7.4J and K, Section 7.4L gives SHAG the right, for two years

after the close of the compliance period, to purchase the Project at the statutory minimum price

(plus some additional possible costs not likely to be relevant here):

> Notwithstanding Paragraphs 7.4J and 7.4K above, for a period of twenty-four (24) months following the close of the Compliance Period as determined by the Code, if (i) the Senior Housing Assistance Group (the "Purchaser") is then the Lessee and operator of the Apartment Complex pursuant to the Operating Use Lease, (ii) the Senior Housing Assistance Corporation is then a qualified corporation with respect to the Purchaser (as defined under Section 42(h)(5)(D)(ii) of the code) and is a member of a General Partner, and (iii) the Purchaser is then a qualified nonprofit organization as defined under Section 42(h)(5)(C) of the Code, then the Purchaser shall have a "Right of First Refusal" (the "Special ROFR") to purchase the Project at a purchase price (the "Purchase Price") equal to the sum of (1) the minimum purchase price as determined under Section 42(i)(7)(B) of the Code (the "Statutory Minimum Purchase Price") and (2) the amount of each of the items set forth in Section 6.2B(ii), Paragraphs First through Seventh thereof, to the extent that the amounts of such items are not already reflected in the Statutory Minimum Purchase Price in order to avoid any duplication.

*Id.* Ex. F § 7.4L.

*Senior Housing Assistance Group's and Senior Housing Assistance Corporation's Motion for Summary Judgment (2:17-cv-01115-RSM) - 8*

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, Washington  98104
Tel: (206) 623-1745 Fax: (206) 623-7789

Nothing in Sections 7.4J, K, and L make the rights in those sections contingent on any other party's consent. And the exercise of SHAG's Special ROFR right, like the General Partner's option, expressly is *not* subject to prior approval by the Investor Limited Partner:[4]

> the Investor Limited Partners shall have the right . . . with consent of all remaining Partners, to approve or disapprove the sale of all or substantially all of the assets of the Partnership *(other than a sale pursuant to the Option described in Section 7.4J or the Special ROFR described in Section 7.4L)*.

*Id.* Ex. F § 4.5A(iii) (emphasis added).

### 3.   The Negotiation and Execution of the Limited Partnership Agreements

The limited partnership agreements for each partnership were negotiated by Bryan Park on behalf of the developer and LLC general partner entities, and by Paramount on behalf of AMTAX. Park Decl. ¶¶ 9, 17. Mr. Park required a Special ROFR for SHAG's benefit. When negotiating the Woodlands limited partnership agreement, the first agreement negotiated and executed, Mr. Park wrote to Paramount to ensure SHAG would have "the opportunity to purchase the Project at the statutory minimum purchase price after the expiration of the 15-year tax credit compliance period." *Id.* ¶ 18, Ex. A.[5] This Section 42 right of first refusal, exercisable after the compliance

---

[4] As explained below, the reference to the "Special ROFR" in this provision was added to the last five partnership agreements to confirm the parties' intent.

[5] That letter stated, in part:

> Because of the involvement of [SHAG] in the Project, we are required to obtain for the benefit of [SHAC] and/or [SHAG] a right of first refusal ("ROFR") to acquire the Project at the statutory minimum price (i.e., the underlying debt plus exit taxes) provided for under Section 42(i)(7) . . ., exercisable after the expiration of the 15-year tax credit compliance period . . . . In order to provide meaningful opportunities and incentives for both the for-profit participants (Pacific Northern, Covenant, Frame and Carroll) and the nonprofit participants ([SHAG] and [SHAC]), our arrangement is that the for-profit participants would be entitled to 99% of the residual economic benefits . . . retained by the General Partner and Developer LLC during the 15-year tax credit compliance period, and the nonprofit participants would be entitled to 1% of the residual economic benefits retained by the General Partner and Developer LLC plus 1% of the gross revenues from Project operations  . . . during the . . . compliance period *and* the opportunity to purchase the Project at the statutory minimum purchase price after the expiration of the . . . compliance period. . . . Since the ROFR is an important factor in our valuable relationship with the [SHAG] and [SHAC], it is important that we obtain such a ROFR on their behalf.

---

*Senior Housing Assistance Group's and Senior Housing Assistance Corporation's Motion for Summary Judgment (2:17-cv-01115-RSM) - 9*

**HILLIS CLARK MARTIN & PETERSON P.S.**
999 Third Avenue, Suite 4600
Seattle, Washington  98104
Tel: (206) 623-1745 Fax: (206) 623-7789

period, was necessary to give "meaningful opportunities and incentives" to SHAG that were commensurate with the other parties' opportunities and incentives. *Id.* Shortly after Mr. Park raised this issue, the parties signed an Investment Agreement that contained the necessary ROFR language in substantially the same form that became Section 7.4L of the partnership agreements. *Id.* ¶ 19, Ex. B.

This letter to Paramount evinced the parties' intent that the below-market Special ROFR be unilaterally exercisable by SHAG at the end of the compliance period in order to give SHAG a "meaningful" "opportunity to purchase the Project" commensurate with the opportunities enjoyed by the other project participants. *Id.* ¶ 20. Mr. Park discussed the Special ROFR with Paramount Executive Vice President Michael Buckley, and Mr. Buckley agreed that SHAG's Special ROFR right would be the primary consideration given to SHAG for its participation in the project, and would therefore be exercisable at SHAG's option without any other party's consent. *Id.* ¶ 21. As is typical in LIHTC deals, Paramount was chiefly interested in securing the tax benefits from the project, and the for-profit developer parties were chiefly interested in development fees and cash flow. *Id.* The parties added Section 7.4L to give SHAG its own "meaningful" future stake in the projects. *Id.* ¶¶ 18-22

In negotiating the partnership agreements for the later five projects, Mr. Park made an edit to affirm and reinforce SHAG's right to exercise its Special ROFR unilaterally. *Id.* ¶ 30. For the five partnership agreements that came after Woodlands and Alderwood, Mr. Park added the phrase "or the Special ROFR described in Section 7.4L" to the language limiting the Investor Limited Partner's right in Section 4.5A(iii) to approve a sale of the project. *Id.* Redlined excerpts from the draft agreements are attached as Exhibits C-G to the Park Decl. Mr. Park made that edit specifically to affirm and reinforce that the Special ROFR could be exercised unilaterally without

*Senior Housing Assistance Group's and Senior Housing Assistance Corporation's Motion for Summary Judgment (2:17-cv-01115-RSM) - 10*

**HILLIS CLARK MARTIN & PETERSON P.S.**
999 Third Avenue, Suite 4600
Seattle, Washington  98104
Tel: (206) 623-1745 Fax: (206) 623-7789

the Investor Limited Partner's involvement at all. *Id.* ¶ 30. Paramount did not object to that edit, and never questioned why it was being made and incorporated into the final signed agreements. *Id.* The edit was consistent with the parties' intent from the beginning (as expressed in Section 7.4L), including in the Woodlands and Alderwood partnership agreements, where the Special ROFR was not included in Section 4.5A(iii)'s exclusionary parenthetical, but where the terms of Section 7.4L are the same as in all the other agreements. *Id.*

The Paramount employees who signed the partnership agreements for AMTAX are no longer involved with AMTAX. *Id.* ¶ 50. Alden Torch employee Ryan Trane, who served as AMTAX's Rule 30(b)(6) witness in discovery, testified that AMTAX does not know why Section 7.4L is in the partnership agreements, or why the Special ROFR (like the General Partner option) was excluded from the Investor Limited Partner's right, under Section 4.5A(iii), to consent to any sale. Decl. of Jake Ewart in Supp. of SHAG's and SHAC's Mot. for Summ. J., Ex. A. Mr. Trane could not "speak to the intention" of the parties that signed the contracts. *Id.*

Even though AMTAX cannot "speak to the intention" of the parties in drafting the limited partnership agreements, other Paramount documents confirm that the price AMTAX was paying for its investment included no expectation whatsoever of back-end sale proceeds. AMTAX was paying—through its capital contributions—an amount tied only to its expected tax credits and losses. Park Decl. ¶¶ 32-34. In the Investment Agreement Paramount executed for Woodlands, Paramount makes clear that AMTAX was paying

> $2,300,000 ($0.819 per tax credit) in exchange for receiving a 10-year stream of Tax Credits in the amount $2,807,974 and after tax loss benefits of $788,058 ($2,300,000 tax losses multiplied by a corporate tax rate of .35) for a Total Benefit Stream of $3,596,032 ($2,807,974 tax credits + $788,058 tax losses). Therefore, 78.08% of PFG's Total Benefit Stream is comprised of Tax Credits and 21.92% is comprised of tax losses.

*Senior Housing Assistance Group's and Senior Housing Assistance Corporation's Motion for Summary Judgment (2:17-cv-01115-RSM) - 11*

**HILLIS CLARK MARTIN & PETERSON P.S.**
999 Third Avenue, Suite 4600
Seattle, Washington  98104
Tel: (206) 623-1745 Fax: (206) 623-7789

*Id.* ¶¶ 32-34, Ex. B. If the project produced more tax credits than anticipated, AMTAX would be required to make additional capital contributions commensurate with the increased credits; if the project produced fewer tax credits than anticipated, AMTAX's required capital contributions would be decreased. *See id.* Although AMTAX would be entitled to certain other kinds of payments before SHAG could exercise its Special ROFR, AMTAX's capital contributions were strictly and exclusively tied to the tax benefits it expected to receive. And Paramount's own internal financial projections—made at or near the time the partnership agreements were negotiated—assumed AMTAX would not receive sale proceeds in assessing the expected rate of return on its investments. Decl. of Joel Rubenzahl in Supp. SHAG's and SHAC's Mot. for Summ. J. ("Rubenzahl Decl.") ¶ 3.

### 4. AMTAX Received the Expected Tax Benefits

AMTAX ultimately realized the returns it expected—and more—from the actual operation of the projects. AMTAX enjoyed, through the first quarter of 2018, a portfolio-wide internal rate of return of 14.2 percent per year on an after-tax basis. Rubenzahl Decl. ¶ 4. AMTAX's returns came almost entirely from tax credits and tax losses, and from modest amounts of cash flow to which the investor limited partner was entitled under the partnership agreements. *Id.* ¶ 5; Park Decl. ¶ 40. All together, those amounts totaled more than $34 million—more than $33 million of which came from tax benefits. *Id.* No financial projection done at or near the outset of any of the seven projects—either by Bryan Park (on behalf of the developers and LLC general partners) or by Paramount for AMTAX—showed an expected rate of return to the Investor Limited Partner as high as 14.2 percent per year. Rubenzahl Decl. ¶ 6. These investments have therefore already exceeded expectations based on their rates of return.

*Senior Housing Assistance Group's and Senior Housing
Assistance Corporation's Motion for Summary Judgment
(2:17-cv-01115-RSM) - 12*

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, Washington  98104
Tel: (206) 623-1745 Fax: (206) 623-7789

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

**C.      SHAG Exercised Its Special ROFRs, AMTAX Objected, and SHAG Filed this Action for Declaratory Judgment**

All tax credits for all seven projects have now been claimed. Park Decl. ¶ 40. The 15-year compliance periods for six of the seven projects have expired, and the last is set to expire on December 31, 2018.[6]  SHAG exercised its Special ROFRs in four projects (within 24 months of the close of the compliance period) and plans to exercise its Special ROFRs in the other three during their exercise windows. Woolford Decl. ¶¶ 27-49, Exs. O-DD. In each case in which SHAG has already exercised, the partnerships had also received bona fide third party offers to purchase the properties before SHAG exercised its Special ROFRs. *Id.* Those offers were transmitted to AMTAX before or on the same day the Special ROFRs were exercised. *Id.* And for Meridian, the general partner had also exercised its option to purchase the project before SHAG exercised its Special ROFR. *Id.* ¶ 36, Exs. Q-R; Park Decl. ¶ 42, Ex. I.

Nevertheless, and despite all the conditions of Section 7.4L having been satisfied, AMTAX has denied SHAG's rights to purchase any of these projects pursuant to its Special ROFRs. First, AMTAX claims that SHAG's Special ROFRs are like common law rights of first refusal, which require an offer to buy and a willingness by the owner to accept that offer. Dkt. No. 26, AMTAX Countercl. ¶ 4. AMTAX claims those features were known to Congress when it chose to use the term "right of 1st refusal" in 26 U.S.C. § 42(i)(7), and argues SHAG cannot exercise its Special ROFRs because AMTAX has not consented to a third-party sale. *E.g.*, *id.* ¶¶ 5, 40, 44. Second, AMTAX claims SHAG has impermissibly entered into an agreement (the "Global Indemnity Agreement") with its for-profit partner (PNCC) that wrongly transfers some of the benefits of the Section 42 ROFR to for-profit entities. *E.g.*, *id.* ¶¶ 6, 8.

---

[6] *See* Dkt. No. 3-1, Compl. ¶¶ 36, 51, 65, 79, 93, 104, 115; Dkt. No. 26, AMTAX Answer ¶¶ 36, 51, 65, 79, 93, 104, 115.  *Accord* Park Decl. ¶ 41.

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, Washington  98104
Tel: (206) 623-1745 Fax: (206) 623-7789

AMTAX also alleges counterclaims against SHAG, and third-party claims against SHAC and the LLC general partners, for conspiring to impermissibly sell the projects at a below-market price without AMTAX's consent. *E.g.*, *id.* ¶¶ 204, 209, 214, 219, 224, 229, 234. AMTAX additionally claims that SHAG, SHAC, and the LLC general partners failed to provide certain reports allegedly required under the partnership agreements, and failed to pay penalties allegedly owed as a result. *Id.*

## III.    ARGUMENT

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Each partnership agreement is governed by Washington law. *E.g.*, Woolford Decl. Exs. E-F § 13.4. Washington courts follow the "objective manifestation theory of contracts," and grant summary judgment when a written contract "is subject to only one reasonable interpretation." *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154 Wash.2d 493, 503, 512 (2005). Washington courts also recognize that the "intent of the contracting parties cannot be interpreted without examining the context surrounding an instrument's execution." *Id.* at 502. Therefore, courts may consider extrinsic evidence, including evidence of (1) the subject matter and objective of the contract, (2) all the circumstances surrounding the making of the contract, (3) the subsequent acts and conduct of the parties, and (4) the reasonableness of respective interpretations urged by the parties. *Id.* A court should grant summary judgment if it can infer only one reasonable interpretation based on the extrinsic evidence. *Oliver v. Alcoa, Inc.*, No. C16-0741JLR, 2017 WL 1498140, at *8 (W.D. Wash. Apr. 25, 2017) (citing cases).

The Court should enter summary judgment for SHAG. The partnership agreements are subject to only one reasonable interpretation, and the extrinsic evidence supports only that single

*Senior Housing Assistance Group's and Senior Housing Assistance Corporation's Motion for Summary Judgment (2:17-cv-01115-RSM) - 14*

**HILLIS CLARK MARTIN & PETERSON P.S.**
999 Third Avenue, Suite 4600
Seattle, Washington  98104
Tel: (206) 623-1745 Fax: (206) 623-7789

reasonable interpretation. The parties did not intend, and cannot have intended, to give SHAG a right it could not reasonably hope to exercise. The partnership agreements explicitly set forth all the requirements for exercise, and they have all been met here. The Court should find that no additional, unwritten, requirements exist.

### A.      Section 7.4L Contains All Conditions for Exercise of SHAG's Special ROFR, and Those Conditions Have Been Met

Section 7.4L sets forth all the conditions for exercise: (1) SHAG must exercise within 24 months of the close of the compliance period; (2) SHAG must be "then the Lessee and operator of the Apartment Complex pursuant to the Operating Use Lease;" (3) SHAC (if involved in that project) must be SHAG's wholly-owned subsidiary and either general partner or a member of the LLC general partner;[7] and (4) SHAG must be "then a qualified nonprofit organization." Woolford Decl. ¶¶ 17-25, Exs. E-M. These conditions do *not* include receipt of a third party offer or an intention by the partnership (with AMTAX's consent) to sell. The Court cannot write those conditions into the contracts. *E.g.*, *Hearst*, 154 Wash.2d at 510 (courts are not "at liberty" to "rewrite" contracts). The conditions actually listed in Section 7.4L have been met, and SHAG should be permitted to exercise its Special ROFRs.

### B.      Section 7.4L is Not a Common Law Right of First Refusal

AMTAX contends, however, that the words "right of first refusal" necessarily impose additional conditions because, at common law, rights of first refusal require a third party offer and the owner's willingness to accept that third party offer. *See*, *e.g.*, Dkt. No. 26, AMTAX Countercl. ¶ 4. But the mere words "right of first refusal" do not have that effect. Even where the words "right of first refusal" are explicitly used, courts look to the substance of the right conveyed to determine

---

[7] In Lakewood, Alderwood, and Woodlands, Section 7.4L requires that SHAC be "then a qualified corporation with respect to" SHAG as defined by Section 42(h)(5)(D)(ii), which requires that it be wholly owned by a qualified nonprofit organization (here, SHAG).

*Senior Housing Assistance Group's and Senior Housing Assistance Corporation's Motion for Summary Judgment (2:17-cv-01115-RSM) - 15*

**HILLIS CLARK MARTIN & PETERSON P.S.**
999 Third Avenue, Suite 4600
Seattle, Washington  98104
Tel: (206) 623-1745 Fax: (206) 623-7789

1   whether the right is a common law right of first refusal or something else entirely. *Kelly v. Ammex*

2   *Tax & Duty Free Shops W., Inc.*, 162 Wash. App. 825, 830-32 (2011). The substance of the right

3   controls the analysis, and if something titled a "right of first refusal" is in substance a "right of first

4   offer," courts will enforce it as a right of first offer. *Id.*

5          Here, the words "right of first refusal" are used in Section 7.4L, but the right conveyed is

6   immediately defined as a "Special ROFR," and nothing about the Special ROFR resembles a

7   common law right of first refusal. Most significantly, the price is pre-set, so there is no "offer" that

8   SHAG must match to effectuate its right. *See, e.g., Kelly*, 162 Wash. App. at 831 (with a common

9   law right of first refusal, the right holder has the "option to match" a third-party offer). Indeed, the

10  requirement that the right of first refusal holder "buy the subject property on the same terms

11  contained in a bona fide offer from a third party" is a quintessential feature of a common law right

12  of first refusal, *Bennett Veneer Factors, Inc. v. Brewer*, 73 Wash.2d 849, 856 (1968), and only

13  immaterial variances from the third-party offer are acceptable in exercising a common law right of

14  first refusal, *e.g., Matson v. Emory*, 36 Wash. App. 681, 687 (1984) (cash offer from right of first

15  refusal holder not similar enough to the terms of the third-party offer, which offered an exchange

16  of properties). Without the requirement that SHAG match the terms of a third-party offer, the right

17  conveyed in Section 7.4L is something other than a common law "right of first refusal." Indeed, a

18  third-party offer—which is not needed to supply the terms of purchase—would serve no purpose at

19  all under the terms of the Special ROFR.

20         The Special ROFR in Section 7.4L also has a very short two-year exercise term—the same

21  exercise term applied to the general partner option under Section 7.4J and AMTAX's right to force

22  a sale under Section 7.4K. Those parallel exercise windows show that the rights were intended to

23  be exercised in parallel ways, and the relative priority of those rights is established by the terms of

24  

25  

26  

---

*Senior Housing Assistance Group's and Senior Housing
Assistance Corporation's Motion for Summary Judgment
(2:17-cv-01115-RSM) - 16*

**HILLIS CLARK MARTIN & PETERSON P.S.**
999 Third Avenue, Suite 4600
Seattle, Washington  98104
Tel: (206) 623-1745 Fax: (206) 623-7789

Sections 7.4J, K, and L. Section 7.4K is "subject to" the option in Section 7.4J, and the Special

ROFR in Section 7.4L has first priority because it is exercisable "[n]otwithstanding" the rights in

Sections 7.4J and 7.4K. Woolford Decl. Exs. E-F § 7.4L.

      Given the Special ROFR's short exercise window, it would be exceedingly difficult, if not

impossible, to exercise the Special ROFR if its exercise also required a third-party offer and

AMTAX's consent to sell. In fact, AMTAX would have every incentive *not* to give its consent

during the Special ROFR's two-year lifespan if it meant the difference between a below-market

sale to SHAG and a sale at fair market value to someone else a short time later. Under those

circumstances, the Special ROFR would have no practical value to SHAG, and the Court should

not interpret it in a way that renders it superfluous or meaningless, *e.g.*, *Ibrahim v. AIU Ins. Co.*,

177 Wash. App. 504, 515 (2013), or in a way that would thwart the parties' objectives in including

a Special ROFR, *e.g.*, *Hearst*, 154 Wash.2d at 502 (courts consider the "objective of the contract").

      Even though AMTAX cannot "speak to the intention" of the parties in drafting these

provisions, AMTAX argues the Special ROFR has value under AMTAX's interpretation because

> the benefit that SHAG's Rights of First Refusal provided was to discourage
> AMTAX/Protech from selling the LIHTC projects out from under SHAG in order
> to capture their appreciated value.  Thus, the fact that the Rights of First Refusal
> have not been triggered means that they are working exactly as intended.

Dkt. No. 26, AMTAX Countercl. ¶ 45. This argument is illogical. AMTAX is suggesting that

SHAG's Special ROFR right in Section 7.4L exists merely to block AMTAX's forced sale right in

Section 7.4K. The Court should not interpret a contract provision in a manner that renders it

superfluous or meaningless, and it certainly should not interpret *two* contract provisions in that

way. *E.g.*, *Ibrahim*, 177 Wash. App. at 515. If the parties had intended to prevent AMTAX from

unilaterally selling the project at fair market value, they could simply not have given AMTAX a

forced sale right under Section 7.4K. And if the parties had intended *not* to give SHAG a

**HILLIS CLARK MARTIN & PETERSON P.S.**
999 Third Avenue, Suite 4600
Seattle, Washington  98104
Tel: (206) 623-1745 Fax: (206) 623-7789

meaningful opportunity to buy the project for a below-market price, the parties could simply have omitted the Special ROFR altogether. The parties did no such thing, and instead gave each project participant a meaningful opportunity to dictate a purchase or sale of the project for two years after the close of the compliance period (with SHAG's Special ROFR granted priority).

If the parties had wanted to give SHAG a different purchase right, they knew how to do so. For a project called Ballinger Court, SHAG and AMTAX entered into a Right of First Refusal Agreement that contains many more conditions than Section 7.4L. Woolford Decl. ¶ 26, Ex. N. In Ballinger, the right of first refusal is exercisable "[i]n the event the Partnership receives a bona fide offer to purchase the Apartment Complex . . . which . . . the Partnership intends to accept." *Id.* But SHAG's right of first refusal in Ballinger is not subject to a strict two-year lifespan, and is exercisable anytime within 90 days of receiving a bona fide third-party offer. *Id.* This is more consistent with a conventional right of first refusal, and—even if AMTAX has the right in Ballinger to consent to an underlying sale—it prevents AMTAX from simply waiting two years before consenting to a market rate third-party sale. *See*, *e.g.*, *MS Real Estate Holdings, LLC v. Donald P. Fox Family Tr.*, 2014 WI App 84, ¶¶ 13-33, 356 Wis. 2d 307, 853 N.W.2d 627 (2014) (rejecting defendants' attempt to revoke non-term-limited right of first refusal and noting a right of first refusal, "by its very nature, is intended to lie dormant until a specified triggering event occurs"). The right in Ballinger is different from the right in Section 7.4L, and AMTAX cannot now rewrite Section 7.4L in Ballinger's image.

Finally, we know SHAG's Special ROFR is not a common law right of first refusal because the parties explicitly made it exercisable without AMTAX's involvement. Section 4.5A(iii) in the last five agreements gives AMTAX the right to consent to any sale *except* sales pursuant to the general partner option and SHAG's Special ROFR. The parties added that

*Senior Housing Assistance Group's and Senior Housing Assistance Corporation's Motion for Summary Judgment (2:17-cv-01115-RSM) - 18*

**HILLIS CLARK MARTIN & PETERSON P.S.**
999 Third Avenue, Suite 4600
Seattle, Washington  98104
Tel: (206) 623-1745 Fax: (206) 623-7789

exclusion specifically to ensure there would be no confusion about SHAG's ability to exercise the Special ROFR unilaterally. The Special ROFR's exclusion from Section 4.5A(iii), and the terms of Section 7.4L itself, give SHAG a right that is anything but a common law right of first refusal.

### C.     The Language of the Partnership Agreements Reflects the Parties' Intent

The parties' negotiating history reinforces this reading of SHAG's Special ROFR. The parties' intent in including the Special ROFR, as expressed in Bryan Park's letter to Paramount, was to give SHAG "meaningful opportunities and incentives"—commensurate to the opportunities given to AMTAX and the developer—in exchange for SHAG's role in the projects; and SHAG's role was key, given the obvious importance the parties placed on SHAG's involvement and the tax exemptions it would supply. *E.g.*, Woolford Decl. Exs. E-F § 2.3. Mr. Park's letter to Paramount cannot reasonably be interpreted to have been a demand for a heavily contingent purchase right or a right that would ultimately be controlled by AMTAX. Mr. Park's subsequent edit to Section 4.5A(iii)—and Paramount's acceptance of it—further confirms the parties' understanding that SHAG's Special ROFR right could not be thwarted by the investor limited partners.

This interpretation of Section 7.4L also makes sense within the broader context in which these partnership agreements were negotiated. The investor limited partners were investing in the projects based on their anticipated tax benefits, not an expectation of back-end sale profits. SHAG's Special ROFR was exercisable only *after* those tax benefits had been realized. The arrangement was thus balanced, giving the significant tax benefits to the investor, most fees and cash flow to the developer, and a meaningful back-end purchase right to SHAG, which cannot pay market rate for these properties, and which wants cashflow less than it wants control over affordable housing units that are critically important to its mission and the communities in which it operates.

*Senior Housing Assistance Group's and Senior Housing Assistance Corporation's Motion for Summary Judgment (2:17-cv-01115-RSM) - 19*

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, Washington  98104
Tel: (206) 623-1745 Fax: (206) 623-7789

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

**D.      The Parties' Contract Controls**

AMTAX also contends the Special ROFR cannot be exercised unilaterally because

Congress chose to use the words "right of 1st refusal" in Section 42(i)(7) specifically to distinguish

that below-market purchase right from a below-market *option*. Dkt. No. 26, AMTAX Countercl.

¶ 5. But the term "right of 1st refusal" is not defined in Section 42(i)(7), and the only court to have

considered this argument has held that no matter what Congress may have intended, the parties'

contract terms control. *Homeowner's Rehab*, 479 Mass at 761-62 (a Section 42 ROFR should be

interpreted in a certain way "unless otherwise negotiated between the parties"). And the contract

terms control even if there may be a "risk of unintended tax implications" for the partnership. *Id.*

at 762 n.15.

In *Homeowner's Rehab*, the Massachusetts Supreme Court concluded that Congress used

the words "right of 1st refusal" instead of "option" to ensure that a below-market option holder

would not be considered, under certain tax principles, the true "owner" of the project and therefore

the proper recipient of the LIHTC tax credits (instead of the partnership itself and its investor

limited partner). *Id.* at 755-56. The Court suggested Congress solved this alleged problem by

substituting "right of 1st refusal" for "option" and eliminating the ownership rights associated with

"the power to compel an unwilling owner to sell." *Id.* (citing T. Kaye, *Sheltering Social Policy in

the Tax Code: The Low-Income Housing Credit*, 38 Vill. L. Rev. 871, 893 (1993)). Against that

backdrop, however, the Court still interpreted the parties' contract in a manner consistent with

Congress's intent to facilitate the inexpensive transfer of LIHTC properties to nonprofits, and in a

manner that did not require the Court to assume "the parties had negotiated an agreement that

could bar the nonprofit . . . from ever purchasing the property at a favorable price." *Id.* at 759-60.

The Court held the parties' contract permitted the nonprofit general partner (and Section 42 ROFR

*Senior Housing Assistance Group's and Senior Housing
Assistance Corporation's Motion for Summary Judgment
(2:17-cv-01115-RSM) - 20*

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, Washington  98104
Tel: (206) 623-1745 Fax: (206) 623-7789

holder) to solicit a third-party offer for the express purpose of triggering the Section 42 ROFR and defeating the third-party offer, all without the investor limited partner's consent. *See id.* at 756-63.

While the ultimate result in *Homeowner's Rehab* was correct, the Court's reasoning, and the facts in that case, led to the convoluted result that, for the nonprofit to exercise its Section 42 ROFR (which had a 4-year exercise window), it should—without the investor's permission— solicit an enforceable offer from a third party that *would never be accepted* for the *sole purpose* of triggering a right that the investor limited partner did not want the nonprofit to exercise. A contract should not need to be structured in this way. Such a structure requires the nonprofit to jump through meaningless hoops to achieve indirectly what AMTAX claims cannot be achieved directly:  the unilateral exercise of a Section 42 ROFR.

The contracts in this case do not require SHAG to jump through such hoops. The Section 42 ROFR in *Homeowner's Rehab* was drafted differently from the Special ROFR here, and made it clear that the property would only be "offered" to the nonprofit only if the partnership were going to sell the property. *See Homeowner's Rehab, Inc. v. Related Corp. V SLP, LP*, No. SUCV20143807BLS2, 34 Mass. L. Rptr. 14, at *2 (Sept. 13, 2016) (unpublished) (quoting the right of first refusal provision at greater length). Here, SHAG has the straightforward right simply "to purchase the Project" if it meets the conditions expressly listed in Section 7.4L. No reasonable reading of that provision would require SHAG to solicit or wait for a third-party offer—knowing it would never be accepted—for the sole purpose of triggering a right that Section 7.4L says can be exercised without going through any of that charade.

In short, the parties' contracts control. The Massachusetts Supreme Court emphasized that principle in *Homeowner's Rehab*, and Section 42(i)(7) does not *prohibit* any particular contractual purchase right, it merely offers a safe harbor for the right described in that provision. 26 U.S.C.

*Senior Housing Assistance Group's and Senior Housing Assistance Corporation's Motion for Summary Judgment (2:17-cv-01115-RSM) - 21*

**HILLIS CLARK MARTIN & PETERSON P.S.**
999 Third Avenue, Suite 4600
Seattle, Washington  98104
Tel: (206) 623-1745 Fax: (206) 623-7789

§ 42(i)(7)(A) ("No Federal tax benefit shall fail to be allowable…"). Parties can lawfully negotiate any purchase rights they desire. If those purchase rights fall outside a safe harbor there may or may not be tax consequences, but the parties' agreement controls in either case. And here, SHAG's purchase rights cannot be exercised until *after* the end of the time period during which any tax credits might be subject to recapture. *Homeowner's Rehab*, 479 Mass. at 744.

E.      **Third Party Offers Also Existed, and Meridian's 7.4J Option Was Exercised**

Although the exercise of SHAG's Special ROFR is not contingent on the receipt of a third-party offer, the partnerships have received one (or more) for each property to date, and those offers were transmitted to AMTAX before or at the time the Special ROFRs were exercised. Woolford Decl. ¶¶ 30-49, Exs. O-DD.

In addition, as in *Homeowner's Rehab*, the limited partnership agreements here, in Article III.C, say the partnerships may sell the projects, and that investor limited partner consent must be obtained only "before such transaction shall be binding on the Partnership." *E.g.*, Woolford Decl. Exs. E-F Art. III.C; *accord Homeowner's Rehab*, 479 Mass. at 760-63. The agreements do *not* prohibit the general partner, which has exclusive management control over the properties, from deciding—short of entering a binding transaction—to sell. *See id.* § 7.3A. That being the case, the general partners can receive third-party offers *and* decide to sell (short of entering a binding transaction) without the investor limited partner's involvement.[8] The general partners have in each case consented to the sale of the property, and no general partner has objected to SHAG's Special ROFR exercises. *Id.* ¶¶ 29, 31; Park Decl. ¶ 43.

---

[8] Even if AMTAX's consent were necessary, AMTAX consented to sell to SHAG in advance by agreeing to the inclusion of the Special ROFRs in the limited partnership agreements.

*Senior Housing Assistance Group's and Senior Housing Assistance Corporation's Motion for Summary Judgment (2:17-cv-01115-RSM) - 22*

**HILLIS CLARK MARTIN & PETERSON P.S.**
999 Third Avenue, Suite 4600
Seattle, Washington  98104
Tel: (206) 623-1745 Fax: (206) 623-7789

In addition to the third-party offers, the LLC general partner in Meridian exercised its purchase option before SHAG exercised its Special ROFR. Woolford Decl. ¶ 36, Exs. Q-R; Park Decl. ¶ 42, Ex. I. Because SHAG's Special ROFR has priority over the option (SHAG's Section 7.4L rights exist "[n]otwithstanding" the rights granted in Sections 7.4J and K), the Special ROFR must be able to trump the option. The LLC general partner in Meridian agrees that SHAG's Special ROFR trumps the general partner's option. Park Decl. ¶ 42.

### F.   The Global Indemnity Agreement Does Not Change the Analysis

AMTAX also argues that SHAG's "Global Indemnity Agreement" with for-profit PNCC and its affiliates precludes SHAG from exercising its Special ROFR. A copy of the Global Indemnity Agreement is attached as Exhibit J to the Park Decl. AMTAX argues that the Global Indemnity Agreement impermissibly transfers the benefits of the below-market Section 42(i)(7) purchase price to a for-profit entity. Dkt No. 26, AMTAX Countercl. ¶¶ 6-8. This argument is a red herring, and represents a factual misunderstanding of the Global Indemnity Agreement.

The Global Indemnity Agreement by its terms only maintains for PNCC, after a Special ROFR exercise, whatever economic interest, if any, PNCC has in any particular project before a Special ROFR exercise. Park Decl. ¶¶ 47-48. Because PNCC's economic interests are the same both before and after a Special ROFR exercise, PNCC is economically *indifferent* to whether SHAG successfully exercises its Special ROFR. *Id.* And because PNCC does not benefit economically from a Special ROFR exercise, any benefit obtained from a Special ROFR flows only to SHAG—which undeniably will benefit significantly from the exercise of its Special ROFRs. *Id.* Section 42(i)(7) does not preclude an agreement like the Global Indemnity Agreement, and the Global Indemnity Agreement between SHAG and PNCC does not affect AMTAX's rights in any way.

*Senior Housing Assistance Group's and Senior Housing Assistance Corporation's Motion for Summary Judgment (2:17-cv-01115-RSM) - 23*

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, Washington  98104
Tel: (206) 623-1745 Fax: (206) 623-7789

AMTAX raised concerns about the Global Indemnity Agreement with the Washington State Housing Finance Commission, the state agency tasked with determining whether a nonprofit is impermissibly affiliated with or controlled by a for-profit entity. *See* 26 U.S.C. § 42(h)(5)(c). The Commission concluded the Global Indemnity Agreement is consistent with SHAG's mission and does not affect SHAG's status as a qualified nonprofit under the LIHTC statute. Woolford Decl. Ex. D. Section 42(i)(7)(A) requires only that the statutory "right of 1st refusal" be held by a qualified nonprofit. SHAG meets that standard.

### G.   SHAG and SHAC Join the LLC General Partners' Motion as to AMTAX's Counterclaims

The LLC General Partners are filing a motion for summary judgment as to AMTAX's counterclaims against the general partners. SHAG and SHAC join that motion.

## IV.   CONCLUSION

SHAG has met all the conditions necessary to exercise its Special ROFRs. The only conditions for exercise are explicitly set forth in Section 7.4L. No unwritten conditions exist. SHAG's Special ROFRs are not common law rights of first refusal; indeed, SHAG's Special ROFRs would be valueless if they were. The Court should enter summary judgment for SHAG, and declare that it can exercise its Special ROFRs without third-party offers or AMTAX's consent.

DATED this 29th day of November, 2018.

HILLIS CLARK MARTIN & PETERSON P.S.

By   *s/ Jake Ewart*
　　Laurie Lootens Chyz, WSBA #14297
　　Jake Ewart, WSBA #38655
　　Jessica C. Kerr, WSBA #49866
　　999 Third Avenue, Suite 4600
　　Seattle, WA  98104
　　Tel: (206) 623-1745; Fax: (206) 623-7789
　　E-mail:  laurie.chyz@hcmp.com
　　jake.ewart@hcmp.com
　　jessica.kerr@hcmp.com
Attorneys for Plaintiff

*Senior Housing Assistance Group's and Senior Housing Assistance Corporation's Motion for Summary Judgment (2:17-cv-01115-RSM) - 24*

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, Washington  98104
Tel: (206) 623-1745 Fax: (206) 623-7789

1

2

**CERTIFICATE OF SERVICE**

I hereby certify that on the 29th day of November, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification to all counsel of record.

D ATED this 29th day of November 2018, at Seattle, Washington.

By  *s/ Jake Ewart*
Jake Ewart, WSBA #38655
Hillis Clark Martin & Peterson P.S.
999 Third Avenue, Suite 4600
Seattle, Washington  98104
Telephone:  (206) 623-1745
Facsimile:  (206) 623-7789
Email:  jake.ewart@hcmp.com

ND: 21822.003 4844-9964-6842v9

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Senior Housing Assistance Group's and Senior Housing Assistance Corporation's Motion for Summary Judgment (2:17-cv-01115-RSM) - 25*

**HILLIS CLARK MARTIN & PETERSON P.S.**
999 Third Avenue, Suite 4600
Seattle, Washington   98104
Tel: (206) 623-1745 Fax: (206) 623-7789