THE HONORABLE RICARDO S. MARTINEZ

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

SENIOR HOUSING ASSISTANCE GROUP,

    Plaintiff/Counter-Defendant,

v.

AMTAX HOLDINGS 260, LLC, et al.

    Defendants/Counter-Plaintiffs.

No. 2:17-cv-01115-RSM

**SENIOR HOUSING ASSISTANCE GROUP'S AND SENIOR HOUSING ASSISTANCE CORPORATION'S RESPONSE TO DEFENDANTS AND COUNTER-PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**NOTED ON MOTION CALENDAR: DECEMBER 21, 2018**

**ORAL ARGUMENT REQUESTED**

AMTAX HOLDINGS 260, LLC, et al.,

    Third-Party Plaintiffs,

v.

SENIOR HOUSING ASSISTANCE CORPORATION, et al.

    Third-Party Defendants.

*Senior Housing Assistance Group's and Senior Housing Assistance Corporation's Response to Defendants' and Counter- Plaintiff's Motion for Summary Judgment (2:17-cv-01115-RSM)*

**HILLIS CLARK MARTIN & PETERSON P.S.**
999 Third Avenue, Suite 4600
Seattle, Washington  98104
Tel: (206) 623-1745 Fax: (206) 623-7789

## I.      INTRODUCTION

The Court should deny AMTAX's Motion for Summary Judgment and enter summary judgment for SHAG. Only one reasonable interpretation of the contracts exists. Section 7.4L of the partnership agreements details the conditions SHAG must meet to exercise its Special ROFR rights. As described in SHAG's Motion for Summary Judgment, Dkt. 85, SHAG has met those conditions and has exercised its Special ROFRs. It should now be permitted to purchase the properties for the pre-determined price as the parties agreed at the outset of these partnerships. SHAG does not need AMTAX's consent either to SHAG's Special ROFR exercise or to a third-party sale that AMTAX claims is needed to trigger SHAG's Special ROFR.

AMTAX asks the Court to interpret SHAG's Special ROFR rights in a wholly unreasonable manner. AMTAX contends that SHAG cannot exercise its purchase right unless (1) within a short two-year window after the end of the 15-year compliance period (2) a third-party makes an unsolicited and unconditional offer to purchase the project (3) despite having been made aware of SHAG's Special ROFR rights, and (4) AMTAX has consented to the third-party sale, during that two-year window, *knowing* its consent will allow SHAG to then buy the project at a significantly lower price than the project would fetch after SHAG's two-year window expires. This is absurd. AMTAX's interpretation of the partnership agreements is unreasonable, and it is impossible to imagine the parties intended to give SHAG—a key project participant—a right it could not reasonably hope to exercise.

Neither SHAG nor any other party is attempting to improperly force AMTAX out of the partnerships. The parties—including AMTAX—agreed almost 20 years ago that SHAG would be entitled to buy the projects on the terms set forth in Section 7.4L. SHAG is merely trying to exercise that right. AMTAX is asking the Court to re-write the contract in a way that would change the agreement now that AMTAX has claimed all its tax credits and the projects have appreciated in value. The Court should enter summary judgment for SHAG.

*Senior Housing Assistance Group's and Senior Housing Assistance Corporation's Response to Defendants and Counter-Plaintiffs' Motion for Summary Judgment (2:17-cv-01115-RSM) - 1*

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, Washington  98104
Telephone: (206) 623-1745
Facsimile: (206) 623-7789

## II.   BACKGROUND

SHAG and Senior Housing Assistance Corporation ("SHAC") filed their own Motion for Summary Judgment, Dkt. 85, which contains a lengthy factual background. SHAG and SHAC will not repeat it in its entirety, but will augment or restate portions here.

### A.   THE LOW-INCOME HOUSING TAX CREDIT STATUTE

This case involves seven Low-Income Housing Tax Credit ("LIHTC") projects, each owned by a limited partnership. The LIHTC projects at issue each dedicate 100 percent of their units to low- and moderate-income elderly and disabled people. Dkt. 88 ("Woolford Decl.") ¶ 10.

The LIHTC statute, 26 U.S.C. § 42 ("Section 42" or "Code Section 42"), encourages private investment in low-income housing by offering 10 years' worth of significant tax credits that reduce an investor's federal income tax on a dollar-for-dollar basis. *E.g.*, *Homeowner's Rehab, Inc. v. Related Corp. V SLP, L.P.*, 479 Mass. 741, 743-44 (2018). After the investor has claimed all its tax credits, the LIHTC statute seeks to facilitate the transfer of LIHTC properties to nonprofit organizations by authorizing a below-market (in most cases), minimum purchase price nonprofits can pay to acquire the properties:

> No Federal income tax benefit shall fail to be allowable to the taxpayer with respect to any qualified low-income building merely by reason of a right of 1st refusal held by . . . a qualified nonprofit organization . . . to purchase the property after the close of the compliance period for a price which is not less than the minimum purchase price [defined in 26 U.S.C. § 42(i)(7)(B)].

26 U.S.C. § 42(i)(7)(A). *See also Homeowner's Rehab*, 479 Mass. at 754-55 (describing the Congressional interest in facilitating these below-market sales). The statute does not define "right of 1st refusal." *See* 26 U.S.C. § 42(i)(7).

### B.   THE LIMITED PARTNERSHIP AGREEMENTS

Each LIHTC project at issue is owned by a limited partnership. Those projects, and the various entities involved in the project partnerships, are listed in a chart in Paragraph 12 of the First Declaration of Bryan Park, Dkt. 93, ("First Park Decl."). The AMTAX defendant entities are

---

*Senior Housing Assistance Group's and Senior Housing Assistance Corporation's Response to Defendants and Counter-Plaintiffs' Motion for Summary Judgment (2:17-cv-01115-RSM) - 2*

**HILLIS CLARK MARTIN & PETERSON P.S.**
999 Third Avenue, Suite 4600
Seattle, Washington  98104
Telephone: (206) 623-1745
Facsimile: (206) 623-7789

the investors (the "Investor Limited Partners") in the limited partnerships, and AMTAX has claimed the LIHTC tax credits generated by the projects. Dkt. 93 (First Park Decl.) ¶¶ 15, 40.  The other participants in the partnerships are described at greater length in SHAG's Motion for Summary Judgment, but include SHAG (a local nonprofit focused on low-income senior housing), SHAC (SHAG's wholly-owned for-profit subsidiary), and Pacific Northern Construction Company and its affiliates ("PNCC") (the developers of each project). Dkt. 88 (Woolford Decl.) ¶¶ 6, 8; Dkt. 93 (First Park Decl.) ¶ 5.

AMTAX disputes SHAG's right under the partnership agreements to buy the LIHTC properties at a pre-determined below-market price after 15 years—at the end of each project's "compliance period."[1] Beginning at the end of the compliance period, the partnership agreements authorize three ways in which the individual project participants can accomplish a purchase or sale of the property. Dkt. 88 (Woolford Decl.) Exs. E-F §§ 7.4J, 7.4K, 7.4L. Each right is exercisable for only two years after the close of the compliance period.

Section 7.4J of each limited partnership agreement provides an "option" held by the General Partner of each partnership. Pursuant to the terms of that option, the General Partner has two years after the close of the compliance period to exercise its right to buy the project at the *greater of* fair market value or the sum of the outstanding debt secured by the project plus any taxes that would be owed by the Investor Limited Partner upon sale (a price similar to the Special ROFR price under Section 7.4L). *Id.* Exs. E-M § 7.4J.

Under Section 7.4K of each agreement, the Investor Limited Partner (AMTAX) has the right to "force a sale" of the project, at fair market value, for two years after the close of the compliance period. *Id.* Exs. E-F § 7.4K. That right is expressly "[s]ubject to the option" in Section 7.4J. *Id.* In the first two agreements negotiated, the partnership agreements reiterate that

---

[1] The "compliance period" is so named because after the 10 years' worth of federal tax credits for each project have been claimed, each project must continue to comply with rent restrictions for another five years to avoid IRS recapture of the tax credits. *E.g.*, *Homeowner's Rehab*, 479 Mass. at 743.

*Senior Housing Assistance Group's and Senior Housing Assistance Corporation's Response to Defendants and Counter-Plaintiffs' Motion for Summary Judgment (2:17-cv-01115-RSM) - 3*

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, Washington  98104
Telephone: (206) 623-1745
Facsimile: (206) 623-7789

point by also giving the General Partner (the option holder) a "Right of First Refusal" to purchase the project in the event the Investor Limited Partner forces a sale under Section 7.4K. *Id.* Exs. E & H § 7.4K. In the other five agreements, Section 7.4K confirms that any forced sale will also be subordinate to SHAG's right to exercise its Special ROFR "in accordance with the provisions of Section 7.4L." *Id.* Exs. F-G, I-M § 7.4K.

Notwithstanding the option and forced sale rights given to the General Partner and the Investor Limited Partner in Sections 7.4J and K, Section 7.4L gives SHAG the right, for two years after the close of the compliance period, to purchase the project at a minimum price set by the LIHTC statute (plus some additional possible costs not likely to be relevant here):

> Notwithstanding Paragraphs 7.4J and 7.4K above, for a period of twenty-four (24) months following the close of the Compliance Period as determined by the Code, if (i) the Senior Housing Assistance Group (the "Purchaser") is then the Lessee and operator of the Apartment Complex pursuant to the Operating Use Lease, (ii) the Senior Housing Assistance Corporation is then a qualified corporation with respect to the Purchaser (as defined under Section 42(h)(5)(D)(ii) of the code) and is a member of a General Partner, and (iii) the Purchaser is then a qualified nonprofit organization as defined under Section 42(h)(5)(C) of the Code, then the Purchaser shall have a "Right of First Refusal" (the "Special ROFR") to purchase the Project at a purchase price (the "Purchase Price") equal to the sum of (1) the minimum purchase price as determined under Section 42(i)(7)(B) of the Code (the "Statutory Minimum Purchase Price") and (2) the amount of each of the items set forth in Section 6.2B(ii), Paragraphs First through Seventh thereof, to the extent that the amounts of such items are not already reflected in the Statutory Minimum Purchase Price in order to avoid any duplication.

*Id.* Ex. F § 7.4L; *accord id.* Exs. E, G-M § 7.4L.

Nothing in Sections 7.4J, K, and L makes the rights in those sections contingent on any other party's consent, although SHAG's right has first priority over the others. And the exercise of SHAG's Special ROFR right, like the General Partner's option, expressly is *not* subject to prior approval by the Investor Limited Partner:[2]

---

[2] As explained below, the reference to the "Special ROFR" in this provision was added to the last five partnership agreements to confirm the parties' intent.

*Senior Housing Assistance Group's and Senior Housing Assistance Corporation's Response to Defendants and Counter-Plaintiffs' Motion for Summary Judgment (2:17-cv-01115-RSM) - 4*

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, Washington  98104
Telephone: (206) 623-1745
Facsimile: (206) 623-7789

the Investor Limited Partners shall have the right . . . with consent of all remaining Partners, to approve or disapprove the sale of all or substantially all of the assets of the Partnership *(other than a sale pursuant to the Option described in Section 7.4J or the Special ROFR described in Section 7.4L)*.

*E.g.*, *id.* Ex. F § 4.5A(iii) (emphasis added).

## C.   THE NEGOTIATION OF THE LIMITED PARTNERSHIP AGREEMENTS

The limited partnership agreements for each partnership were negotiated by Bryan M. Park on behalf of the developer and General Partner entities, and by Paramount Investment Group, Inc. or its affiliates ("Paramount") on behalf of AMTAX. Dkt. 93 (First Park Decl.) ¶¶ 9, 17. From the beginning, Mr. Park required a Special ROFR for SHAG's benefit. When negotiating the Woodlands limited partnership agreement, the first partnership agreement negotiated and executed, Mr. Park wrote to Paramount to ensure the Special ROFR would be included in the partnership agreements:

> Because of the involvement of the Senior Housing Assistance Group in the Project, we are required to obtain for the benefit of the Senior Housing Assistance Corporation and/or the Senior Housing Assistance Group a right of first refusal ("ROFR") to acquire the Project at the statutory minimum price (i.e., the underlying debt plus exit taxes) provided for under Section 42(i)(7) of the Internal Revenue Code of 1986 (the "Code"), exercisable after the expiration of the 15-year tax credit compliance period. The Senior Housing Assistance Group and the Senior Housing Assistance Corporation, its wholly-owned taxable subsidiary, are both qualified nonprofit organizations for purposes of Section 42(i)(7) of the Code. In order to provide meaningful opportunities and incentives for both the for-profit participants (Pacific Northern, Covenant, Frame and Carroll) and the nonprofit participants (Senior Housing Assistance Group and the Senior Housing Assistance Corporation), our arrangement is that the for-profit participants would be entitled to 99% of the residual economic benefits (i.e., the Development Fee, the Deferred Development Fee and any other fees paid from available cash flow) retained by the General Partner and Developer LLC during the 15-year tax credit compliance period, and the nonprofit participants would be entitled to 1% of the residual economic benefits retained by the General Partner and Developer LLC plus 1% of the gross revenues from Project operations (as a portion of the combined Property Management Fee) during the 15-year tax credit compliance period *and* the opportunity to purchase the Project at the statutory minimum purchase price after the expiration of the 15-year tax credit compliance period. However, for purposes of determining the actual purchase price under the ROFR, the statutory minimum purchase price would be increased to the extent necessary

*Senior Housing Assistance Group's and Senior Housing Assistance Corporation's Response to Defendants and Counter-Plaintiffs' Motion for Summary Judgment (2:17-cv-01115-RSM) - 5*

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, Washington  98104
Telephone: (206) 623-1745
Facsimile: (206) 623-7789

to pay any unpaid Asset Management Fee to Paramount Financial Group, any Credit Recovery Loans to the Investment Partnership, and any Exit Tax Distribution to the Investment Partnership, consistent with Paragraphs 4.3.2, 4.3.3 and 4.3.4 of the Proposal. Since the ROFR is an important factor in our valuable relationship with the Senior Housing Assistance Group and the Senior Housing Assistance Corporation, it is important that we obtain such a ROFR on their behalf.

*Id.* ¶ 18, Ex. A. Shortly after Mr. Park raised this issue, the parties signed an Investment Agreement that contained the necessary ROFR language in substantially the same form that became Section 7.4L of the partnership agreements. *Id.* ¶ 19, Ex. B.

As described in SHAG's Motion for Summary Judgment, Mr. Park's letter to Paramount evinced the parties' intent that the below-market Special ROFR be unilaterally exercisable by SHAG at the end of the compliance period in order to give SHAG a "meaningful" opportunity to purchase the Project commensurate with the opportunities enjoyed by the other project participants. *Id.* ¶ 20. However, the parties conditioned SHAG's Section 7.4L Special ROFR right on SHAG having fulfilled its expected role in the project: serving as lessee and operator for each project and ensuring favorable tax treatment for the projects. *Id.* ¶¶ 22-29; *see also* Dkt. 88 (Woolford Decl.) Exs. E-F § 2.3 (stating that one of the two purposes of the partnerships was to enter into operating lease agreements with SHAG to ensure favorable tax treatment), Exs. E-M § 7.4L (listing conditions of Special ROFR exercise). If SHAG performed the function intended by the partnerships, SHAG would then—and only then—be entitled to purchase the project, without further condition, at the end of the 15-year compliance period. *See id.*

In negotiating the partnership agreements for the last five of the seven LIHTC projects, the parties also made an edit to affirm and reinforce SHAG's right to exercise its Special ROFR unilaterally. Dkt. 93 (First Park Decl.) ¶ 30. For the last five partnership agreements, the parties added the phrase "or the Special ROFR described in Section 7.4L" to the language limiting the Investor Limited Partner's right in Section 4.5A(iii) to approve a sale of the project (quoted in full

*Senior Housing Assistance Group's and Senior Housing Assistance Corporation's Response to Defendants and Counter-Plaintiffs' Motion for Summary Judgment (2:17-cv-01115-RSM) - 6*

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, Washington  98104
Telephone: (206) 623-1745
Facsimile: (206) 623-7789

above). *Id.* ¶ 30 & Exs. C-G. Paramount did not object to that edit, and never questioned why it was being made and incorporated into the final signed agreements. *Id.* ¶ 30.

Other Paramount documents confirm that the price AMTAX was paying for its investment included no expectation of benefiting from an ultimate sale of the property. AMTAX was paying—through its capital contributions—an amount tied only to its expected tax credits and losses. *Id.* ¶¶ 32-34. In the Investment Agreement Paramount executed for Woodlands, Paramount makes clear that AMTAX was paying

> $2,300,000 ($0.819 per tax credit) in exchange for receiving a 10-year stream of Tax Credits in the amount $2,807,974 and after tax loss benefits of $788,058 ($2,300,000 tax losses multiplied by a corporate tax rate of .35) for a Total Benefit Stream of $3,596,032 ($2,807,974 tax credits + $788,058 tax losses). Therefore, 78.08% of PFG's Total Benefit Stream is comprised of Tax Credits and 21.92% is comprised of tax losses.

*Id.* ¶¶ 32-34, Ex. B. In addition, Paramount's own internal financial projections—made at or near the time the partnership agreements were negotiated—assumed AMTAX would not receive sale proceeds in evaluating the expected rate of return on its investments. Dkt. 87 (Rubenzahl Decl.) ¶ 3.

### D.    THE PROJECTS' OPERATIONAL HISTORY

AMTAX has realized the financial returns it expected—and more—from the actual operation of the projects. AMTAX has now claimed all the tax credits available for the seven LIHTC projects at issue. Dkt. 93 (First Park Decl.) ¶ 40. AMTAX has enjoyed a portfolio-wide internal rate of return of 14.2 percent per year on an after-tax basis. Dkt. 87 (Rubenzahl Decl.) ¶ 4. AMTAX's returns have come almost entirely from tax credits and tax losses, and—by design— from only modest amounts of cash flow to which the Investor Limited Partner was entitled under the partnership agreements. *Id.* ¶ 5; Dkt. 93 (First Park Decl.) ¶ 40. All together, those amounts totaled more than $34 million—more than $33 million of which came from tax benefits. *Id.* No financial projection done at or near the outset of any of the seven projects showed an expected rate of return to the Investor Limited Partner as high as 14.2 percent per year. Dkt. 87 (Rubenzahl

*Senior Housing Assistance Group's and Senior Housing Assistance Corporation's Response to Defendants and Counter-Plaintiffs' Motion for Summary Judgment (2:17-cv-01115-RSM) - 7*

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, Washington  98104
Telephone: (206) 623-1745
Facsimile: (206) 623-7789

Decl.) ¶ 6. These investments have therefore already exceeded expectations based on their rates of return.

The developer, PNCC, has made money through earning certain fees and through property management agreements that allocate operating cash flow to a property management company affiliated with PNCC. Second Decl. of Bryan Park ("Second Park Decl.") ¶ 8. All told, SHAG and SHAC have retained only approximately one percent of the fees that have flowed to the General Partners in the projects, and one percent of the operational cash flow resulting from managing the projects. Decl. of Jay Woolford in Supp. of SHAG's and SHAC's Resp. to AMTAX Holdings 260 LLC's Mot. for Summ J. ("Woolford Resp. Decl.") ¶ 5. SHAG has not otherwise benefitted financially (including tax benefits) in any significant way to date. *Id.* ¶ 6. The benefits SHAG expects from these projects come almost entirely from its Special ROFRs, which SHAG wants to exercise in order to fulfill its mission and provide as much low-income housing as possible in the region. *Id.* ¶ 7.

### E.    AMTAX HAS REJECTED SHAG'S ATTEMPTS TO EXERCISE ITS SPECIAL ROFRS

SHAG has exercised its Special ROFRs in four of the LIHTC projects within two years of the close of those projects' compliance periods. Dkt. 88 (Woolford Decl.) ¶ 29. SHAG expects to exercise its Special ROFRs in the others. *Id.* ¶ 31. To date, SHAG has exercised its Special ROFR in projects called Meridian Court, Auburn Court, Boardwalk, and WoodRose. *Id.* ¶ 29.

The compliance period for Meridian Court expired first among the seven projects—on December 31, 2012. *See* Dkt. 93 (First Park Decl.) ¶ 12. SHAG therefore had until two years later—December 31, 2014—to exercise its Special ROFR. *See* Dkt. 88 (Woolford Decl.) Ex. I at § 7.4L. In the weeks preceding December 31, 2014, SHAG began taking steps to exercise its Special ROFR. Bryan Park, who negotiated the Meridian Court partnership agreement (like all of the partnership agreements), discussed a potential Special ROFR exercise with SHAG's board of directors. Dkt. 90 (Decl. of Eric S. Pettit in Supp. of Defs. and Counter-Pls.' Mot. for Summ. J.

*Senior Housing Assistance Group's and Senior Housing Assistance Corporation's Response to Defendants and Counter-Plaintiffs' Motion for Summary Judgment (2:17-cv-01115-RSM) - 8*

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, Washington  98104
Telephone: (206) 623-1745
Facsimile: (206) 623-7789

("Pettit Decl.")) Ex. GG. Because Mr. Park understood, by reputation and course of dealing, that AMTAX's new management was likely to resist SHAG's Special ROFR exercise (AMTAX was no longer managed by Paramount, and was managed instead by an entity called HCP Pacific Asset Management LLC), Mr. Park recommended a "belt and suspenders" approach that included soliciting a third-party offer for the Meridian Court property, even though he did not believe a third-party offer to be a necessary pre-condition to SHAG's Special ROFR exercise. Second Park Decl. ¶ 17; Dkt. 90 (Pettit Decl.) Ex. B at 65-67. Mr. Park solicited a third-party offer from SSRE Development, which ultimately offered $13 million for Meridian Court. Dkt. 88 Ex. O; Dkt. 90 (Pettit Decl.) Ex. B at 65-67. SSRE signed and delivered a Purchase and Sale Agreement for Meridian Court, and understood that Agreement would have been binding on SSRE had the Agreement been counter-signed by the Meridian Court limited partnership. Dkt. 88 Ex. O; Decl. of Jake Ewart in Supp. of SHAG's and SHAC's Resp. to AMTAX Holdings 260, LLC's Mot. for Summ. J. ("Ewart Resp. Decl.") Ex. A. Mr. Park, on behalf of Meridian Court's general partner, transmitted SSRE's Purchase and Sale Agreement to AMTAX on December 29, 2014. Dkt. 88 (Woolford Decl.) Ex. P.

Also on December 29, 2014, Meridian Court's General Partner, Steel Lake Enterprises, LLC, exercised its option right under Section 7.4J. Dkt. 93 (First Park Decl.) Ex. I. SHAG exercised its Special ROFR the following day, on December 30, 2014. Dkt. 88 (Woolford Decl.) Ex. S. As anticipated, AMTAX objected to SHAG's Special ROFR exercise in a letter dated February 13, 2015, stating that the partnership had not agreed to accept any third-party offer for the property, which AMTAX contended was a necessary pre-condition to SHAG's Special ROFR exercise. Dkt. 91 (Trane Decl.) Ex. PP at 2.

SHAG went through a similar process for subsequent Special ROFR exercises. Dkt. 88 (Woolford Decl.) ¶¶ 39-49. For Auburn Court, SHAG received another signed Purchase and Sale Agreement from SSRE offering to purchase Auburn Court for $21 million. Dkt. 90 (Pettit Decl.)

*Senior Housing Assistance Group's and Senior Housing Assistance Corporation's Response to Defendants and Counter-Plaintiffs' Motion for Summary Judgment (2:17-cv-01115-RSM) - 9*

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, Washington  98104
Telephone: (206) 623-1745
Facsimile: (206) 623-7789

Ex. RR. This offer was, like SSRE's Meridian offer, solicited by Bryan Park, but was intended by SSRE to be binding had it been accepted. Dkt. 90 (Pettit Decl.) Ex. B at 65-67; Ewart Resp. Decl. Ex. A. SHAG also received a signed letter of intent from Redwood Housing Partners, LLC making an all cash offer to buy Auburn Court for $21.5 million. Dkt. 77 ¶¶ 12-14; Dkt. 88 (Woolford Decl.) Ex. U. Both offers were transmitted to AMTAX before SHAG exercised its Special ROFR. Dkt. 88 (Woolford Decl.) Exs. V, X, Y. AMTAX again objected to SHAG's Special ROFR exercise. Dkt. 90 (Pettit Decl.) Ex. UU.

For the Boardwalk and WoodRose Special ROFR exercises, SHAG had received two signed letters of intent from Reliant Group Management, LLC to purchase Boardwalk and WoodRose for $23.6 million and $15.7 million, respectively. Dkt. 77 ¶ 5; Dkt. 88 (Woolford Decl.) Ex. Z. SHAC, the General Partner for both Boardwalk and WoodRose, forwarded Reliant's offers to AMTAX on November 17, 2016. Dkt. 88 (Woolford Decl.) Exs. AA, CC. SHAG exercised its Special ROFRs for those two projects the next day. *Id.* Exs. BB, DD. AMTAX has objected to those exercises, as well. Dkt. 90 (Pettit Decl.) Ex. XX.

Although AMTAX claims third-party offers are necessary for SHAG to exercise its Special ROFRs, AMTAX finds fault with all of these third-party offers. AMTAX describes them either as a "sham" (if solicited), insufficient (if not in the form of a final binding agreement), or ineffective for having not been accepted by the partnerships. Dkt. 89 (Defs. and Counter-Pls.' Mot. for Summ. J., Dkt. 89 ("AMTAX Mot.")) at 20, 28-29.

Given AMTAX's objections, SHAG has taken no further steps to purchase the properties. It filed this declaratory judgment action seeking to enforce its purchase rights.

## III.    ARGUMENT

In Washington, a court interprets a contract as a matter of law. *Int'l Marine Underwriters v. ABCD Marine, LLC*, 179 Wash.2d 274, 282 (2013). In doing so, the court's "primary goal is to ascertain the parties' intent at the time they executed the contract," and to

*Senior Housing Assistance Group's and Senior Housing Assistance Corporation's Response to Defendants and Counter-Plaintiffs' Motion for Summary Judgment (2:17-cv-01115-RSM) - 10*

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, Washington  98104
Telephone: (206) 623-1745
Facsimile: (206) 623-7789

distinguish that intent from the "interpretations the parties are advocating at the time of the litigation." *Id.* Courts may use extrinsic evidence in ascertaining the parties' intent, and may consider the structure and overall content of the contract as a whole. *Id.* at 82-83. A court should not interpret a contract in a manner that would lead to an absurd result, or that would render a provision superfluous or meaningless. *E.g.*, *Hartford Fire Ins. Co. v. Columbia State Bank*, 183 Wash. App. 599, 608 (2014) (courts should not interpret contracts in ways that lead to "absurd results"); *Ibrahim v. AIU Ins. Co.*, 177 Wash. App. 504, 515 (2013) (courts should give "meaning to all provisions" and not "render some superfluous or meaningless").

The Court should deny AMTAX's Motion for Summary Judgment and enter summary judgment for SHAG. AMTAX asks the Court to assume the parties negotiated a purchase right for SHAG that it could never hope to exercise. This is not a reasonable reading of the partnership agreements based on either their plain language or the context in which they were entered.

**A.      SECTION 7.4L CONTAINS ALL CONDITIONS FOR EXERCISE OF SHAG'S SPECIAL ROFR, AND THOSE CONDITIONS HAVE BEEN MET**

Section 7.4L sets forth all the conditions for a Special ROFR exercise: (1) SHAG must exercise within 24 months of the close of the compliance period; (2) SHAG must be "then the Lessee and operator of the Apartment Complex pursuant to the Operating Use Lease;" (3) SHAC (if involved in that project) must still be SHAG's wholly-owned subsidiary and either general partner or a member of the LLC general partner;[3] and (4) SHAG must be "then a qualified nonprofit organization." Dkt. 88 (Woolford Decl.) Exs. E-M. These conditions do *not* include receipt of a third party offer or an intention by the partnership (with AMTAX's consent) to sell. If the parties had wanted to add such conditions, they knew how to do so, and did so in a subsequent project. *See* Dkt. 85 at 19; Dkt. 88 (Woolford Decl.) Ex. N (Right of First Refusal Agreement for Ballinger Court project, which explicitly requires a third-party offer acceptable to the partnership,

---

[3] In Lakewood, Alderwood, and Woodlands, Section 7.4L requires that SHAC be "then a qualified corporation with respect to" SHAG as defined by Section 42(h)(5)(D)(ii), which requires that it be wholly owned by a qualified nonprofit organization (here, SHAG). Dkt. 88 (Woolford Decl.) Exs. G, H, M.

*Senior Housing Assistance Group's and Senior Housing Assistance Corporation's Response to Defendants and Counter-Plaintiffs' Motion for Summary Judgment (2:17-cv-01115-RSM) - 11*

**HILLIS CLARK MARTIN & PETERSON P.S.**
999 Third Avenue, Suite 4600
Seattle, Washington  98104
Telephone: (206) 623-1745
Facsimile: (206) 623-7789

but which contains no expiration date for the ROFR right). AMTAX cannot now ask the Court to write new conditions into the seven contracts at issue. *E.g.*, *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154 Wash.2d 493, 510 (2005) (courts are not "at liberty" to "rewrite" contracts). As described in SHAG's Motion for Summary Judgment, Dkt. 85, the conditions the parties actually included in Section 7.4L have been met, and SHAG should be permitted to exercise its Special ROFRs.

### B.    SHAG'S SPECIAL ROFR IS NOT, AND CANNOT BE CONVERTED INTO, A COMMON LAW RIGHT OF FIRST REFUSAL

AMTAX argues the term "Right of First Refusal," as used in Section 7.4L, is "not affirmatively defined anywhere in the Partnership Agreements," and that the Court should therefore look to dictionary sources and the common law to supply a definition. Dkt. 89 (AMTAX Mot.) at 20. The Court cannot do that. As the dictionary and common law sources cited by AMTAX all confirm, a common law right of first refusal is a right to buy on the *same terms—including price—offered by a third party. See id.* at 14 (citing the MERRIAM-WEBSTER DICTIONARY, BLACK'S LAW DICTIONARY, and case law). Here, the parties negotiated a purchase right that renders third-party terms irrelevant. The parties pre-determined the purchase terms under the Special ROFR and included them in Section 7.4L, so it is not possible simply to import the dictionary definition of a "right of first refusal." And courts do *not* apply a term's "plain" or "ordinary" meaning when the parties have shown they intended that term to mean something different. *E.g.*, *Hearst Commc'ns, Inc.*, 154 Wash.2d 493, 504 (2005) ("We generally give words in a contract their ordinary, usual, and popular meaning *unless the entirety of the agreement clearly demonstrates a contrary intent*." (Emphasis added)).

The Special ROFR's "definition" is supplied by Section 7.4L's express terms. *See Kelly v. Ammex Tax & Duty Free Shops W., Inc.*, 162 Wash. App. 825, 832-33 (2011) (holding that the express terms of a right titled "Right of First Refusal" described, in substance, a "right of first offer," no matter its title in the contract); *accord Overton v. Bengel*, 139 S.W.3d 754, 757

*Senior Housing Assistance Group's and Senior Housing Assistance Corporation's Response to Defendants and Counter-Plaintiffs' Motion for Summary Judgment (2:17-cv-01115-RSM) - 12*

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, Washington  98104
Telephone: (206) 623-1745
Facsimile: (206) 623-7789

(Tex. App. 2004) (finding "the very nature of an option contract" is the "right to purchase property for a fixed price within a set time period" (there, thirty days), and holding a contract provision with those features—but called a "right of first refusal"—was actually an option). SHAG has the right to "purchase the Project" if it meets the explicit criteria tied to whether SHAG has continued to fulfill its expected role in the project, *i.e.*, acting as a qualified nonprofit operator of the project and ensuring both the proper operation of the LIHTC property and the favorable tax treatment so important to the partnership (including AMTAX). *See* Dkt. 88 (Woolford Decl.) Exs. E-F §§ 2.3, 7.4L; *accord* Dkt. 93 (First Park Decl.) ¶¶ 22-29 (describing the reasons for the conditions to SHAG's Special ROFR exercise). AMTAX cannot now rewrite the contract to make the Special ROFRs something they are not: common law rights of first refusal subject to AMTAX's control.

### C. SHAG's INTERPRETATION OF SECTION 7.4L DOES NOT RENDER THE SECTION 7.4J OPTIONS SUPERFLUOUS

AMTAX claims that SHAG's Special ROFR rights cannot be unilaterally exercisable, pursuant to Section 7.4L's express terms, because the Special ROFRs would then render the options described in Section 7.4J "superfluous." Dkt. 89 (AMTAX Mot.) at 23. They do no such thing. The options are held by the General Partner, not SHAG. *See* Dkt. 88 (Woolford Decl.) Exs. E-M § 7.4J; Dkt. 93 (First Park Decl.) ¶ 12. If SHAG were to elect *not* to exercise its Special ROFR for any project, the General Partner could still exercise its option. The different parties have different rights.

Even in cases where the General Partner (the option holder) happens to be SHAG or SHAC, the options serve a separate purpose from the Special ROFRs. The options described in Section 7.4J are essentially condition-less. *See* Dkt. 88 (Woolford Decl.) Exs. E-M § 7.4J. They permit the General Partner to exercise within two years after close of the compliance period so long as the General Partner is willing to pay the *greater of* fair market value or a different predetermined price similar to the price set in Section 7.4L. *See id.* SHAG's Special ROFR, on the

*Senior Housing Assistance Group's and Senior Housing Assistance Corporation's Response to Defendants and Counter-Plaintiffs' Motion for Summary Judgment (2:17-cv-01115-RSM) - 13*

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, Washington  98104
Telephone: (206) 623-1745
Facsimile: (206) 623-7789

other hand, has conditions. To exercise, SHAG must still be lessee and operator of the project, must still be a qualified nonprofit organization, and, in cases where SHAC is involved in the project, be the owner of SHAC, and SHAC must still be a General Partner or a member of an LLC general partner. *See id.* § 7.4L. At the time the partnership agreements were signed (17 or 18 years ago), it was not a foregone conclusion that SHAG would satisfy those criteria at the end of the compliance period. Even in the case of Auburn Court, for example, where SHAG is the General Partner, if SHAG were not still lessee and operator of the project it could not exercise its Special ROFR but could exercise its Section 7.4J option. And, depending on Auburn Court's fair market value at the time of exercise, an option exercise might have been within SHAG's financial capability.

The rights in Sections 7.4J and 7.4L thus serve different purposes for different entities. The options in Section 7.4J ensure that the "General Partner"—no matter which entity holds that role—has two years in which to buy the project at fair market value or greater. SHAG's Special ROFR under Section 7.4L is different: it was granted only to SHAG, and is exercisable only if SHAG continues to meet Section 7.4L's express conditions. Because the rights under Sections 7.4J and 7.4L are different, neither is rendered superfluous under SHAG's interpretation of Section 7.4L, even where SHAG is both the General Partner and the Special ROFR holder, as in Auburn Court (and only in Auburn Court).

### D.   THE CONTRACT CONTROLS AND IS CONSISTENT WITH CONGRESSIONAL INTENT

AMTAX also claims that SHAG's Special ROFRs cannot be unilaterally exercisable because Congress considered calling the right described in Code Section 42(i)(7) an "option" instead of a "right of 1st refusal" and ultimately rejected that idea. Dkt. 89 (AMTAX Mot.) at 24-27. AMTAX cites a law review article suggesting Congress was concerned that granting a below-market option (which any rational holder would eventually exercise) would curtail the owner's economic interests in the project enough that the mere *grant* of the option would be, for

*Senior Housing Assistance Group's and Senior Housing Assistance Corporation's Response to Defendants and Counter-Plaintiffs' Motion for Summary Judgment (2:17-cv-01115-RSM) - 14*

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, Washington  98104
Telephone: (206) 623-1745
Facsimile: (206) 623-7789

certain tax purposes, treated like a *sale* of the project, and shift the rights to the tax benefits (which go to the "owner") from the nominal owner to the below-market option holder. *See* Tracy A. Kaye, *Sheltering Social Policy in the Tax Code: The Low-Income Housing Credit*, 38 Villanova L. Rev. 871, 889-93 (1993). AMTAX argues Congress used the words "right of 1st refusal" instead of "option" to ensure that a below-market option holder would not immediately be considered the true "owner" of a project and thereby shift entitlement to the LIHTC tax credits from the limited partnership (and its investor limited partner) to the option holder. *See* Dkt. 89 (AMTAX Mot.) at 25.

AMTAX reads too much into this legislative history. First, Section 42(i)(7) is a *safe harbor* provision that expressly ensures that the purchase right described in that provision will not jeopardize the project owner's right to the tax credits. 26 U.S.C. § 42(i)(7). If, as AMTAX claims, the tax "ownership" problem was solved by describing a below-market *common law right of first refusal* rather than a below-market *option*, there would have been no need for the safe harbor component of that provision at all. Parties would already have been safe in granting below-market common law rights of first refusal. AMTAX is thus asking the Court to interpret the Section 42(i)(7) safe harbor provision in a manner that renders the "safe harbor" component of it superfluous—something the Court cannot do. *E.g.*, *Nieto v. Ecker*, 845 F.2d 868, 873 (9th Cir. 1988) (cannot interpret statute in a manner that renders a provision superfluous). For the "safe harbor" in Section 42(i)(7) to have meaning, the right described by Congress in Section 42(i)(7) must be something different from a common law right of first refusal.

Second, even if Congress was concerned about the grant of a below-market option so readily exercisable that it could reasonably be treated as a *sale* at the time of its *grant*, no such option exists here. The Special ROFR in this case is contingent, by design, on factors that would not be known until at least after the close of the compliance-period. At the time the Special ROFR was included in the partnership agreements the parties may have expected it would be exercised,

*Senior Housing Assistance Group's and Senior Housing Assistance Corporation's Response to Defendants and Counter-Plaintiffs' Motion for Summary Judgment (2:17-cv-01115-RSM) - 15*

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, Washington  98104
Telephone: (206) 623-1745
Facsimile: (206) 623-7789

but it would not have been a certainty that SHAG—15 years later—would still be in a position to meet all of the conditions required by Section 7.4L, including, for example, that it still act as the lessee and operator of the projects. SHAG's right was thus contingent on its continued beneficial involvement in the projects for at least 15 years, and cannot reasonably be interpreted to fall within the class of readily exercisable "options" that AMTAX claims caused Congress concern.

The Court should thus enforce the terms of the parties' contracts as written. Indeed, the only court to have considered AMTAX's legislative history argument, the Massachusetts Supreme Court, held that no matter what Congress may have intended, the parties' contract terms control.[4] *Homeowner's Rehab*, 479 Mass. at 761-62 (a Section 42 ROFR should be interpreted in a certain way "unless otherwise negotiated between the parties"). And the contract terms control even if there may be a "risk of unintended tax implications" for the partnership. *Id.* at 762 n.15.

In *Homeowner's Rehab*, the Massachusetts Supreme Court acknowledged the legislative history argument AMTAX makes here, *id.* at 755-56, but, against that backdrop, still interpreted the parties' contract in a manner consistent with Congress's intent to facilitate the inexpensive transfer of LIHTC properties to nonprofits, and in a manner that did not require the Court to assume "the parties had negotiated an agreement that could bar the nonprofit . . . from ever purchasing the property at a favorable price." *Id.* at 759-60. The Court focused on the specific terms of the parties' agreement and held it permitted the nonprofit general partner (and Section 42 ROFR holder) to solicit a third-party offer for the express purpose of triggering its Section 42 ROFR and defeating the third-party offer, all without the investor limited partner's consent. *See id.* at 756-63.

While the ultimate result in *Homeowner's Rehab* was correct, the Court's reasoning, and the facts in that case, led to the convoluted outcome that, for the nonprofit to exercise its Section 42 ROFR (which had a 4-year exercise window), it should—without the investor's

---

[4] The entity that now manages AMTAX, Denver-based Alden Torch Financial, LLC, also managed the investor limited partner in *Homeowner's Rehab*. Ewart Resp. Decl. Ex. B.

*Senior Housing Assistance Group's and Senior Housing Assistance Corporation's Response to Defendants and Counter-Plaintiffs' Motion for Summary Judgment (2:17-cv-01115-RSM) - 16*

**HILLIS CLARK MARTIN & PETERSON P.S.**
999 Third Avenue, Suite 4600
Seattle, Washington  98104
Telephone: (206) 623-1745
Facsimile: (206) 623-7789

permission—solicit an enforceable offer from a third party that *would never be accepted* for the *sole purpose* of triggering a right that the investor limited partner did not want the nonprofit to exercise. A contract should not need to be structured in this way. Such a structure requires the nonprofit to jump through meaningless hoops to achieve indirectly what AMTAX claims cannot be achieved directly: the unilateral exercise of a Section 42 ROFR.

The contracts in this case are different, and do not require SHAG to jump through such hoops. The Section 42 ROFR in *Homeowner's Rehab* was drafted differently from the Special ROFR here, and made it clear that the property would be "offered" to the nonprofit only if the partnership were going to sell the property. *See Homeowner's Rehab, Inc. v. Related Corp. V SLP, LP*, No. SUCV20143807BLS2, 34 Mass. L. Rptr. 14, at *2 (Sept. 13, 2016) (unpublished) (quoting the right of first refusal provision at greater length). Here, Section 7.4L says nothing about third-party offers, investor limited partner consent, or a partnership decision to sell, and no reasonable reading of Section 7.4L would require SHAG to solicit or wait for a third-party offer— knowing it would never be accepted—for the sole purpose of triggering a right that Section 7.4L says can be exercised without going through any of that charade. SHAG has the straightforward right simply "to purchase the Project" if it meets the conditions expressly listed in Section 7.4L.

Code Section 42(i)(7) does not foreclose this interpretation. In fact, Section 42(i)(7) does not *prohibit* parties in LIHTC partnerships from granting any particular contractual purchase right, it merely offers a safe harbor for the right described in that provision. 26 U.S.C. § 42(i)(7)(A) ("No Federal tax benefit shall fail to be allowable…"). Parties can lawfully negotiate any purchase rights they desire. If those purchase rights fall outside a safe harbor there may or may not be tax consequences (something not alleged here), but the parties' agreement controls in either case. Here, the parties ensured that SHAG's purchase rights could not be exercised until *after* the end of the time period during which any tax credits might be subject to recapture, *see Homeowner's Rehab*, 479 Mass. at 744, and *after* SHAG had fulfilled its expected role in the projects. The Court

*Senior Housing Assistance Group's and Senior Housing Assistance Corporation's Response to Defendants and Counter-Plaintiffs' Motion for Summary Judgment (2:17-cv-01115-RSM) - 17*

**HILLIS CLARK MARTIN & PETERSON P.S.**
999 Third Avenue, Suite 4600
Seattle, Washington  98104
Telephone: (206) 623-1745
Facsimile: (206) 623-7789

thus can and should interpret Section 7.4L and Code Section 42(i)(7) in a way that is consistent with both the parties' intent and Congress's "key policy goal[]" of ensuring "that affordable housing remains affordable in the long term" by facilitating ownership by nonprofits. *Homeowner's Rehab*, 479 Mass. At 754-55.

### E.    AMTAX DOES NOT HAVE THE RIGHT TO BLOCK SHAG'S SPECIAL ROFR

Based on its interpretation of SHAG's Special ROFR, AMTAX claims an "absolute right to block" any sale other than a sale pursuant to the General Partner's option in Section 7.4J or "a sale to SHAG pursuant to the valid exercise of its ROFR, *once this right has been triggered by the Partnership's (and Limited Partners') willingness to accept a bona-fide third party offer*." Dkt. 89 (AMTAX Mot.) at 27 (emphasis added). This is wrong. As discussed above, Section 7.4L does not require a bona fide third-party offer or AMTAX's willingness to accept such an offer. In addition, Section 4.5A(iii) makes it clear that AMTAX does *not* have the right to consent to an exercise of SHAG's Special ROFR:

> the Investor Limited Partners shall have the right . . . with consent of all remaining Partners, to approve or disapprove the sale of all or substantially all of the assets of the Partnership ***(other than a sale pursuant to the Option described in Section 7.4J or the Special ROFR described in Section 7.4L)***.

*E.g.*, Dkt. 88 (Woolford Decl.) Ex. F § 4.5A(iii) (emphasis added).

AMTAX insists this exclusionary provision means only that AMTAX cannot block a Special ROFR exercise *after* AMTAX has already approved a third-party sale, Dkt. 89 (AMTAX Mot.) at 27, but that interpretation would render this provision meaningless. Section 4.5A(iii) confirms that AMTAX does not have the right to consent to two types of sales (the option and the Special ROFR), but AMTAX argues that for one of those two types of sales AMTAX would retain the right to do *indirectly* what Section 4.5A(iii) says it cannot do *directly*: block SHAG's Special ROFR exercise. This is neither a logical nor permissible interpretation of Section 4.5A(iii). *See Ibrahim v. AIU Ins. Co.*, 177 Wash. App. 504, 515 (2013) (courts should give "meaning to all provisions" and not "render some superfluous or meaningless").

*Senior Housing Assistance Group's and Senior Housing Assistance Corporation's Response to Defendants and Counter-Plaintiffs' Motion for Summary Judgment (2:17-cv-01115-RSM) - 18*

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, Washington  98104
Telephone: (206) 623-1745
Facsimile: (206) 623-7789

AMTAX also notes that another provision, Section 7.1B(viii) (which says the General

Partner cannot sell the property except with Investor Limited Partner consent to the terms), *does*

*not* exclude the General Partner's option or the Special ROFR, and that if the parties had

> intended to allow the General Partner to consent unilaterally to a third-party sale
> in order to trigger SHAG's ROFR against the Limited Partners' objection, they
> could have and would have included language in Section 7.1B(viii) that limited
> the categorical prohibition on the General Partner's unilateral sale of the Project.

Dkt. 89 (AMTAX Mot.) at 27. This is also wrong. First, unlike Section 4.5A(iii),

Section 7.1B(viii) excludes *neither* the General Partner's option under Section 7.4J *nor* SHAG's

Special ROFR under Section 7.4L. AMTAX does *not* contend this absence subjects the General

Partner's option to AMTAX's prior approval. Second, where two provisions conflict, the Court

must give effect to the more specific provision. *E.g.*, *Foote v. Viking Ins. Co. of Wis.*,

57 Wash. App. 831, 834-35 (1990). Section 4.5A(iii) plainly and specifically excludes SHAG's

Special ROFR from AMTAX's consent, and that exclusion must be given effect. Indeed, one

would expect that this limitation on the Investor Limited Partner would be located in a section of

the contract focused on the Investor Limited Partner's powers (like Section 4.5A(iii)) rather than

a section focused on the General Partner's powers (like Section 7.1B(viii)).

### F.   AMTAX'S INTERPRETATION WOULD RENDER SHAG'S SPECIAL ROFR VALUELESS

AMTAX's interpretation of SHAG's Special ROFR would make it impossible to exercise.

First, as described above, AMTAX argues that any sale to SHAG pursuant to Section 7.4L would

have to be at least indirectly approved by AMTAX during the short two-year exercise window

after the compliance period ends. In other words, AMTAX would have to agree to a third-party

sale during those two years *knowing* such a sale would—under AMTAX's view of Section 7.4L—

permit SHAG to buy the project at a significantly below-market price. AMTAX would have no

incentive to approve such a third-party sale during those two years when any sale after that time

would be at fair market value.

*Senior Housing Assistance Group's and Senior Housing Assistance
Corporation's Response to Defendants and Counter-Plaintiffs'
Motion for Summary Judgment
(2:17-cv-01115-RSM) - 19*

**HILLIS CLARK MARTIN & PETERSON P.S.**
999 Third Avenue, Suite 4600
Seattle, Washington  98104
Telephone: (206) 623-1745
Facsimile: (206) 623-7789

Second, AMTAX claims that, as a condition to exercise of the Special ROFR, the partnership (including AMTAX) must agree to accept a bona fide third-party offer during SHAG's two-year exercise window. This, too, would never happen. Of the third-party offers SHAG has received to date, AMTAX ridicules as "sham" offers any offers that were solicited, faults other offers (no matter how genuine) as insufficient if not in the form of final binding agreements, and complains that the offers are irrelevant if not actually *accepted* by the partnerships before SHAG exercises its Special ROFR rights. Dkt. 89 (AMTAX Mot.) at 20, 27-29. At the same time, AMTAX criticizes SHAG for "deceiv[ing] unwitting third parties" because SHAG did not tell those third parties, while they were making offers, that SHAG held a Special ROFR for each project. *Id.* at 18 n.4. Thus, under AMTAX's theory of the case, the following would have to occur before SHAG could exercise a Special ROFR:  During SHAG's two-year exercise window the partnerships would need to receive unsolicited third-party offers. The partnerships would then need to tell the third parties that SHAG holds a below-market right of first refusal that can be exercised only during a two-year time frame. The third parties would then need to agree to proceed, nevertheless, with all due diligence and other work necessary to bring the parties to a final, binding agreement to buy the project, and then the partnerships (including AMTAX) would need to agree to enter into the agreement to sell the project. Only then could SHAG, in AMTAX's view, exercise its Special ROFR.[5]

AMTAX's interpretation is unreasonable, to say the least, and would render SHAG's Special ROFRs valueless. AMTAX faults SHAG for deceiving third parties, but AMTAX's interpretation of Section 7.4L is even more injurious to third parties. Even though in exercising its Special ROFRs SHAG felt it prudent also to transmit third-party offers (solicited or not) out of concern for the legal position AMTAX would (and did) take, SHAG has had no inclination to put

---

[5] Presumably, the third-party buyer would also want to ask SHAG whether it actually intended to exercise its Special ROFR, which would force SHAG to answer truthfully and risk the third party breaking off its time-consuming negotiations before a final agreement could be reached.

*Senior Housing Assistance Group's and Senior Housing Assistance Corporation's Response to Defendants and Counter-Plaintiffs' Motion for Summary Judgment (2:17-cv-01115-RSM) - 20*

**HILLIS CLARK MARTIN & PETERSON P.S.**
999 Third Avenue, Suite 4600
Seattle, Washington  98104
Telephone: (206) 623-1745
Facsimile: (206) 623-7789

a third party through all the steps AMTAX claims are necessary to trigger the exercise of SHAG's Special ROFR. The parties cannot have intended, and Section 7.4L does not require, such a wasteful and futile charade. If AMTAX were willing to approve a third-party sale during SHAG's two-year exercise window, it should be equally willing to consent to a direct sale to SHAG pursuant to its Special ROFR rights without needlessly involving a third-party.

At bottom, AMTAX claims it has the right, either directly or indirectly, to decide whether the projects will be sold to SHAG on the terms the parties agreed to nearly 20 years ago. AMTAX does not have that right under Sections 7.4L and 4.5A(iii), or under any common sense reading of the contracts. AMTAX's unreasonable interpretation of Section 7.4L would permit exercise of SHAG's Special ROFR only under conditions that do not appear in the contracts and will almost certainly never exist. It would thus render the Special ROFR valueless to SHAG, and would result in an interpretation of Section 7.4L that would not give effect to the parties' intent—at the time of contracting, and as expressed in Sections 7.4L and 4.5A(iii)—that SHAG be given its own, meaningful opportunity to buy the projects after the close of the compliance periods. The Court cannot and should not accept AMTAX's interpretation. *E.g.*, *Int'l Marine Underwriters*, 179 Wash.2d at 282 (courts must give effect to the parties' intent at the time of contracting); *Hartford Fire Ins. Co.*, 183 Wash. App. at 608 (courts should not interpret contracts in ways that lead to "absurd results"); *Ibrahim*, 177 Wash. App. at 515 (courts should give "meaning to all provisions" and not "render some superfluous or meaningless"); *cf. Homeowner's Rehab*, 479 Mass. At 759 ("Consequently, if we were to interpret the right of first refusal to require the consent of the special limited partner, the nonprofit developer could be denied any meaningful opportunity to acquire the property interest at the § 42 price.")

### G. EVEN UNDER AMTAX'S INTERPRETATION OF THE CONTRACTS, THE MERIDIAN COURT SPECIAL ROFR WAS PROPERLY EXERCISED

In addition to the third-party offer that existed for Meridian Court, the LLC general partner in Meridian exercised its purchase option before SHAG exercised its Special ROFR. Dkt. 88

*Senior Housing Assistance Group's and Senior Housing Assistance Corporation's Response to Defendants and Counter-Plaintiffs' Motion for Summary Judgment (2:17-cv-01115-RSM) - 21*

**HILLIS CLARK MARTIN & PETERSON P.S.**
999 Third Avenue, Suite 4600
Seattle, Washington  98104
Telephone: (206) 623-1745
Facsimile: (206) 623-7789

(Woolford Decl.) ¶ 36, Exs. Q-R; Dkt. 93 (First Park Decl.) ¶ 42, Ex. I. Because SHAG's Special ROFR has priority over the option (SHAG's Section 7.4L rights exist "[n]otwithstanding" the rights granted in Sections 7.4J and K), the Special ROFR must be able to trump the option, even under AMTAX's interpretation. The LLC general partner in Meridian agrees that SHAG's Special ROFR trumps the general partner's option. Dkt. 93 (First Park Decl.) ¶ 42. AMTAX does not explain in its Motion why, in light of the option exercise, SHAG's Special ROFR exercise in Meridian should be held invalid.

### H.   THE GLOBAL INDEMNITY AGREEMENT DOES NOT CHANGE THE ANALYSIS

AMTAX also contends that SHAG's "Global Indemnity Agreement" with for-profit PNCC precludes SHAG from exercising its Special ROFR. AMTAX argues that Congress intended to promote nonprofit ownership of LIHTC properties after the compliance period, and that SHAG's Global Indemnity Agreement with for-profit PNCC thwarts this Congressional purpose. Dkt. 89 (AMTAX Mot.) at 29-30. The Global Indemnity Agreement does no such thing.

The Global Indemnity Agreement by its terms only *maintains* for PNCC, after a Special ROFR exercise, whatever economic interest, if any, PNCC has in any particular project before a Special ROFR exercise.[6] Dkt. 93 (First Park Decl.) ¶¶ 47-49. There will be no joint ownership of the projects. SHAG will own 100 percent of the property after a Special ROFR exercise but, if the Global Indemnity Agreement is triggered, SHAG will ensure that PNCC's economic interests in the property remain otherwise unchanged.[7] *Id*. Because PNCC's economic interests are the same both before and after a Special ROFR exercise, PNCC is economically *indifferent* to whether SHAG successfully exercises its Special ROFR. *Id.* And because PNCC does not benefit

---

[6] AMTAX claims PNCC's economic interest will be equivalent to 90 percent of each project's value, based on a years-old email from Bryan Park to SHAG's Executive Director, Jay Woolford. Dkt. 89 (AMTAX Mot.) at 7; Dkt. 90 (Pettit Decl.) Ex. J. This is wrong. PNCC's interest in each project varies, and whatever its interest, it will be unchanged from the status quo under the existing partnerships, except that the projects, after a Special ROFR exercise, will be owned entirely by SHAG rather than the limited partnerships. Second Park Decl. ¶ 25-26.

[7] Because SHAG has never actually exercised a Special ROFR, this aspect of the Global Indemnity Agreement has never been implemented. The parties will not implement it in a manner that runs afoul of legal requirements.

*Senior Housing Assistance Group's and Senior Housing Assistance Corporation's Response to Defendants and Counter-Plaintiffs' Motion for Summary Judgment (2:17-cv-01115-RSM) - 22*

**HILLIS CLARK MARTIN & PETERSON P.S.**
999 Third Avenue, Suite 4600
Seattle, Washington  98104
Telephone: (206) 623-1745
Facsimile: (206) 623-7789

economically from a Special ROFR exercise, any benefit obtained from a Special ROFR (including ultimate ownership of the property) flows only to SHAG. *Id.* Section 42(i)(7) does not preclude an agreement like the Global Indemnity Agreement, and the Global Indemnity Agreement between SHAG and PNCC does not affect AMTAX's rights in any way.

As noted in SHAG's Motion for Summary Judgment, AMTAX raised concerns about the Global Indemnity Agreement with the Washington State Housing Finance Commission (the "State Housing Commission"), the state agency tasked with determining whether a nonprofit is impermissibly affiliated with or controlled by a for-profit entity. *See* 26 U.S.C. § 42(h)(5)(c). The Commission concluded the Global Indemnity Agreement is consistent with SHAG's mission and does not affect SHAG's status as a qualified nonprofit under the LIHTC statute. Dkt. 88 (Woolford Decl.) Ex. D. Section 42(i)(7)(A) requires only that the statutory "right of 1st refusal" be held by a qualified nonprofit. As explained in SHAG's motion, Dkt. 85, SHAG meets that standard.

I.   BRYAN PARK DOES NOT CONTROL SHAG

AMTAX suggests throughout its Motion that SHAG's longtime working relationship with PNCC and its owner, Bryan Park, somehow makes SHAG something other than a legitimate nonprofit. Dkt. 89 (AMTAX Mot.) at 7, 10 n.1, 12-13. Leaving aside the fact that AMTAX has *for years* benefitted from SHAG's nonprofit status and the favorable tax treatment the projects received as a result, and that one of the partnerships' *only purposes* was to contract with SHAG to receive that favorable tax treatment, AMTAX's argument simply misses the mark. SHAG asked the State Housing Commission to confirm that SHAG is neither improperly affiliated with nor improperly controlled by PNCC, and AMTAX participated extensively in the Commission's analysis. The Commission concluded SHAG's relationship with PNCC is not improper, and

*Senior Housing Assistance Group's and Senior Housing Assistance Corporation's Response to Defendants and Counter-Plaintiffs' Motion for Summary Judgment (2:17-cv-01115-RSM) - 23*

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, Washington  98104
Telephone: (206) 623-1745
Facsimile: (206) 623-7789

serves to further SHAG's mission. Dkt. 88 (Woolford Decl.) Ex. D at 43. The Court need not and should not revisit that analysis here.[8]

### J.    SHAG AND SHAC HAVE BREACHED NO FIDUCIARY DUTIES TO AMTAX

Finally, AMTAX contends SHAG, SHAC, and the other General Partners have breached fiduciary duties to AMTAX in attempting to facilitate the exercise of SHAG's Special ROFRs. The only duties general partners have under Washington law are outlined in RCW 25.10.441. AMTAX does not identify which of those duties has been breached. *See* Dkt. 89 (AMTAX Mot.) at 23-24. Moreover, SHAG and the General Partners cannot breach their fiduciary duties when they are acting pursuant to their contractual rights. *E.g.*, *J&J Celcom v. AT&T Wireless Servs., Inc.*, 162 Wash.2d 102, 108 (2007). And AMTAX cannot have been injured for purposes of proving breach of fiduciary duty simply by having to litigate this contract dispute; otherwise all such disagreements would give rise to breach of fiduciary duty claims. *See* Dkt. 89 (AMTAX Mot.) at 24. The parties are engaged in a genuine contract dispute. That, without more, does not support a claim for breach of fiduciary duty under Washington law. *See* RCW 25.10.441.

### IV.    CONCLUSION

AMTAX does not have the right to block SHAG's Special ROFR exercises under any reasonable interpretation of the partnership agreements. AMTAX asks the Court to adopt an interpretation that assumes the parties gave SHAG a purchase right it could never hope to exercise. That interpretation of the contracts is unreasonable and inconsistent with the contracts' plain language, the parties' intent, and Congress's intent in providing a means by which nonprofits can eventually assume ownership of LIHTC projects. The Court should deny AMTAX's Motion for Summary Judgment and enter summary judgment for SHAG.

---

[8] AMTAX misrepresents the evidence it cites, in any event. The examples of "control" it cites on page 13 of its Motion, for example, amount at most to participation and involvement, which are different, as a legal matter, from control.

*Senior Housing Assistance Group's and Senior Housing Assistance Corporation's Response to Defendants and Counter-Plaintiffs' Motion for Summary Judgment*
*(2:17-cv-01115-RSM) - 24*

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, Washington  98104
Telephone: (206) 623-1745
Facsimile: (206) 623-7789

DATED this 14th day of December, 2018.

HILLIS CLARK MARTIN & PETERSON P.S.

By    *s/ Jake Ewart*
Laurie Lootens Chyz, WSBA #14297
Jake Ewart, WSBA #38655
Jessica C. Kerr, WSBA #49866
999 Third Avenue, Suite 4600
Seattle, WA  98104
Tel: (206) 623-1745; Fax: (206) 623-7789
E-mail:  laurie.chyz@hcmp.com
jake.ewart@hcmp.com
jessica.kerr@hcmp.com

Attorneys for Senior Housing Assistance Group and
Senior Housing Assistance Corporation

*Senior Housing Assistance Group's and Senior Housing Assistance Corporation's Response to Defendants and Counter-Plaintiffs' Motion for Summary Judgment (2:17-cv-01115-RSM) - 25*

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, Washington  98104
Telephone: (206) 623-1745
Facsimile: (206) 623-7789

1

**CERTIFICATE OF SERVICE**

2          I hereby certify that on the 14th day of December, 2018, I electronically filed the

3  foregoing with the Clerk of the Court using the CM/ECF system which will send notification to

4  all counsel of record.

5          DATED this 14th day of December 2018, at Seattle, Washington.

6
                                    By     *s/ Jake Ewart*
7                                            Jake Ewart, WSBA #38655
                                         Hillis Clark Martin & Peterson P.S.
8                                        999 Third Avenue, Suite 4600
                                         Seattle, Washington  98104
9                                        Telephone:  (206) 623-1745
                                         Facsimile:  (206) 623-7789
10                                       Email:  jake.ewart@hcmp.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

*Senior Housing Assistance Group's and Senior Housing Assistance Corporation's Response to Defendants and Counter-Plaintiffs' Motion for Summary Judgment (2:17-cv-01115-RSM) - 26*

**HILLIS CLARK MARTIN & PETERSON P.S.**
999 Third Avenue, Suite 4600
Seattle, Washington  98104
Telephone: (206) 623-1745
Facsimile: (206) 623-7789