THE HONORABLE RICARDO S. MARTINEZ

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

SENIOR HOUSING ASSISTANCE
GROUP,

               Plaintiff,

    v.

AMTAX HOLDINGS 260, LLC, et al.,

               Defendants.

---

AMTAX HOLDINGS 260, LLC, et al.,

               Counter-Plaintiffs,

    v.

SENIOR HOUSING ASSISTANCE
GROUP, et al.,

               Counter-Defendants.

No. 2:17-cv-01115-RSM

**DEFENDANTS AND COUNTER-PLAINTIFFS' OPPOSITION TO SENIOR HOUSING ASSISTANCE GROUP'S AND SENIOR HOUSING ASSISTANCE CORPORATION'S MOTION FOR SUMMARY JUDGMENT**

**NOTE ON MOTION CALENDAR:**
DECEMBER 21, 2018

ORAL ARGUMENT REQUESTED

## <u>TABLE OF CONTENTS</u>

I.   INTRODUCTION ........................................................................................................ 1

II.  SHAG IS NOT ENTITLED TO A DECLARATORY JUDGMENT ................................ 3

  A.   A Unilaterally Exercisable ROFR Is an Oxymoron ........................................ 3

    1.   An Option and a ROFR Are Two Distinct Purchase Rights............................ 3

    2.   Congress Relied on the Distinction Between Options and ROFR When Enacting the
Safe Harbor Provision in Section 42(i)(7)........................................................... 4

  B.   The Plain Language of the Partnership Agreements Does Not Support SHAG's Claim
that Its ROFR Can Be Exercised Unilaterally ................................................ 6

    1.   Under Washington Law, Except as Otherwise Defined, the Term "Right of First
Refusal" Retains Its Ordinary Meaning ........................................................... 6

    2.   Section 7.4L Describes Only What Is Required for SHAG to *Have* the ROFR, Not
What is Necessary to *Trigger* SHAG's ROFR............................................. 10

    3.   The Parties Intended for the Partnership Agreements to Comport with Section 42,
Which Does Not Permit a Below-Market Option ........................................... 11

    4.   SHAG's Interpretation of the ROFR Would Render Provisions of the Partnership
Agreements Superfluous and Lead to Untenable Results .............................. 12

    5.   Section 4.5A(iii) Only Prevents the Limited Partners from Blocking a Sale to SHAG
Upon the Exercise of Its Validly Triggered ROFR ....................................... 13

  C.   Extrinsic Evidence Provides No Support for SHAG's Position ....................... 15

    1.   SHAG's Questionable Evidence of Park's Unilateral Intent Cannot Modify the
Unambiguous Language of the Partnership Agreements ............................... 16

    2.   Financial Projections Are Irrelevant to Interpreting the ROFR.................... 17

  D.   SHAG's ROFR Has Value Irrespective of Its Exercise................................... 19

  E.   There Have Been No Enforceable Offers, and Exercise of the Option Does Not Trigger
the ROFR .................................................................................................. 22

  F.   The Global Indemnity Agreement Creates Triable Issues of Fact as to the Actual Holder
of the ROFR .............................................................................................. 23

III. CONCLUSION........................................................................................................ 24

**Boies Schiller Flexner LLP**
725 South Figueroa Street, 31st Floor
Los Angeles, CA  90017-5524
Phone:  (213) 629-9040
Fax:  (213) 629-9022

1

## <u>TABLE OF AUTHORITIES</u>

2

**Cases**                                                              **Page(s)**

*Bennett Veneer Factors Inc. v. Brewer*,
   73 Wn.2d 849, 441 P.2d 128 (1968) ...................................................................3, 7, 10, 13, 21

*Berg v. Hudesman*,
   115 Wn.2d 657, 801 P.2d 222 (1990) ...................................................................................16

*Comm'r of Internal Revenue v. Tower*,
   327 U.S. 280 (1946) ..............................................................................................................19

*Dalton v. Balum*,
   13 Wn. App. 160, 534 P.2d 56 (1975) ....................................................................................7

*Frank Lyon Co. v. United States*,
   435 U.S. 561 (1978) ................................................................................................................5

*Hearst Commc'ns, Inc. v. Seattle Times Co.*,
   154 Wn.2d 493, 115 P.3d 262 (2005) ..............................................................................16, 19

*Historic Boardwalk Hall, LLC v. Comm'r of Internal Revenue*,
   694 F.3d 425 (3rd Cir. 2012), *cert. denied*, __ U.S. __, 133 S.Ct. 2374 (2013) ....................19

*Homeowner's Rehab Inc. v. Related Corp. V SLP, L.P.*,
   479 Mass. 741, 99 N.E.3d 744 (2018) .........................................................................5, 6, 9, 12

*Int'l Marine Underwriters v. ABCD Marine, LLC*,
   179 Wn.2d 274, 313 P.3d 395 (2013) .....................................................................................6

*Kelly v. Ammex Tax & Duty Free Shops W., Inc.*,
   162 Wn. App. 825, 256 P.3d 1255 (2011) ..........................................................................9, 10

*Matson v. Emory*,
   36 Wn. App. 681, 676 P.2d 1029 (1984) .............................................................................4, 7

*Nw. Television Club, Inc. v. Gross Seattle, Inc.*,
   96 Wn.2d 973, 634 P.2d 837 (1981) .......................................................................................3

*Reddam v. Comm'r of Internal Revenue*,
   755 F.3d 1051 (9th Cir. 2014) .................................................................................................5

*Robroy Land Co. v. Prather*,
   95 Wn.2d 66, 622 P.2d 367 (1980) ..........................................................................3, 8, 10, 13

**Boies Schiller Flexner LLP**
725 South Figueroa Street, 31st Floor
Los Angeles, CA  90017-5524
Phone:  (213) 629-9040
Fax:  (213) 629-9022

*Rubin v. Moys,*
     97 Wn. App. 1020 (1999) ....................................................................................8

*S. Kitsap Family Worship Ctr. v. Weir,*
     135 Wn. App. 900, 146 P.3d 935 (2006) ..........................................................16

*State v. Chester,*
     133 Wn. 2d 15, 940 P.2d 1374 (1997) ...............................................................9

*William G. Hulbert, Jr. & Clare Mumford Hulbert Revocable Living Trust v. Port of Everett,*
     159 Wn. App. 389, 245 P.3d 779 (2011) ......................................................6, 16

**Statutes**

26 U.S.C. § 42(i)(7)(A) ...............................................................................5, 11

**Rules**

Fed. R. Evid. 602 ............................................................................................4

Fed. R. Evid. 1004 ..........................................................................................4

**Other Authorities**

136 Cong. Rec. 30528 (1990) .........................................................................5

H.R. Rep. No. 101–247 (1989) .......................................................................6

Merriam-Webster Dictionary, http://www.merriam
    webster.com//dictionary/right%20of%20first%20refusal
    (last visited December 12, 2018) ....................................................................7

Thomas W. Giegerich, *The Monetization of Business Tax Credits*, 12 FLA. TAX
    REV. 709, 793 (2012) ....................................................................................5

Tracy A. Kaye, *Sheltering Social Policy in the Tax Code: The Low-Income
    Housing Credit* .............................................................................................5

DEFENDANTS AND COUNTER-PLAINTIFFS'
OPPOSITION TO SHAG/SHAC MSJ
(No. 2:17-cv-01115-RSM) – iv

**Boies Schiller Flexner LLP**
725 South Figueroa Street, 31st Floor
Los Angeles, CA  90017-5524
Phone:  (213) 629-9040
Fax:  (213) 629-9022

1

## I.     INTRODUCTION

2

Plaintiff and Counter-Defendant Senior Housing Assistance Group ("SHAG") is the

3

holder of rights of first refusal ("ROFR") to purchase seven affordable housing properties (the

4

"Projects") from the limited partnerships (the "Partnerships") that were formed to develop and

5

operate those Projects under the federal Low-Income Housing Tax Credit ("LIHTC") program

6

codified in Section 42 of the Internal Revenue Code ("Section 42").  SHAG seeks a declaration

7

from this Court that it may exercise its ROFR unilaterally—even in the absence of a bona fide

8

third-party offer to purchase the Projects, and even without the Partnerships' intent to sell,

9

requiring the consent of Defendants and Counter-Plaintiffs (the "Limited Partners"), who

10

collectively own more than 99% of each Partnership.  SHAG is not entitled to such a declaration.

11

The ROFR granted to nonprofit SHAG pursuant to the limited partnership agreements for

12

the Projects (the "Partnership Agreements") permits SHAG to purchase the Projects at a below-

13

market price specified by Section 42 once the ROFR is triggered by the owner's willingness to

14

accept a bona fide third-party offer.  The ROFR is thus a *defensive* right that inhibits the

15

Partnerships from selling the Projects out from under SHAG, because doing so would trigger

16

SHAG's right to purchase the Projects at below-market prices.  SHAG's contrary interpretation

17

of its ROFR as unilaterally exercisable effectively supplants the ROFR with an *option*, in

18

contravention of the plain language of the Partnership Agreements, the ordinary meaning of a

19

ROFR, and the requirements of Section 42, with which the Partnership Agreements are expressly

20

intended to comply.  SHAG's efforts to force the Limited Partners out of the Partnerships against

21

their will and at substantially below-market prices must be rejected.

22

*First*, SHAG's interpretation of the ROFR as unilaterally exercisable is oxymoronic, and

23

improperly confuses a ROFR with an option.  The two rights, however, are not only distinct, but

24

are distinguishable *precisely because* an option, unlike a ROFR may be exercised unilaterally.

25

Congress, moreover, relied on this distinction when it enacted the safe harbor provision in

26

Section 42(i)(7).

**Boies Schiller Flexner LLP**
725 South Figueroa Street, 31st Floor
Los Angeles, CA  90017-5524
Phone:  (213) 629-9040
Fax:  (213) 629-9022

1       *Second*, the plain language of the Partnership Agreements does not support SHAG's

2 claim that its ROFR may be exercised unilaterally.  Indeed, the term "Right of First Refusal" is

3 ordinarily understood under Washington law as being a *defensive* purchase right that is only

4 triggered where there is a bona fide third-party offer that the owner is willing to accept, and in

5 the absence of a contrary definition, that understanding controls its meaning in the Partnership

6 Agreements.  SHAG, however, improperly conflates the conditions that must be satisfied for

7 SHAG to *have* its ROFR with what is necessary for SHAG to *exercise* its ROFR, and misreads

8 Section 4.5A(iii) of the Partnership Agreement to erroneously suggest that the consent of the

9 Limited Partners is unnecessary to trigger SHAG's right to exercise its ROFR.  The Partnership

10 Agreements, moreover, are expressly intended to comply with Section 42, and Congress

11 considered and affirmatively declined to create a safe harbor in Section 42 for below-market

12 options in favor of a safe harbor that extends only to below-market ROFR.

13       *Third*, SHAG seeks to introduce extrinsic evidence that it claims demonstrates the

14 parties' intention to confer to SHAG a unilaterally exercisable right to purchase the Projects at a

15 below-market price.  SHAG, however, misconstrues the evidence, which cannot in any event be

16 used to vary the ordinary meaning of the ROFR.

17       *Fourth*, SHAG argues that unless the ROFR is unilaterally exercisable by SHAG, it has

18 no value.  SHAG fails, however, to account for circumstances in which the ROFR could be

19 triggered, and also ignores that the ROFR is a defensive right that protects SHAG even if it is

20 never exercised by inhibiting the Limited Partners from forcing a sale to third-party buyers.

21       *Fifth*, contrary to SHAG's contention, none of the seven Partnerships has received a bona

22 fide, enforceable third-party purchase offer, and SHAG's ROFR is not triggered by the exercise

23 of a fair-market option held by the Partnerships' General Partners.

24       *Finally*, even if the Court were somehow to find that SHAG could exercise its ROFR in

25 the absence of a bona fide third-party offer that the Partnerships (including the Limited Partners)

26 are willing to accept, SHAG still is not entitled to summary judgment because the Global

DEFENDANTS AND COUNTER-PLAINTIFFS'
OPPOSITION TO SHAG/SHAC MSJ
(No. 2:17-cv-01115-RSM) – 2

**Boies Schiller Flexner LLP**
725 South Figueroa Street, 31st Floor
Los Angeles, CA  90017-5524
Phone:  (213) 629-9040
Fax:  (213) 629-9022

1  Indemnity Agreement it entered into with for-profit entities raises a triable issue of fact as to

2  whether SHAG can be considered the true holder of the ROFR.

3      For these reasons, explained in greater detail below, the Court must reject SHAG's claim

4  that its ROFR can be exercised unilaterally, and deny SHAG's motion for summary judgment.

5  **II.    SHAG IS NOT ENTITLED TO A DECLARATORY JUDGMENT[1]**

6      **A.    A Unilaterally Exercisable ROFR Is an Oxymoron**

7      SHAG's position that the "Right of First Refusal" described in Section 7.4L of the

8  Partnership Agreements can be unilaterally exercised converts the ROFR into the functional

9  equivalent of an option, in contravention of common law and Congressional intent behind the

10 Section 42 safe harbor. *See* Dkt. 90-1, Exs. Y–Z; Dkt. 90-2, Exs. AA–DD; Dkt. 91-1, Ex. EE

11 (collectively, the "Partnership Agreements") § 7.4L. Indeed, as explained below, whether a

12 purchase right can be exercised unilaterally or only defensively is the decisive factor in

13 determining whether that right can properly be described as an option or a ROFR, and Congress

14 relied on that distinction when it limited the Section 42 safe harbor to below-market ROFR.

15      **1.    An Option and a ROFR Are Two Distinct Purchase Rights**

16     It is well-settled that a ROFR is distinct from an option precisely because of the ability of

17 the holder to force an unwilling owner to sell. *See, e.g.*, *Bennett Veneer Factors Inc. v. Brewer*,

18 73 Wn.2d 849, 853–54, 441 P.2d 128 (1968) (unlike a "normal option contract[,]" a right of first

19 refusal is a "preemptive right" that gives "the prospective purchaser the right to buy upon terms

20 established by the seller; *but only if the seller decides to sell*") (emphasis added); *Nw. Television*

21 *Club, Inc. v. Gross Seattle, Inc.*, 96 Wn.2d 973, 980 n.2, 634 P.2d 837 (1981) ("The right of first

22 refusal ripens when the owner forms a specific intention to sell the property."); *Robroy Land Co.*

23 *v. Prather*, 95 Wn.2d 66, 71, 622 P.2d 367 (1980) ("The holder of a right of first refusal has far

24 less of an interest in land than the holder of an ordinary option. The preemptioner has no power

25

26     [1] The Limited Partners incorporate by reference the statement of facts as set forth in its motion for summary judgment, Dkt. 89, and will not recite such facts again here.

DEFENDANTS AND COUNTER-PLAINTIFFS'
OPPOSITION TO SHAG/SHAC MSJ
(No. 2:17-cv-01115-RSM) – 3

**Boies Schiller Flexner LLP**
725 South Figueroa Street, 31st Floor
Los Angeles, CA  90017-5524
Phone:  (213) 629-9040
Fax:  (213) 629-9022

or right to affect the property in any way *until its owner expresses a desire and willingness to sell*.") (emphasis added); *Matson v. Emory*, 36 Wn. App. 681, 684, 676 P.2d 1029 (1984) ("If the right holder wants the privilege of . . . forcing a sale, those additional rights should be obtained through an option."). By arguing that it can exercise its ROFR unilaterally, SHAG improperly disregards this fundamental distinction between a ROFR and an option.

### 2.   Congress Relied on the Distinction Between Options and ROFR When Enacting the Safe Harbor Provision in Section 42(i)(7)

SHAG claims that, because the ROFR in Section 7.4L of the Partnership Agreements contemplates a price established by Section 42(i)(7) that need not match the terms of a third-party offer, distinction between options and ROFR has no bearing on its interpretation.  *See* Dkt. 85 ("SHAG MSJ") at 16 ("Without the requirement that SHAG match the terms of a third-party offer, the right conveyed in Section 7.4L is something other than a common law 'right of first refusal.'"); *see also* Dkt. 93 ("Park Decl."), ¶ 38 ("Section 7.4L should be viewed as being self-contained or self-sufficient, and not dependent on any broad analysis or interpretation about the distinction between an option and a right of first refusal.").[2]  SHAG's argument, however, ignores that when Congress passed Section 42(i)(7), it specifically contemplated the existence of a  ROFR at a price set by Section 42, and understood that even in the absence of a requirement that the ROFR-holder match the terms of a third-party offer, such a ROFR continued to be distinguishable from an option based on whether or not it could be unilaterally exercised.

Section 42(i)(7) permits the transfer of projects to nonprofit organizations for a below-market purchase price *only* pursuant a right of first refusal—not an option:

---

[2] This paragraph is one of many paragraphs in the First Declaration of Bryan Park that is inadmissible under the Federal Rules of Evidence.  AMTAX hereby objects to Paragraphs 20–22, 30, 32, 37, 38 of Mr. Park's Declaration on the ground that Mr. Park lacks personal knowledge (*see* Fed. R. Evid. 602); and to Paragraphs  23, 25, 26, 28, 29, 33, 35, 36, 38, 41, 42, 46, and 47 on the ground that they contain improper legal conclusions and the underlying documents speak for themselves (*see* Fed. R. Evid. 1004).  AMTAX also hereby objects to Paragraphs 29, 30, 37, 43, 46, and 49 of the Declaration of John "Jay" Woolford on the ground that they contain improper legal conclusions and the underlying documents speak for themselves (*see* Fed. R. Evid. 1004); and to Paragraph 6 of the Declaration of Joel Rubenzahl on the ground that Mr. Rubenzahl lacks personal knowledge (*see* Fed. R Evid. 602).

DEFENDANTS AND COUNTER-PLAINTIFFS'
OPPOSITION TO SHAG/SHAC MSJ
(No. 2:17-cv-01115-RSM) – 4

**Boies Schiller Flexner LLP**
725 South Figueroa Street, 31st Floor
Los Angeles, CA  90017-5524
Phone:  (213) 629-9040
Fax:  (213) 629-9022

No Federal income tax benefit shall fail to be allowable to the taxpayer with respect to any qualified low-income building merely by reason of a **right of 1st refusal** held by the tenants (in cooperative form or otherwise) or resident management corporation of such building or by a qualified nonprofit organization (as defined in subsection (h)(5)(c)) or government agency to purchase the property after the close of the compliance period for a price which is not less than the minimum purchase price determined under subparagraph (B).

26 U.S.C. § 42(i)(7)(A) (emphasis added).  When Congress enacted the Section 42(i)(7) safe harbor, it initially considered permitting a unilateral *option* to purchase LIHTC properties at the Section 42 price, but rejected that language in favor of a preemptive *right of first refusal* because it recognized that, under the "economic substance" doctrine, the holder of a unilateral below-market option could be considered the true owner of the property for tax purposes, and thereby endanger the ability of the investor limited partner to claim the tax credits.[3]  *See* Tracy A. Kaye, *Sheltering Social Policy in the Tax Code: The Low-Income Housing Credit*, 38 Villanova L. Rev. 871, 893 (1993) (noting that "there was congressional concern that the grant of a below-market *option* (as proposed by the Low-Income Housing Tax Credit Act of 1989) was a substantial enough relinquishment of one of the benefits of ownership that true ownership was at issue").  Congress therefore enacted a version of Section 42(i)(7) that permitted a below-market *right of first refusal*, which—unlike an option—"does not give the holder the power to compel an unwilling owner to sell." *Id.* at 897; *see also* 136 Cong. Rec. 30528 (Oct. 18, 1990 Senate Report) (describing Section 42(i)(7) ROFR as applying "should the owner decide to sell").

In light of Congress's limitation of the Section 42(i)(7) safe harbor to ROFRs and not options, it is clear that the parties intended the ROFR in Section 7.4L to be just that—a ROFR— in order to maintain the tax benefits for which the Partnership was created.  *See Homeowner's*

---

[3] Under the economic substance doctrine, an investor partner can receive tax credits only if the LIHTC partnership is considered the true owner of the property, which requires it to have a tax-independent potential for profit.  *See Reddam v. Comm'r of Internal Revenue*, 755 F.3d 1051, 1059 (9th Cir. 2014); *Frank Lyon Co. v. United States*, 435 U.S. 561, 572–73 (1978) (holding that the economic substance of a transaction, rather than its form, determines who the true owner is for tax purposes); Thomas W. Giegerich, *The Monetization of Business Tax Credits*, 12 FLA. TAX REV. 709, 793 (2012) (an investment must have "sufficient hallmarks of ownership").  Because an option to purchase the property at the below-market Section 42 price would unilaterally transfer this profit potential from the partnership to the option holder, Congress was concerned that, under the economic substance doctrine, the IRS would consider a Section 42 option holder to be the true owner of the property instead of the partnership.

DEFENDANTS AND COUNTER-PLAINTIFFS'
OPPOSITION TO SHAG/SHAC MSJ
(No. 2:17-cv-01115-RSM) – 5

Boies Schiller Flexner LLP
725 South Figueroa Street, 31st Floor
Los Angeles, CA  90017-5524
Phone:  (213) 629-9040
Fax:  (213) 629-9022

*Rehab Inc. v. Related Corp. V SLP, L.P.*, 479 Mass. 741, 99 N.E.3d 744, 760 (2018) ("Where the agreement was intended to operate 'in accordance with' § 42(i)(7), we must interpret its provisions consistently with Congressional intent, and Congress intended for nonprofit organizations to exercise their right of first refusal only when 'the owner decide[s] to sell.'") (quoting H.R. Rep. No. 101–247, 101st Cong., 1st Sess., at 1195 (1989)).  The construction of the ROFR advanced by SHAG—that it can be exercised in the absence of the owner's willingness to sell—therefore must be rejected.  *See Homeowner's Rehab*, 479 Mass. at 758 (rejecting argument that the partnership need not have decided to accept the third-party offer to trigger the ROFR "because it effaces the common-law distinction between a right of first refusal and an option to purchase, which . . . Congress relied upon when it enacted § 42(i)(7)").[4]

**B.      The Plain Language of the Partnership Agreements Does Not Support SHAG's Claim that Its ROFR Can Be Exercised Unilaterally**

In its effort to establish a unilateral right to purchase the Projects, SHAG ignores the import of the term "Right of First Refusal" as used in the Partnership Agreements, and instead promotes a facially implausible reading of Section 7.4L that would eviscerate the distinction between a ROFR and an option by making the ROFR exercisable even in the absence of a third-party offer and a willingness to accept that offer.  As explained below, the Court should reject SHAG's argument and enforce the Partnership Agreements according to their terms.

**1.      Under Washington Law, Except as Otherwise Defined, the Term "Right of First Refusal" Retains Its Ordinary Meaning**

Where, as here, the term "Right of First Refusal" is not affirmatively defined in the contract, the term "will be given [its] 'plain, ordinary, and popular meaning.'"  *Int'l Marine*

---

[4] SHAG argues that "the contract terms control even if there may be a 'risk of unintended tax implications' for the partnership."  *See* SHAG MSJ at 20 (relying on *Homeowner's Rehab*, 479 Mass. at 762 n.15).  But a contract should be interpreted in light of its purpose, and the Partnership Agreements themselves expressly state that they are intended to comport with the requirements of Section 42.  Partnership Agreements §§ 2.3, 7.4(A), (C), (L); *see also William G. Hulbert, Jr. & Clare Mumford Hulbert Revocable Living Trust v. Port of Everett,* 159 Wn. App. 389, 400, 245 P.3d 779 (2011) (noting the relevance of a contract's "subject matter and objective").

DEFENDANTS AND COUNTER-PLAINTIFFS'
OPPOSITION TO SHAG/SHAC MSJ
(No. 2:17-cv-01115-RSM) – 6

**Boies Schiller Flexner LLP**
725 South Figueroa Street, 31st Floor
Los Angeles, CA  90017-5524
Phone:  (213) 629-9040
Fax: (213) 629-9022

*Underwriters v. ABCD Marine, LLC*, 179 Wn.2d 274, 284, 313 P.3d 395 (2013) (explaining that the plain meaning is determined by reference to dictionaries and common law). In this case, as explained by the Washington Supreme Court,

> [t]he phrase 'first refusal right' and terms of similar import have a well understood meaning in the business world which is that the owner of such a contract right is entitled to the opportunity to buy the subject property on the same terms contained in a *bona fide offer from a third party acceptable to the owner of the goods*.

*Bennett*, 73 Wn.2d at 856 (emphasis added); *see also Matson*, 36 Wn. App. at 683 ("The right [of first refusal] has been defined as entitling the owner of the right to the opportunity to buy the subject property on the same terms contained in a bona fide offer from a third party, acceptable to the property owner."); Merriam-Webster Dictionary, http://www.merriam webster.com//dictionary/right%20of%20first%20refusal (last visited December 12, 2018) (defining "right of first refusal" as "the right to have the first choice to buy something on the same terms as *offered to someone else*") (emphasis added).

Including a term like "Right of First Refusal" or "ROFR" in a contract thus implies certain presumptions that need not be expressly set out in the contract. *See Bennett*, 73 Wn.2d at 856 (holding that the requirements for exercise of a ROFR are "implied from the use of the term 'first refusal'" "irrespective of whether it is specifically provided for in the agreement"). These presumptions—*i.e.*, that the right is exercisable (1) on the same terms as (2) a bona fide third-party offer (3) that the owner is willing to accept—can be modified, but otherwise apply. *See Dalton v. Balum*, 13 Wn. App. 160, 161–62, 534 P.2d 56 (1975) ("The rule in Washington is that the owner of a right of first refusal is entitled to the opportunity to buy the subject property on the same terms contained in a bona fide offer from a third party acceptable to the owner.").

Here, the only aspect of a traditional ROFR that has been modified in Section 7.4L of the Partnership Agreements is the requirement that the ROFR be exercised on the same terms as the third-party offer. Instead of matching the price set by the acceptable third-party offer, the Partnership Agreements provide that SHAG's ROFR is exercisable at not less than the statutorily

DEFENDANTS AND COUNTER-PLAINTIFFS'
OPPOSITION TO SHAG/SHAC MSJ
(No. 2:17-cv-01115-RSM) – 7

**Boies Schiller Flexner LLP**
725 South Figueroa Street, 31st Floor
Los Angeles, CA  90017-5524
Phone:  (213) 629-9040
Fax:  (213) 629-9022

1   defined purchase price in Section 42(i)(7).  *See* Partnership Agreements § 7.4L.  The price-

2   matching feature, however, is not a necessary element of a ROFR, which "'merely requires the

3   owner, when and if he decides to sell, to offer the property first to the person entitled to the pre-

4   emption, *at the stipulated price*.'"  *Robroy*, 95 Wn.2d at 70 (internal quotation marks and

5   citations omitted) (emphasis added); *see also Rubin v. Moys*, 97 Wn. App. 1020, *7 (1999)

6   (holding that "a right of first refusal to purchase [property] for a *set price* in the event it would be

7   sold" was a valid ROFR) (emphasis added).  Moreover, even if the matching element were a

8   defining characteristic of a ROFR, the Partnership Agreements do not modify any of the other

9   defining characteristics.  (*See id.* § 7.4L (providing only that SHAG "shall have a 'Right of First

10   Refusal' (the 'Special ROFR') to purchase the Project" at not less than the minimum price under

11   Section 42(i)(7)).)  Contrary to SHAG's suggestion, the stipulation to the Section 42 price does

12   not convert the right into another type of right altogether (*i.e.*, an option).

13        SHAG points to the fact that the need for a bona fide offer and willingness to accept was

14   expressly recognized in the "Right of First Refusal Agreement" for a different project, Ballinger

15   Court, to argue that '[i]f the parties had wanted to give SHAG a different purchase right, they

16   knew how to do so."  SHAG MSJ at 18.  The Ballinger Court agreement, however, serves only to

17   confirm that, whether affirmatively stated or not, the parties shared the ordinary understanding of

18   a "Right of First Refusal" as a defensive right that is not triggered in the absence of those

19   elements.  If the parties wanted to modify that ordinary understanding, they knew how to do so,

20   as evidenced by the modification of the "matching" element in SHAG's Section 42 ROFR.  That

21   the parties simply chose to make explicit in the later-executed Ballinger Court agreement the

22   requirements that are otherwise implied by the use of the term "Right of First Refusal" in the

23   Partnership Agreements does not negate those implications in the earlier agreements.

24        Nor does the fact that the ROFR in Section 7.4L is labeled a "Special ROFR" and

25   contemplates a price set by Section 42 convert that preemptive right into a unilateral option.  As

26   with the Partnership Agreements, an undefined term used in Section 42 is given its common law

DEFENDANTS AND COUNTER-PLAINTIFFS'
OPPOSITION TO SHAG/SHAC MSJ
(No. 2:17-cv-01115-RSM) – 8

**Boies Schiller Flexner LLP**
725 South Figueroa Street, 31st Floor
Los Angeles, CA  90017-5524
Phone:  (213) 629-9040
Fax:  (213) 629-9022

or ordinary meaning. *See State v. Chester*, 133 Wn. 2d 15, 22, 940 P.2d 1374 (1997) ("In the absence of a specific statutory definition, words in a statute are given their common law or ordinary meaning."). Thus, the ROFR contemplated by Section 42(i)(7) also contains all of the same requirements as an ordinary ROFR, except that there is a statutorily set purchase price.[5]

SHAG, however, urges the Court to look beyond the term "Right of First Refusal" in Section 7.4L, and instead "look to the substance of the right conveyed to determine whether the right is a common law right of first refusal or something else entirely," and to conclude based on that review that the Section 42 ROFR in Section 7.4L is essentially a below-market option. *See* SHAG MSJ at 15–16 (relying on *Kelly v. Ammex Tax & Duty Free Shops W., Inc.*, 162 Wn. App. 825, 830–32, 256 P.3d 1255 (2011)). But the court in *Kelly* was asked to determine the nature of a right that had been referred to confusingly as both a "right of first refusal" and a "right of first offer," and the court resolved the ambiguity by applying the right as described in the contract. *Kelly*, 162 Wn. App. at 830–32. Here, by contrast, SHAG asks the Court to treat its ROFR like an option even though (a) the ROFR is never referred to as an option, and (b) the parties did use the term "option" elsewhere in the Partnership Agreements to describe different, unilateral rights to purchase the Project at *fair market value*, demonstrating that the parties used the term "option" when describing a unilateral purchase right. Indeed, far from supporting SHAG's construction of the ROFR, *Kelly* confirms that a ROFR "requires the landowner to first get an offer to purchase from a third party, that the seller is willing to accept." *Id*. at 831.

---

[5] Indeed, the only Court to have interpreted the inclusion of a Section 42 ROFR in a partnership agreement confirmed that to be exercisable, there must have been a third-party offer and the partnership must have decided to accept the third-party offer. *See Homeowner's Rehab,* 479 Mass. at 741. SHAG attempts to distinguish *Homeowner's Rehab* on the ground that the contract in that case provided that the project would be "offered" to the ROFR-holder once the ROFR was triggered, whereas the Partnership Agreements allow the ROFR-holder "to purchase" the Project once the ROFR is triggered. *See* SHAG MSJ at 21. SHAG, however, fails to explain what meaningful difference there is between being offered and being allowed to purchase the project. Indeed there is none. *Homeowner's Rehab*, 479 Mass. at 746 (describing that once the project is "offered" through a "disposition notice," the ROFR-holder "can exercise its right of first refusal and acquire the property interest").

DEFENDANTS AND COUNTER-PLAINTIFFS'
OPPOSITION TO SHAG/SHAC MSJ
(No. 2:17-cv-01115-RSM) – 9

**Boies Schiller Flexner LLP**
725 South Figueroa Street, 31st Floor
Los Angeles, CA  90017-5524
Phone:  (213) 629-9040
Fax:  (213) 629-9022

## 2.   Section 7.4L Describes Only What Is Required for SHAG to *Have* the ROFR, Not What is Necessary to *Trigger* SHAG's ROFR

To distract from the ordinary meaning of the term "Right of First Refusal," SHAG claims that Section 7.4L grants it "the straightforward right simply 'to purchase the Project' if it meets the conditions expressly listed in Section 7.4L"—*i.e.* that it remains (1) the lessee and operator of the project and (2) a "qualified nonprofit organization." *See* SHAG MSJ at 15, 21.

SHAG, however, conflates the conditions for *exercise* of its ROFR with the requirements for *possession* of the ROFR. The requirements that SHAG be a qualified nonprofit organization and the operator and lessee of the Project are threshold criteria that must be met in order for SHAG even to have the ROFR in the first place. *See* Partnership Agreements § 7.4L (providing that, subject to its continuing status as a qualified nonprofit organization and the operator and lessee of the Projects, SHAG "shall *have* a 'Right of First Refusal' (the "Special ROFR")") (emphasis added). Having a ROFR, however, is not the same as being able to exercise it to purchase the Projects. *See Robroy*, 95 Wn.2d at 71 ("The [ROFR-holder] has no power or right to affect the property in any way until its owner expresses a desire and willingness to sell."); *Kelly*, 162 Wn. App. at 831 ("A right of first refusal does not become an option to purchase until the owner of the property voluntarily decides to sell the property and receives a bona fide offer to purchase from a third party.") (citing *Bennett*, 73 Wn.2d at 856).[6]

The preconditions that the Partnership Agreements impose for the *possession* of the ROFR are consistent with the legislative scheme codified in Section 42. As noted in the Limited Partners' summary judgment motion, Congress only allows a Section 42 ROFR to be granted to certain types of entities, including "qualified nonprofit organizations," without jeopardizing the

---

[6] Similarly, Section 7.4K provides that in the event the Investor Limited Partner exercises its Limited Partnership Option to force a sale, "the Purchaser *shall have* a Right of First Refusal to purchase the Project in accordance with the provisions of Paragraph 7.4L hereof." *See* Partnership Agreements § 7.4K (emphasis added). This is because, while SHAG *possesses* the ROFR in that circumstance, only one of the two requirements for the *exercise* of a ROFR is present—the Investor Limited Partner's willingness to sell. Once there is a bona fide third-party offer, the ROFR will become exercisable. *See Kelly*, 162 Wn. App. at 831 (holding that a ROFR "requires the landowner to first get an offer to purchase from a third party, that the seller is willing to accept").

Partnership's entitlement to tax credits. *See* 26 U.S.C. § 42(i)(7)(A) ("No Federal income tax benefit shall fail to be allowable to the taxpayer with respect to any qualified low-income building merely by reason of a right of 1st refusal held by . . . a qualified nonprofit organization (as defined in subsection (h)(5)(C))"). Section 7.4L of the Partnership Agreements accordingly contains language confirming that, in order to "have" the Section 42 ROFR, the Purchaser must be a qualified nonprofit organization.

### 3. The Parties Intended for the Partnership Agreements to Comport with Section 42, Which Does Not Permit a Below-Market Option

The parties deliberately chose to grant SHAG a Section 42 ROFR instead of a below-market option because granting a below-market option would have jeopardized the Partnership's ability to take advantage of Section 42's tax benefits, in contravention of the Partnership's express purpose. (Declaration of Craig H. Bessenger ("Bessenger Decl."), Ex. QQQ (Transcript of Second Deposition of Bryan Park ("Park Dep. Tr. II")) at 38:20–40:02 (acknowledging that granting a below-market option "could create some concerns for . . . investor's tax counsel" because it would undermine whether the deal was in "compliance with Section 42(i)[,]" and specifically "whether the deal was within the safe harbor of Section 42(i)(7)").)

That the parties intended for the Partnership Agreements to comport with Section 42 is evident throughout the Partnership Agreements, including as follows:

- **Section 2.3** provides that the purpose of agreement is to enter into Operating Use Leases with SHAG "to operate the Project on behalf of the Partnership in such a manner as to cause the Project to constitute a qualified low income housing project . . . within the meaning of Section 42(g) of the Code."

- **Section 7.4C** provides that the General Partners "shall cause the Lessee . . . to hold for occupancy such percentage of the apartment units in the Project in such a manner as to qualify the entire Project as a 'qualified low income housing project' under Section 42(g) of the Code" . . . [and] shall cause the Lessee not to take any action . . . which

DEFENDANTS AND COUNTER-PLAINTIFFS'
OPPOSITION TO SHAG/SHAC MSJ
(No. 2:17-cv-01115-RSM) – 11

**Boies Schiller Flexner LLP**
725 South Figueroa Street, 31st Floor
Los Angeles, CA  90017-5524
Phone:  (213) 629-9040
Fax:  (213) 629-9022

would cause the recapture of any Federal Housing Tax Credit without the Consent of the Investor Limited Partner."

- **Section 7.4L** incorporates the definition of "qualified nonprofit organization" that is specified by Section 42(h)(5)(C) as well as the minimum statutory purchase price set forth in Section 42(i)(7)(B)).[7]

These repeated references to Section 42 confirm that the parties did not intend to grant any purchase rights to SHAG that would jeopardize the Partnerships' tax status and/or eligibility for tax benefits under Section 42, and thus intended for SHAG's purchase right in Section 7.4L to fall within the safe harbor that Congress limited to below-market *rights of first refusal*.

### 4. SHAG's Interpretation of the ROFR Would Render Provisions of the Partnership Agreements Superfluous and Lead to Untenable Results

By including both an option and a ROFR in the Partnership Agreements, the parties clearly recognized that the ROFR and option are distinct rights. To nonetheless interpret the ROFR as unilaterally exercisable, as SHAG urges, would violate key precepts of contract interpretation. Because the option is exercisable at the *greater of* fair market value and the Section 42 price, *see* Partnership Agreements § 7.4J, in circumstances where the fair market value is *lower* than the Section 42 price, the ROFR-holder and the option-holder would *both* have an absolute unilateral right to purchase at the Section 42 price. Because in all but one of the Partnership Agreements the ROFR-holder and the option-holder are different entities, the result would be that two distinct entities would have the same one right to purchase the Projects. *See Hartford Fire Ins. Co. v. Columbia State Bank*, 183 Wn. App. 599, 608, 334 P.3d 87 (2014) ("[Courts] avoid interpreting statutes and contracts in ways that lead to absurd results.").

---

[7] Relying on *Homeowner's Rehab*, SHAG argues that the negative tax implications of its interpretation of the ROFR are irrelevant, *see* SHAG MSJ at 21–22, but this argument ignores these provisions in the Partnership Agreements, which confirm that the parties intended to draft the ROFR in a way that would not jeopardize the Partnerships' low-income housing tax credits. Moreover, that the ROFR cannot be exercised until after the compliance period, *id.* at 22, is of no moment because (a) it is the *grant* of the ROFR, not its exercise, that raises concerns under tax principles and that the Section 42 safe harbor protects; and (b) by definition, for it to comply with Section 42(i)(7), a below-market ROFR cannot be exercised until "after the close of the compliance period."

DEFENDANTS AND COUNTER-PLAINTIFFS'
OPPOSITION TO SHAG/SHAC MSJ
(No. 2:17-cv-01115-RSM) – 12

**Boies Schiller Flexner LLP**
725 South Figueroa Street, 31st Floor
Los Angeles, CA  90017-5524
Phone:  (213) 629-9040
Fax:  (213) 629-9022

Moreover, in the one Partnership Agreement in which SHAG holds both the ROFR and the option (the Auburn Court Partnership Agreement), the option would be rendered superfluous because, where fair market value is *greater* than the Section 42 price, there would be no reason for SHAG to exercise the higher-priced option instead of its ROFR; and where fair market value is *less* than the Section 42 price, the option affords nothing beyond what is already provided by the ROFR. *See Diamond B Constructors, Inc. v. Granite Falls Sch. Dist.*, 117 Wn. App. 157, 165, 70 P.3d 966 (2003) ("We must construe a contract to give meaning to every term.").

SHAG seeks to avoid the absurd consequences of its interpretation by arguing that the option is subordinate to the ROFR, but options, by definition, cannot be subordinate to another party's purchase right. *See Bennett*, 73 Wn.2d at 853 (option "is a complete, valid and binding agreement by the terms of which a collateral offer is kept open for a specified period of time"); *Robroy*, 95 Wn.2d at 71 ("The holder of a right of first refusal has far less of an interest in land than the holder of an ordinary option."). Indeed, the parties recognized as much when they expressly provided that the Section 7.4K forced sale right was subject to the ROFR in Section 7.4L, but included no such language to subordinate the Section 7.4J option to the ROFR.

### 5. Section 4.5A(iii) Only Prevents the Limited Partners from Blocking a Sale to SHAG Upon the Exercise of Its Validly Triggered ROFR

In an attempt to benefit from the limited holding in *Homeowner's Rehab*, SHAG argues that the Investor Limited Partner's assent is not required in order for the Partnership to consent to a third-party sale so as to trigger SHAG's ROFR. *See* SHAG MSJ at 20–21. The *Homeowner's Rehab* court, however, "emphasize[d] that [it was] only interpreting the language of the agreements that the parties executed [t]here," and that case thus provides no support for SHAG's argument in the context of its distinct contracts with the Limited Partners. *Homeowner's Rehab*, 479 Mass. at 761. Far from obviating the need for Investor Limited Partner consent to trigger the ROFR, the relevant sections of the Partnership Agreements here confirm that the Limited Partners' consent is *necessary*.

**Boies Schiller Flexner LLP**
725 South Figueroa Street, 31st Floor
Los Angeles, CA  90017-5524
Phone:  (213) 629-9040
Fax:  (213) 629-9022

1    Specifically, Section 4.5A(iii) of the Partnership Agreements provides that the Investor

2    Limited Partner has the general right to approve or disapprove of a sale of the Partnership's

3    assets, subject to limited exceptions:

4         [T]he Investor Limited Partners shall have the right . . . with consent of all remaining
         Partners, to approve or disapprove the sale of all or substantially all of the assets of the
5         Partnership (other than a sale pursuant to the Option described in Section 7.4J or the
         Special ROFR described in Section 7.4L)[.]
6

7    Partnership Agreements § 4.5A(iii).

8    SHAG claims that the exception set forth in the parenthetical—"other than a sale

9    pursuant to . . . the Special ROFR"—demonstrates that the Limited Partners' willingness to sell

10   the Projects is not a necessary precondition to the valid exercise of SHAG's ROFR.  *See* SHAG

11   MSJ at 9.  SHAG further claims that the absence of this language in the first two Partnership

12   Agreements—Woodlands and Lakewood Meadows—establishes that "[t]he parties added that

13   exclusion to ensure that there would be no confusion about SHAG's ability to exercise the

14   special ROFR unilaterally."  *Id.* at 18–19.[8]  This flawed argument, however, conflates the

15   requirement that the Limited Partners approve of a sale to a *third-party* (so as to trigger the valid

16   exercise of the ROFR) with a requirement that the Limited Partners approve of a sale to *SHAG*

17   (once the ROFR has been triggered).  The reality is that the parenthetical was necessary to

18   eliminate any argument that the Limited Partners could block the sale of the Projects to SHAG

19   after its ROFR had been validly triggered and exercised, which the parties clearly did not intend.

20   The insertion of the parenthetical thus simply serves to eliminate any confusion and make

21   Section 4.5 fully compatible with SHAG's preemptive ROFR under Section 7.4L.[9]

22

23        [8] Of course, if the addition of the reference to the "Special ROFR described in Section 7.4L" to the
     parenthetical in Section 4.5A(iii) were necessary to eliminate the Investor Limited Partner's right to withhold
     approval of the third-party offer that *triggers* the ROFR, as SHAG argues, then the absence of that language in the
24   Partnership Agreements for Woodlands and Lakewood Meadows would suggest that the Limited Partners' *retain*
     their consent rights in connection with those Projects.  While this clearly is not SHAG's position, it is the logical
25   extension of the reasoning it asks the Court to adopt.

26        [9] Notably, SHAG is unable to muster any evidence in support of its claims concerning the reasons for the
     changes to Section 4.5A(iii) other than Mr. Park's unsubstantiated and self-serving statements regarding his own

By contrast, to read the parenthetical as SHAG urges would be to create an inconsistency with Section 7.1B of the Partnership Agreements, which restricts the authority of the General Partner to act without the consent of the Investor Limited Partner. *See* Partnership Agreements § 7.1(B). Section 7.1B(viii) expressly states that the General Partner shall not have any authority "to sell or convey the Property, except as provided in Article IIIC," which in turn provides that the Partnership "must receive the Consent of the Investor Limited Partner" to the terms of any proposed sale. *Id.* §§ 3(C), 7.1(B). Properly read, Section 4.5A(iii) and Section 7.1(B) confirm that there are only two potential sales that the Limited Partners do not have an absolute right to block: (1) a sale to the General Partner pursuant to the exercise of its option; and (2) a sale to SHAG pursuant to the valid exercise of its ROFR, once this right has been triggered by the Partnership's willingness—with the Limited Partners' consent—to accept a bona fide third-party offer. If the parties had instead intended to allow the General Partner to consent unilaterally to a third-party sale in order to trigger SHAG's ROFR against the Limited Partners' objection, they could have and would have included language in Section 7.1B(viii) that limited the categorical prohibition on the General Partner's unilateral sale of the Project.[10]

### C.   Extrinsic Evidence Provides No Support for SHAG's Position

Notwithstanding the unambiguous language of the Partnership Agreements, SHAG asks

---

intent in including the provisions and his claim that the Limited Partners "did not object to my proposed edits to Section 4.5A(iii), and never questioned why those edits were being proposed." As noted above, however, these edits were necessary to ensure that SHAG could exercise its ROFR without interference from the Limited Partners if and when it was ever validly triggered, and the Limited Partners had no legitimate reason to object to such a change.

[10] SHAG pulls phrases out of context from the deposition of the Limited Partners' Rule 30(b)(6) designee Ryan Trane to argue that the Limited Partners do not know why Section 7.4L was included in the Partnership Agreements, or why Section 4.5(A)(iii) includes an exception for the ROFR. *See* SHAG MSJ at 11. Mr. Trane, however, testified to the reasons for both provisions. When asked about Section 7.4L, Mr. Trane testified that "the entire purpose of the special [] ROFR is to protect the qualified nonprofit and essentially keep them [ ] in [the Project]." (Bessenger Decl., Ex. RRR (Transcript of Deposition of Ryan Trane) at 189:14–17; *see also id.* at 190:18–21, 191:03–05 (testifying that the Section 7.4L ROFR "is defensive in that it prevents should [the nonprofit] wish to stay on the property, them being . . . kicked out or. . . the property sold []out from under them," which Mr. Trane testified was important "insomuch as it allows [the nonprofit] to stay a part of the project"). When asked why there was a carve-out in Section 4.5(A)(iii) for the SHAG's ROFR, Mr. Trane explained that the carve-out applies after the ROFR is "validly exercised." (*Id.* at 195:10–13.)

DEFENDANTS AND COUNTER-PLAINTIFFS'
OPPOSITION TO SHAG/SHAC MSJ
(No. 2:17-cv-01115-RSM) – 15

**Boies Schiller Flexner LLP**
725 South Figueroa Street, 31st Floor
Los Angeles, CA  90017-5524
Phone:  (213) 629-9040
Fax:  (213) 629-9022

1    this Court to consider extrinsic evidence of what it claims was the intent of the parties in

2    negotiating the Partnership Agreements.  *See* SHAG MSJ at 19.  As explained below, the Court

3    should disregard this extrinsic evidence.

### 1.    SHAG's Questionable Evidence of Park's Unilateral Intent Cannot Modify the Unambiguous Language of the Partnership Agreements

6        As an initial matter, SHAG's proffered evidence should be disregarded because extrinsic

7    evidence may not be used "to 'show an intention independent of the instrument' or to 'vary,

8    contradict or modify the written word.'"  *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154

9    Wn.2d 493, 503, 115 P.3d 262 (2005) (quoting *Berg v. Hudesman*, 115 Wn.2d 657, 801 P.2d 222

10   (1990)).  Here, notwithstanding the Partnership Agreements' express use of the term "Right of

11   First Refusal," SHAG relies on extrinsic evidence to argue that the "Right of First Refusal"

12   should be rewritten to become a purchase right that can be unilaterally exercised by the holder—

13   a different right altogether.  *See S. Kitsap Family Worship Ctr. v. Weir*, 135 Wn. App. 900, 909,

14   146 P.3d 935 (2006) (explaining that the Supreme Court of Washington "distinguished a right of

15   first refusal from an ordinary option, which gives the holder the power to compel an unwilling

16   owner to sell").  As it would be used to contradict the express terms of the Partnership

17   Agreements, the extrinsic evidence should not be considered.

18       Moreover, the primary evidence on which SHAG relies is Bryan Park's *own* letter to

19   Paramount (AMTAX's predecessor) on behalf of Pacific Northern Construction Company

20   ("PNCC"), noting that the general partner is required to obtain a ROFR for SHAG, and reflecting

21   *Mr. Park's* desire for SHAG to have "meaningful opportunities and incentives" in connection

22   with one of the seven projects at issue.  SHAG MSJ at 9–10, 19 (citing Park Decl., Ex. A).

23   SHAG, however, offers no evidence of Paramount's response to the letter.  This self-serving

24   evidence of Park's unilateral intent is not admissible to aid in interpretation of the contract.  *See*

25   *William G. Hulbert*, 159 Wn. App. at 400 ("[E]xtrinsic evidence of a party's subjective,

26   unilateral intent as to the contract's meaning is not admissible.").  And even if the letter could be

DEFENDANTS AND COUNTER-PLAINTIFFS'
OPPOSITION TO SHAG/SHAC MSJ
(No. 2:17-cv-01115-RSM) – 16

**Boies Schiller Flexner LLP**
725 South Figueroa Street, 31st Floor
Los Angeles, CA  90017-5524
Phone:  (213) 629-9040
Fax:  (213) 629-9022

considered evidence of the parties' *mutual* intent, which it cannot, nothing in the letter defines

the parameters of the ROFR, other than to make clear that it is intended to fall within the safe

harbor of Section 42(i)(7).  *See* Park Decl., Ex. A.

Nor can Mr. Park's unfounded statement regarding *Paramount*'s intent be considered

competent evidence of the parties' mutual intent.  Mr. Park makes a single conclusory and

entirely self-serving statement that then Paramount Executive Vice President Michael Buckley

"agreed" that SHAG's ROFR "would be exercisable by SHAG (if all express conditions were

met) without requiring the consent of any other party." Park Decl., ¶ 21.  Mr. Park, however,

provides no specific details about this alleged conversation—not a date, location, or description

of the parties present.  Nor does SHAG proffer any evidence regarding Mr. Buckley's role in the

negotiations, much less any evidence demonstrating that Mr. Buckley was authorized to bind

Paramount with respect to Mr. Park's characterization of SHAG's ROFR.  Moreover, even if this

highly questionable allegation were true—and SHAG has proffered insufficient evidence that it

is—it does not demonstrate that the parties mutually intended that the ROFR could be exercised

without a bona fide third-party offer, which is an additional requirement for exercise of the

ROFR.  At most, Mr. Park's statement regarding Mr. Buckley's intent creates a triable issue of

fact as to the parties' mutual intent.  It certainly does not warrant a grant of summary judgment.

### 2.      Financial Projections Are Irrelevant to Interpreting the ROFR

SHAG also relies on evidence of Paramount's financial "projections" to argue that

interpreting the ROFR as being unilaterally exercisable "makes sense" because the Limited

Partners "were investing in the projects based on their anticipated tax benefits, not an expectation

of back-end sale profits."  SHAG MSJ at 19.  SHAG claims that because the Limited Partners'

investments have "already exceeded expectations based on their rates of return[,]" (*id.* at 12),

SHAG should be permitted to unilaterally exercise its ROFR and prevent the Limited Partners

from participating in any portion of the enormous residual value of the Projects.  SHAG's

position lacks merit.

DEFENDANTS AND COUNTER-PLAINTIFFS'
OPPOSITION TO SHAG/SHAC MSJ
(No. 2:17-cv-01115-RSM) – 17

**Boies Schiller Flexner LLP**
725 South Figueroa Street, 31st Floor
Los Angeles, CA  90017-5524
Phone:  (213) 629-9040
Fax:  (213) 629-9022

First, in support of its claims regarding the Limited Partners' expectations, SHAG relies on a declaration from its purported expert, Joel Rubenzahl, that "Paramount's own internal financial projections . . . assumed AMTAX would not receive sale proceeds in assessing the expected rate of return on its investments."  SHAG MSJ at 12 (citing Declaration of Joel Rubenzahl, ¶ 3).  Mr. Rubenzahl, however, misunderstands the nature of these types of projections, which are often used for "conservative underwriting" purposes as a "worst-case scenario" (Declaration of Jon E. Krabbenschmidt ("Krabbenschmidt Decl."), ¶ 5; Bessenger Decl., Ex. SSS, (Transcript of Deposition of Jon E. Krabbenschmidt) at 167:08–18), and do not reflect the investors' actual expectations.[11]  Indeed, it is standard industry practice for LIHTC investors to assume that there will be little to no cash distributions for conservative underwriting purposes.  (Krabbenschmidt Decl., ¶ 4; Bessenger Decl., Ex. TTT (Expert Rebuttal Report of Jon E. Krabbenschmidt) at 2.)  That does not change the fact that LIHTC investors negotiate for the right to receive cash distributions as calculated in accordance with the applicable partnership or operating agreements, including distributions from capital transactions.  (Krabbenschmidt Decl, ¶ 6.)  Thus, it would be wrong to conclude that an investor had no expectation of benefits beyond the tax benefits generated by a LIHTC investment simply because the investor did not factor cash distributions into its financial projections.  (*Id.*, ¶ 5.)

Moreover, even if the projections reflected the investors' actual view of the likely performance of the investment, rather than a conservative one, whether a party expects that the ultimate disposition of a project will generate proceeds and whether a party expects to share in those proceeds if they are generated are two different questions.  Here, the Partnership Agreements themselves confirm that the Limited Partners anticipated and are contractually

---

[11] In his deposition, Mr. Rubenzahl admitted that he has never spoken with the Investor Limited Partners regarding their actual expectations for their LIHTC investments, and has never been involved in *any* negotiations regarding *any* such investments.  (Bessenger Decl., Ex. UUU, (Transcript of Deposition of Joel Rubenzahl) at 93:10–94:13.)  Mr. Rubenzahl also confirmed his lack of objectivity on the issues presented in this action, testifying that he has devoted his entire career to efforts to transfer wealth away from LIHTC investors for the benefit of the nonprofit entities for whom he consults.  (*Id.* at 18:03–20:03, 32:01–23.)

DEFENDANTS AND COUNTER-PLAINTIFFS'
OPPOSITION TO SHAG/SHAC MSJ
(No. 2:17-cv-01115-RSM) – 18

**Boies Schiller Flexner LLP**
725 South Figueroa Street, 31st Floor
Los Angeles, CA  90017-5524
Phone:  (213) 629-9040
Fax:  (213) 629-9022

entitled to a portion of any upside realized from a sale of the Projects.  *See* Partnership Agreement § 6.2B(ii) ("waterfall" providing for distribution of cash proceeds from the sale of a Project to the Investor Limited Partner).  Indeed, had the Investor Limited Partner *not* had an expectation to share in any profit from the sale of the Project, then the Partnership would have violated the "economic substance" requirements applicable under federal income tax principles.  Under the economic substance rule, a partnership will not be recognized as such for federal tax purposes unless all partners are subject to tax-independent upside and downside potential.  *See Comm'r of Internal Revenue v. Tower*, 327 U.S. 280, 287 (1946) (all partners must have "really and truly intended to join together for the purpose of carrying on business *and sharing in the profits or losses or both*") (emphasis added); *Historic Boardwalk Hall, LLC v. Comm'r of Internal Revenue*, 694 F.3d 425, 459 (3rd Cir. 2012) ("dearth of any meaningful upside potential" meant that purported partner in limited liability company was not a bona fide partner for federal tax purposes), *cert. denied*, __ U.S. __, 133 S.Ct. 2374 (2013).

Because the parties clearly intended for the Partnership to be a real partnership for tax law purposes, *see* Partnership Agreements § 2.3, and expressly contracted for the Investor Limited Partners to share in upside potential of the project, *see id.* § 6.2, SHAG's attempt to prove through extrinsic evidence that the Limited Partners are not entitled to share in the residual value of the Projects must be rejected.  *See Hearst Commc'ns,* 154 Wn.2d at 503 (extrinsic evidence cannot be used to vary the terms of a contract).

### D.   SHAG's ROFR Has Value Irrespective of Its Exercise

SHAG also urges the Court to reject the plain meaning of the Section 42 ROFR in Section 7.4L of the Partnership Agreements because it claims the ROFR "would have no practical value to SHAG" if its exercise required bona fide third-party offers that the Partnerships were willing to accept, requiring the Limited Partners' consent.  *See* SHAG MSJ at 17.  This argument fails for several reasons.

DEFENDANTS AND COUNTER-PLAINTIFFS'
OPPOSITION TO SHAG/SHAC MSJ
(No. 2:17-cv-01115-RSM) – 19

**Boies Schiller Flexner LLP**
725 South Figueroa Street, 31st Floor
Los Angeles, CA  90017-5524
Phone:  (213) 629-9040
Fax:  (213) 629-9022

As an initial matter, the position SHAG has adopted in this litigation—that anything other than a unilaterally exercisable ROFR has no value to the ROFR-holder—is belied by the parties' own deal history.  In his deposition in this action, Mr. Park testified emphatically that he had *never* seen a ROFR provision that requires the consent of the Partnership (or limited partners) to sell.  (*See* Park Dep. Tr. II at 78:09–18 ("When I say no, I mean no."); *see also id.* 78:19–79:05 ("Q: . . . [T]hese [ROFR's requiring the consent of the project partnership to sell] just don't exist. Is that what you're saying?  A:  In the tax credit world, absolutely not.  I've never seen a consent provision, and it would be completely contrary to the grant.  I mean, what's the point?  Why bother?  . . . Why bother doing a special ROFR if the limited partner can, you know, change their mind 15-plus years later, you know, because they've got seller's remorse.").)[12]  After being shown a document by the Limited Partners' counsel, however, Mr. Park admitted that the ROFR agreement he negotiated between SHAG and an AMTAX entity in the Ballinger Court Limited Partnership (another partnership between the parties) requires just that—"both a bona fide offer and an intention by the partnership to accept that offer."  (Park Dep. Tr. II at 82:05–10; 83:07– 12); *see also* Dkt. 88-1 ("Woolford Decl."), Ex. N ("In the event that the Partnership receives a bona fide offer to purchase the Apartment Complex . . . , which offer the Partnership intends to accept, SHAG shall have a right of refusal to purchase the Apartment Complex. . .").  That Mr. Park negotiated in 2004 precisely the type of ROFR for SHAG that he now claims could not exist because it would be valueless to the ROFR-holder fatally undermines SHAG's argument.

SHAG's argument is also based on the erroneous premise that there are *no* circumstances in which the Limited Partners would consent to a third-party sale or exercise its forced sale right, thereby triggering SHAG's right to exercise its ROFR.  Contrary to SHAG's assumption, it is not difficult to foresee reasons why the Limited Partners would agree to facilitate the transfer of a

---

[12] Notably, in explaining that the reason *partnership* consent is never required for exercise of the ROFR is that the *limited partners* could change their mind at the end of the compliance period, Mr. Park conceded that the limited partners' consent is required in order for the partnership to consent to a sale.  Park Dep. Tr. II at 78:19– 79:05; *see also id.* at 81:03–10 (explaining that having a ROFR with consent rights was inconsistent with his experience because "what's the point of granting a ROFR when it can be unilaterally denied?").

DEFENDANTS AND COUNTER-PLAINTIFFS'
OPPOSITION TO SHAG/SHAC MSJ
(No. 2:17-cv-01115-RSM) – 20

**Boies Schiller Flexner LLP**
725 South Figueroa Street, 31st Floor
Los Angeles, CA  90017-5524
Phone:  (213) 629-9040
Fax:  (213) 629-9022

Project with little residual value to SHAG at the Section 42 Price (*e.g.*, to foster their relationship with their nonprofit partner, or because it is administratively simpler to no longer be involved in a partnership with limited back-end upside).  *See* Dkt. 98 (Declaration of Ryan Trane ("Trane Decl.")) ¶ 9.  That such circumstances are not present here—where the Projects have accrued enormous equity based on the substantial appreciation in real estate value they have enjoyed—does not mean that, at the time it was granted, the ROFR did not provide SHAG with a "meaningful opportunity to purchase the Project commensurate with the opportunities enjoyed by the other project participants."  SHAG MSJ at 10 (quotation marks and citations omitted).

Moreover, the ROFR plays an important role regardless of whether or not it is ever exercised.  Where a Project has a low residual value at the end of its fifteen-year compliance period, it is not uncommon for the price set by Section 42 to be close to, or even higher than, fair market value.  Trane Decl. ¶ 11.  In these circumstances, it can be in the interest of the Limited Partners to *trigger* the Section 42 ROFR—either by exercising their forced sale rights under Section 7.4.K, or by consenting to a sale to a third party—and *also* be in SHAG's interest to *exercise* the ROFR, because a transfer pursuant to the Section 42 ROFR allows both parties avoid the time and resources associated with a sale of the property, and allows SHAG to obtain sole ownership and control of the Property.  *Id.*  Alternatively, where the Project has accumulated significant residual value over the compliance period, the ROFR prevents the Partnership from cashing in on that value by selling the property out from under the nonprofit, because doing so would trigger SHAG's below-market ROFR.  In other words, because the ROFR is a preemptive or defensive right, *see Bennett*, 73 Wn.2d at 856, its presence in the Partnership Agreements provides value to SHAG even in the absence of its exercise.

Finally, it is significant that the Limited Partners' forced sale right—contained in Sections 7.4K of the Partnership Agreements—has the same two-year sunset provision as SHAG's ROFR, such that the Limited Partners cannot simply wait SHAG out and force a sale after SHAG's ROFR has expired.  The intended and actual result of this structure is that the only

DEFENDANTS AND COUNTER-PLAINTIFFS'
OPPOSITION TO SHAG/SHAC MSJ
(No. 2:17-cv-01115-RSM) – 21

**Boies Schiller Flexner LLP**
725 South Figueroa Street, 31st Floor
Los Angeles, CA  90017-5524
Phone:  (213) 629-9040
Fax:  (213) 629-9022

way that the Limited Partners can force an exit from the Partnership is at the Section 42 price, and the Section 42 ROFR is a critical component of that structure.

**E.      There Have Been No Enforceable Offers, and Exercise of the Option Does Not Trigger the ROFR**

SHAG devotes a single sentence towards the end of its summary judgment brief to arguing that the Partnerships have received third-party offers to purchase the Projects that were transmitted to the Limited Partners before or at the time SHAG purported to exercise its ROFR. *See* SHAG MSJ at 22.  Given that SHAG seeks a judicial declaration that it can unilaterally exercise its ROFR even in the absence of third-party offers, this issue is irrelevant to whether SHAG is entitled to summary judgment on its affirmative declaratory relief claim (except insofar as it demonstrates that—despite their claims to the contrary here—SHAG and Mr. Park recognized that a third-party offer was necessary to trigger SHAG's ROFR).  Moreover, as explained in the Limited Partners' summary judgment motion:  (a) SHAG has not purported to exercise its ROFR with respect to three of the seven Projects (*i.e.*, the Lakewood Meadows Project, the Alderwood Court Project, and the Woodlands Project), *see* Dkt. 89 at 8 n.3; and (b) the "offers" for the other four Projects were neither bona fide nor enforceable, and thus did not trigger the Limited Partners' consent rights or SHAG's ROFR, *see id.* at 8–11, 21–22.

SHAG also claims that the decision by Counter-Defendant Steel Lake Enterprises, LLC ("Steel Lake") to exercise its option under Section 7.4J of the Meridian Court Partnership Agreement independently triggered SHAG's ROFR to purchase the Meridian Court Project because, according to SHAG, its "ROFR has priority over the option."  SHAG MSJ at 23.  Steel Lake's exercise of its option, however, does not trigger SHAG's ROFR under Section 7.4L. Indeed, in contrast to Section 7.4K, which provides that "[i]n the event that the Investor Limited Partner exercises [its Forced Sale Right], [SHAG] shall have a Right of First Refusal to purchase the Project in accordance with the provisions of Paragraph 7.4L hereof," Section 7.4J contains no such language.  This demonstrates that the parties knew what to say when they wanted the

1    exercise of a right to trigger the ROFR, but chose not to include that language when discussing

2    the General Partner's option.[13]

3    **F.    The Global Indemnity Agreement Creates Triable Issues of Fact as to the**

4    **Actual Holder of the ROFR**

5    As described in the Limited Partners' summary judgment motion, SHAG entered into a

6    Global Indemnity Agreement (the "Global Indemnity Agreement" or "GIA") with Mr. Park and

7    his company PNCC whereby SHAG improperly transferred economic ownership interests arising

8    from the exercise of its ROFR to for-profit entities controlled by Mr. Park.  *See* Dkt. 89 at 6–7.

9    Under the GIA, after the exercise of SHAG's ROFR, the Projects would not be owned by SHAG

10   outright, but instead would be owned jointly by SHAG and a for-profit entity controlled by Mr.

11   Park, with the latter maintaining control over the Project as General Partner and receiving—by

12   Mr. Park's estimation—around *ninety percent* of the economic benefits.  Dkt. 90-1, Ex. B

13   (Transcript of First Deposition of Bryan Park) at 200:10–21; *id.*, Ex. J.  If permitted, SHAG's

14   exercise of its ROFR under these circumstances would defeat Congress' purpose in enacting the

15   Section 42(i)(7) safe harbor—*i.e.*, to promote LIHTC property ownership by qualified nonprofits

16   and other eligible groups, including tenants and residential management corporations.  *See* Dkt.

17   89 at 22–23.

18   In its motion, SHAG attempts to minimize the significance of the Global Indemnity

19   Agreement by claiming that, "[b]ecause PNCC's economic interests are the same both before

20   and after a Special ROFR exercise, PNCC is economically *indifferent* to whether SHAG

21   successfully exercises its Special ROFR."  SHAG MSJ at 23 (emphasis in original).  SHAG

22   ignores, however, that it made this same argument to the state agency responsible for regulating

23   affordable housing in Washington State, which *expressly rejected* SHAG's claim.  Specifically,

24   in a determination letter regarding SHAG's relationship with PNCC that the Washington State

25

26   _____

[13] Given that Steel Lake stands to personally gain from SHAG's exercise of its ROFR as a result of the Global Indemnity Agreement (*see* Section II.F *infra*), it would be particularly inequitable if Steel Lake could control the triggering of the ROFR through its unilateral right to exercise its option.

Housing Finance Commission (the "WSHFC") issued at SHAG's request, the WSHFC found that "PNCC's preserved economic interests [under the Global Indemnity Agreement] appear to be worth tens of millions of dollars."  Woolford Decl., Ex. D at 12.  The WSHFC went on to reject SHAG's claim that "it gave up nothing of value with the GIA," holding that SHAG's position ignored a number of contrary facts, including "that preserving PNCC's interests precluded SHAG from keeping those interests after exercising those ROFRs in the future . . . ." *Id.* at 13.  These findings undercut SHAG's efforts to downplay the substantial transfer of economic benefits from the exercise of the ROFR that the GIA accomplished, and raise triable issues of fact as to whether, in light of the GIA, SHAG can still be considered the holder of the Section 42 ROFR in Section 7.4L of the Partnership Agreements.

Ironically, despite ignoring its findings as described above, SHAG seeks to rely on the WSHFC determination letter to argue that the existence of the GIA does not impact its ability to exercise the ROFR.  *See* SHAG MSJ at 24 ("The Commission concluded the Global Indemnity Agreement is consistent with SHAG's mission and does not affect SHAG's status as a qualified nonprofit under the LIHTC statute").  SHAG, however, overstates the scope of WSHFC's evaluation and determination, which were focused solely on whether PNCC "controlled" or was "affiliated with" SHAG as those terms are used in Section 42(h)(5)(c)(ii).  Other than reaffirming SHAG's nonprofit status under Washington law, the WSHFC did *not* evaluate or make *any* findings as to whether SHAG could exercise its ROFR notwithstanding the existence of the GIA. The determination letter accordingly is irrelevant to the issues that this Court must address, and its existence does not resolve the factual dispute over the impact of the GIA on SHAG's ROFR.

## III.      CONCLUSION

For the reasons explained above, the Limited Partners respectfully request that the Court deny SHAG's Motion for Summary Judgment.


RESPECTFULLY SUBMITTED this 14th day of December, 2018.

**Boies Schiller Flexner LLP**
725 South Figueroa Street, 31st Floor
Los Angeles, CA  90017-5524
Phone:  (213) 629-9040
Fax:  (213) 629-9022

**Boies Schiller Flexner LLP**

By: /s/ Eric S. Pettit
Christopher G. Caldwell, admitted *pro hac vice*
Eric S. Pettit, admitted *pro hac vice*
725 S Figueroa Street, 31st Floor
Los Angeles, CA 90017
Telephone:  213 629 9040
Facsimile:  213 629 9022
Email:   ccaldwell@bsfllp.com
            epettit@bsfllp.com

**Perkins Coie LLP**

By: /s/ Steven D. Merriman
David J. Burman, WSBA #10611
Steven D. Merriman, WSBA #44035
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Telephone:  206.359.8000
Facsimile:  206.359.9000
Email:   DBurman@perkinscoie.com
            SMerriman@perkinscoie.com

Attorneys for the Limited Partners

DEFENDANTS AND COUNTER-PLAINTIFFS'
OPPOSITION TO SHAG/SHAC MSJ
(No. 2:17-cv-01115-RSM) – 25

**Boies Schiller Flexner LLP**
725 South Figueroa Street, 31st Floor
Los Angeles, CA  90017-5524
Phone:  (213) 629-9040
Fax:  (213) 629-9022

1

**CERTIFICATE OF SERVICE**

2

     On December 14, 2018, I caused a copy of DEFENDANTS AND COUNTER-

3

PLAINTIFFS' OPPOSITION TO SENIOR HOUSING ASSISTANCE GROUP'S AND

4

SENIOR HOUSING ASSISTANCE CORPORATION'S MOTION FOR SUMMARY

5

JUDGMENT to be electronically filed via the Court's Electronic Case Filing System, which

6

will notify all attorneys of record of the filing.

7

                                     By:    /s/ Sonia Mejia
                                             Sonia Mejia

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**Boies Schiller Flexner LLP**
725 South Figueroa Street, 31st Floor
Los Angeles, CA  90017-5524
Phone:  (213) 629-9040
Fax:  (213) 629-9022