THE HONORABLE RICARDO S. MARTINEZ

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

SENIOR HOUSING ASSISTANCE
GROUP,

                    Plaintiff,

        v.

AMTAX HOLDINGS 260, LLC, et al.,

                    Defendants.

AMTAX HOLDINGS 260, LLC, et al.,

                    Counter-Plaintiffs,

        v.

SENIOR HOUSING ASSISTANCE
GROUP, et al.,

                    Counter-Defendants.

No. 2:17-cv-01115-RSM

**DEFENDANTS AND COUNTER-
PLAINTIFFS' RESPONSES TO LLC
GENERAL PARTNERS' MOTIONS IN
LIMINE**

**NOTE ON MOTION CALENDAR:
FEBRUARY 8, 2019**

ORAL ARGUMENT REQUESTED

**Boies Schiller Flexner LLP**
725 South Figueroa Street, 31st Floor
Los Angeles, CA 90017-5524
Phone: (213) 629-9040
Fax: (213) 629-9022

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION .................................................................................................1

II.     THE LLC GENERAL PARTNERS' MOTIONS IN LIMINE SHOULD BE
        DENIED...............................................................................................................1

        A.      The Exhibits Challenged by the LLC General Partners Are Relevant to
                Disputed Issues in the Case..................................................................................1

                1.      The Motion Is Predicated on a Misconception of Relevance .....................2

                2.      The LLC General Partners Are Taking Inconsistent Positions...................4

        B.      The Global Indemnity Agreement Is Relevant to Both the Legitimacy of
                SHAG's Attempted ROFR Exercise and the LLC General Partners' Bad
                Faith ....................................................................................................................5

                1.      The Court Should Not Accept Bryan Park's Mischaracterization of
                        the Origins of the Global Indemnity Agreement .......................................6

                2.      At Park's Behest, SHAG Assigned Ownership Interests Arising
                        Out of the Exercise of Its ROFR to Park's For-Profit Entities .................6

                3.      The Global Indemnity Agreement Is Relevant to Whether SHAG
                        Can Exercise its ROFR .........................................................................11

                4.      The Global Indemnity Agreement Is Relevant to Whether Counter-
                        Defendants Acted in Bad Faith and with Unclean Hands.........................13

                5.      The Limited Partners Should Not Be "Estopped" From Presenting
                        Evidence Relating to the Global Indemnity Agreement ...........................13

III.    CONCLUSION...................................................................................................15

LIMITED PARTNERS' RESPONSE TO LLC MIL
(No. 2:17-cv-01115-RSM) – i

**Boies Schiller Flexner LLP**
725 South Figueroa Street, 31st Floor
Los Angeles, CA 90017-5524
Phone: (213) 629-9040
Fax: (213) 629-9022

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

I.      **INTRODUCTION**[1]

Third Party Defendants Lynnwood Retirement Living, LLC, Steel Lake Enterprises, LLC, Woodlands Associates, LLC, and Lakewood Meadows Enterprises, LLC (collectively, the "LLC General Partners") are all general partners of the project partnerships at issue in this litigation (the "Project Partnerships"), and are all controlled by a common principal, an attorney and certified public accountant named Bryan Park.  The LLC General Partners have filed two motions in limine, both of which seek to exclude from trial evidence that is directly relevant to the claims and affirmative defenses of Defendants and Counter-Plaintiffs (the "Limited Partners").  For the reasons explained herein, both motions lack merit and should be denied.

II.     **THE LLC GENERAL PARTNERS' MOTIONS IN LIMINE SHOULD BE DENIED**

A.      *The Exhibits Challenged by the LLC General Partners Are Relevant to Disputed Issues in the Case*

The LLC General Partners seek to exclude as irrelevant 46[2] of the Limited Partners' proposed trial exhibits, which are documents that also were submitted to the Washington State Housing Finance Commission ("WSHFC") in connection with the WSHFC's November 19, 2018, determination regarding the Senior Housing Assistance Group's ("SHAG") qualified nonprofit status.[3]  The LLC General Partners argue that because the Limited Partners are not challenging that determination in this action, none of the documents can be relevant here.  The Court should reject the LLC General Partners' argument because it is based on a

---

[1] The Limited Partners are filing two separate responses because Counter-Defendants filed two separate motions.  Both responses combined are within the page limitation for responses to motions in limine.  *See* Local Rules W.D. Wash. LCR 7(e)(5).

[2] The LLC General Partners indicate that they are moving to exclude 47 exhibits (*see* Dkt. # 129 ("LLC MIL") at 3), but have identified only 46 exhibits (Dkt. # 130 (Second Howard Decl.) at ¶¶ 5-6).

[3] The LLC General Partners misstate the breadth of the WSHFC's November 2018 determination, which determined only that between 2014 through November 2018 SHAG was not affiliated with or controlled by a for-profit organization.   There are three requirements for being determined a "qualified nonprofit organization" under Section 42(h)(5)(C)—only one of which is that the state housing credit agency has determined that the organization is not affiliated with or controlled by a for-profit organization.  26 U.S.C. § 42(h)(5)(C).

**Boies Schiller Flexner LLP**
725 South Figueroa Street, 31st Floor
Los Angeles, CA 90017-5524
Phone: (213) 629-9040
Fax: (213) 629-9022

misunderstanding of the concept of relevance, and is inconsistent with the LLC General Partners' attempt to introduce other documents that were submitted to the WSHFC.  Indeed, the LLC General Partners are attempting to cherry-pick the WSHFC-related documents admitted into evidence—excluding the documents offered by the Limited Partners while admitting those offered by SHAG and its wholly owned subsidiary ("SHAC").

### 1.    *The Motion Is Predicated on a Misconception of Relevance*

The LLC General Partners' argument is based on the faulty premise that a document can be relevant to no more than one issue.  Just because the documents that the Limited Partners submitted to the WSHFC were relevant to SHAG's qualified nonprofit status, however, does not negate their *relevance* to other issues in this case, namely: (a) SHAG's improper exercise of the Section 42 ROFRs for the Projects at issue; (b) Counter-Defendants'—including the LLC General Partners'—breaches of fiduciary duty; and (c) SHAG's unclean hands, which bar it from the relief it seeks.

The evidence challenged by the LLC General Partners—which includes correspondence between the LLC General Partners' principal Bryan Park and SHAG representatives, as well as board meeting minutes for SHAG and SHAC—demonstrate that Park, the principal of for-profit entity Pacific Northern Construction Company ("PNCC") and its for-profit affiliates (including the LLC General Partners), has actively controlled SHAG for decades, such that SHAG has become little more than a shell entity utilized by Park to benefit himself and the companies he owns and controls.  The exhibits challenged by the LLC General Partners and the supporting testimony establish the following joint efforts by Park and SHAG:

- SHAG's formation was assisted by Park, who served as an early member of SHAG's Board, and continued to advise SHAG even after leaving the Board (*see, e.g.*, Dkt. # 90-1, Ex. C (Proposed Ex. A-0166) (5/16/95 Park letter to Chairman of SHAG's Board, Jim Sullivan, re SHAG Letters of Resignation - Ed James and Bryan Park); *Id.*, Ex. D (Proposed Ex. A-0053) (3/6/01 SHAG Board minutes) at 3 ("If the transaction with Vital Retirement Living is realized, Bryan Park's move into the new company as a Board Member and major stockholder of Vital would take him out of the role of serving informally as SHAG's financial/legal advisor since PNC[C] would no longer be SHAG's management agent."));

**Boies Schiller Flexner LLP**
725 South Figueroa Street, 31st Floor
Los Angeles, CA 90017-5524
Phone: (213) 629-9040
Fax: (213) 629-9022

- SHAG permitted Park to control the agenda at SHAG Board meetings, with SHAG's board considering only those development opportunities in which PNCC or its affiliates had a financial interest (*see, e.g.*, Declaration of Eric Pettit ("Pettit Decl."), Ex. B, Proposed Ex. A-0225 (redacted minutes from 12/16/14 SHAG Board meeting); *Id.*, Ex. C, Proposed Ex. A-0206 (6/6/11 email attaching SHAG and SHAC Board meeting minutes and asking Park to review); Dkt. # 90-1, Ex. L, Proposed Ex. A-0056 (11/7/11 email from Park to SHAG's Executive Director, Jay Woolford, stating "I reviewed the SHAG and SHAC Board minutes and I had some suggested changes – mainly clarifications or minor corrections."));

- SHAG and Park entered into agreements whereby SHAG delegated its obligations to the Project Partnerships and nearly all of the associated economic benefits under development services agreements and operating use lease agreements to for-profit affiliates of PNCC controlled by Park (Dkt. # 90-1, Ex. T (Property Management Agreement at 1, 7; Project Management Agreement at 1-2, 6));

- SHAG approved the Global Indemnity Agreement, which purports to assign 90% of the economic interests associated with SHAG's ROFR to PNCC and its affiliates in exchange for illusory consideration (*see, e.g., id.*, Ex. H, Proposed Ex. A-0054 (7/12/2001 Board Meeting minutes); *see also* Section II.B *infra*);

- SHAG appointed its for-profit subsidiary, SHAC, as the managing member of limited liability companies owned primarily by PNCC or its affiliates and designated to serve as general partners of certain Project Partnerships;

- SHAG identified and branded Park and his companies as affiliated with SHAG, and generally treated SHAG's interests collectively and interchangeably with Park's own (*see, e.g.*, Pettit Decl., Ex. D, Proposed Ex. A-0227 (2/24/15 Board Meeting minutes stating that Woolford "provided background information and goals for the branding work that is being done with SHAG, Independent Living and PNCC to align the organizations around expectations for representing SHAG."));

- SHAG allowed Park to prepare key SHAG documents, including Board minutes, tax returns, and management representation letters, and SHAG's Board then took action based on those documents (*see, e.g., id.*, Ex. E, Proposed Ex. A-0057 (5/4/12 email from Park to Sullivan attaching management representation letters and asking Sullivan to execute "at your earliest convenience"); *Id.*, Ex. F, A-0211 (9/15/14 email from Park to his assistant, Amanda Hagen (copying Woolford): "Let Jay know that we will complete and file SHAC's return between now and the SHAG ta[x] return due date so that we can report SHAG's direct or indirect share of assets, liabilities and income or loss from SHAC in SHAG's Form 990.")); and

- SHAG has permitted Park to control the process by which SHAG purported to exercise its ROFR, as well as the resulting litigation, which will economically benefit the LLC General Partners almost exclusively to the detriment of SHAG (*see, e.g., id.*, Ex. D, Proposed Ex. A-0227 (2/24/15 SHAG Board Meeting minutes re Meridian Court ROFR: "Jay confirmed that the board has exercised the right of first refusal and the limited partner has responded.  Bryan will need to address").

**Boies Schiller Flexner LLP**
725 South Figueroa Street, 31st Floor
Los Angeles, CA 90017-5524
Phone: (213) 629-9040
Fax: (213) 629-9022

1   These joint efforts by SHAG, Park, and the LLC General Partners have enabled Park to

2   utilize the nonprofit SHAG entity to enrich Park's for-profit companies, including the LLC

3   General Partners, allowing them to benefit from opportunities that, by the terms of the Project

4   Partnership Agreements and Section 42 of the Internal Revenue Code, are available only to

5   nonprofits and other eligible recipients—including the below-market rights of first refusal for

6   which Section 42(i)(7) provides a safe harbor.  This evidence demonstrates that the ROFR was

7   not properly exercised, establishes breaches of fiduciary duties owed by SHAG to the Limited

8   Partners, and supports the Limited Partners' unclean hands affirmative defense.  These are all

9   issues that the WSHFC did not and could not have considered in issuing its limited

10  determination.  Because the documents the LLC General Partners seek to exclude make each of

11  these facts supporting the Limited Partners' claims and defenses "more probable," those

12  documents are relevant.  *See United States v. Curtin*, 489 F.3d 935, 943 (9th Cir. 2007) (evidence

13  is relevant if it has "any tendency to make the existence of any fact that is of consequence to the

14  determination of the action more probable or less probable than it would be without the

15  evidence." (citing Fed. R. Evid. 401)).

16              ***2.***     ***The LLC General Partners Are Taking Inconsistent Positions***

17      The LLC General Partners' overly restrictive view of the relevance of documents

18  submitted to the WSHFC is undermined by their *agreement* to co-defendant SHAG's proposed

19  trial exhibit list, which includes an exhibit (Proposed Ex. 260) that consists of more than 3,000

20  pages of documents submitted to the WSHFC.  Notably, the LLC General Partners have not

21  moved to exclude SHAG's proposed exhibit even though the LLC General Partners' theory of

22  relevance would apply with equal force to that exhibit.[4]  The LLC General Partners' inconsistent

23

24          [4] The LLC General Partners also have made no objection to certain documents included on SHAG's
    proposed exhibit list, while seeking to exclude the *very same documents* on the Limited Partners' proposed exhibit

25  list simply because they were submitted to the WSHFC.  *See* Declaration of Eric Pettit ("Pettit Decl."), ¶ 13
    (comparing Proposed Ex. 265 & Proposed Ex. A-0054 (7/12/2001 Board Meeting Minutes)).  Relevant underlying

26  documents that preexisted the WSHFC submission, however, do not become irrelevant simply by virtue of having
    been submitted to the WSHFC.

LIMITED PARTNERS' RESPONSE TO LLC MIL
(No. 2:17-cv-01115-RSM) – 4

**Boies Schiller Flexner LLP**
725 South Figueroa Street, 31st Floor
Los Angeles, CA 90017-5524
Phone: (213) 629-9040
Fax: (213) 629-9022

position with respect to SHAG's proposed exhibit and the Limited Partners' proposed exhibits demonstrates that the LLC General Partners' motion *in limine* is not motivated by relevance concerns, but rather by a desire to exclude evidence favorable to the Limited Partners while admitting evidence favorable to the LLC General Partners and SHAG, who are coordinating their efforts pursuant to a Joint Defense Agreement.

Finally, although the LLC General Partners cite Federal Rule of Evidence 403 (Dkt. # 129 (LLC MIL) at 4), they do not even attempt to explain how they would be unfairly prejudiced if the Court considered the challenged exhibits, nor could they, *see United States v. Hankey*, 203 F.3d 1160, 1172 (9th Cir. 2000) (explaining that relevant evidence may be excluded under Rule 403 "because of prejudicial dangers or considerations" and "only if its probative value is substantially outweighed by one or more of the articulated dangers or considerations").  The fact that the evidence is damaging to the LLC General Partners' case does not make it unfairly prejudicial.

Because the LLC General Partners have failed to establish that the documents the Limited Partners submitted to the WSHFC are irrelevant to any issue in this case under Federal Rules of Evidence 401, 402, and 403, the LLC General Partners' motion on this issue should be denied.

> **B.**    ***The Global Indemnity Agreement Is Relevant to Both the Legitimacy of SHAG's Attempted ROFR Exercise and the LLC General Partners' Bad Faith***

The brief supporting the LLC General Partners' motions in limine devotes more than eight pages to arguing that the Limited Partners' claims regarding the Global Indemnity Agreement are without merit.  (*See* Dkt. # 129 (LLC MIL) at 4-12.)  This thinly-veiled effort to submit what is essentially a lengthy and improper surreply on the pending cross-motions for summary judgment is procedurally suspect.  Moreover, as explained below, the LLC General Partners mischaracterize the origins and implications of the Global Indemnity Agreement, both of which are directly relevant to the Limited Partners' claims and defenses in this action.

**Boies Schiller Flexner LLP**
725 South Figueroa Street, 31st Floor
Los Angeles, CA 90017-5524
Phone: (213) 629-9040
Fax: (213) 629-9022

1

2

### 1. The Court Should Not Accept Bryan Park's Mischaracterization of the Origins of the Global Indemnity Agreement

Relying on a self-serving declaration authored by Bryan Park, the LLC General Partners would have the Court believe that Park, rather than Congress, created the opportunity for SHAG to hold its below-market ROFR.  (Dkt. # 129 (LLC MIL) at 5 (citing Park summary judgment declaration to claim that "Mr. Park offered (on behalf of PNCC and its affiliates) to SHAG (1) a commitment to obtain for SHAG a Code Section 42(i)(7) ROFR….").)  Indeed, the LLC General Partners suggest that Park was doing SHAG a favor by securing for SHAG a below-market ROFR even though, under the Global Indemnity Agreement, for-profit entities controlled by Park would retain the vast majority—approximately 90%— of the funds generated by the Projects.  (*Id.*; *see also* Section II.B.2 *infra*.)

This logic is untethered to the actual economic positions of the parties, and demonstrates the extent to which Park and SHAG have joined forces, with SHAG accepting the unfounded premise that it lacks any ability to secure for itself an unencumbered below-market ROFR.  The reality is that—as the LLC General Partners themselves recognize (*see* Dkt. # 129 (LLC MIL) at 5)—nonprofits provide tax exemptions and other benefits that are critical to the success of any LIHTC project, and SHAG accordingly had plenty of leverage to obtain a below-market ROFR for itself without having to pay Park what amounts to a 90% commission.  As discussed below, the true origins of the Global Indemnity Agreement illustrate the extent to which SHAG has been utilized by Park as little more than a vessel through which ownership interests and associated benefits that only nonprofits and other designated recipients are supposed to receive are instead channeled to for-profit companies that Park owns and controls.

### 2. At Park's Behest, SHAG Assigned Ownership Interests Arising Out of the Exercise of Its ROFR to Park's For-Profit Entities

In 2001, Park wanted to assign Property Management Agreements that SHAG had entered into with Park's for-profit company, PNCC, to a new entity, Independent Living, in

connection with a merger PNCC was pursuing.  At a special meeting of SHAG's Board on July 12, 2001, Park addressed the proposed merger and requested that SHAG consent to the merger and to the assignment of its Property Management Agreements to Independent Living.  (*See* Dkt. # 90-1, Ex. H (7/12/01 SHAG Board meeting minutes).)  In response to concerns by SHAG Board members about SHAG's potential exposure following the merger, Park "assured the Board that it will have a blanket indemnity regarding any claims," and "advised the Board members that an indemnification agreement that he will draft will memorialize/ensure SHAG's indemnification." (*Id.* at 3; *see also id*. at 7 ("Bryan Park advised the Board that he will prepare a draft of an Indemnification Agreement to protect the SHAG organization")).)  The minutes include no mention of Park discussing the transfer of SHAG's rights under the ROFR for the Project Partnerships from SHAG to PNCC in connection with the indemnification agreement he was proposing.  (*See id.*)[5]

Park drafted the Global Indemnity Agreement sometime *after* SHAG's Board meeting on July 12, 2001.  (*See id.*, Ex. B (Park Dep. Tr. at 106:8-17) ("Q.  So at the time that this board meeting occurred had that indemnification agreement not been drafted?  A.  I believe that the drafting of it occurred after this.  Notwithstanding the fact that everything ended up being dated July 12th, which was the effective date, I be -- I believe that the actual drafting of the -- of the -- of that global indemnity agreement occurred within a few days of that.  So it wasn't in place at this time, that's correct.").)  SHAG's Board, however, did not reconvene to consider the Global Indemnity Agreement before it was executed by Board chair Jim Sullivan.  (*See id.* at 108:19-109:7.)

Section 3 of the Global Indemnity Agreement provides:

In exchange for executing and delivering this Agreement and continuing to provide financial support, guarantees and indemnifications to or for the benefit of

---

[5] Counter-Defendants did not produce all of SHAG's board meeting minutes from this time period until the Limited Partners identified and raised their failure to produce specific minutes.  (*See* Pettit Decl., ¶ 14.)  None of these minutes, however, describe any discussion of the Global Indemnity Agreement that goes beyond or is contrary to what is reflected in the July 12, 2001 minutes.  (*Id.*)

**Boies Schiller Flexner LLP**
725 South Figueroa Street, 31st Floor
Los Angeles, CA 90017-5524
Phone: (213) 629-9040
Fax: (213) 629-9022

the Project Partnerships and the General Partners with respect to the Facilities
pursuant to the Development Contracts, the Project Financing, the Equity
Financing, and/or the Project Partnerships Agreements, and for agreeing to pay
any tax liability of the tax credit investor limited partners and all transaction costs
associated with the exercise of a ROFR, ***it is understood and agreed by the
parties that the ownership of the Facilities after the exercise of the ROFR will
be arranged such that the Developers and/or Co-General Partners affiliated
with PNCC will maintain the same direct or indirect economic ownership
percentage in each of the Facilities as they enjoyed immediately before the
expiration of the 15-year tax credit compliance period and the exercise of the
ROFR*** and SHAG and/or SHAC would succeed to the direct or indirect economic
ownership percentage of the tax credit investor limited partners at the same time
of the exit of such tax credit investor limited partners from the Project
Partnerships.

(Dkt. # 90-1, Ex. U ("GIA") at 3 (emphasis added).)  As Park confirmed at his deposition, the

intended effect of the Global Indemnity Agreement was to provide that, after the exercise of

SHAG's ROFR, the Projects would not be owned solely by a non-profit (SHAG), but instead

would be owned jointly by a non-profit (SHAG) and a for-profit organization (PNCC or one of

its affiliates) controlled by Park.  (*See id.*, Ex. B (Park Dep. Tr. at 200:10-21) ("Q.  And would

the end route -- at the end of the day when all of the obligations under the global indemnity

agreement in 6 -- Section 6.33 -- excuse me -- Section 6.3 of the operating agreements were

fulfilled, who would own the project partnership?  A.  It would be the -- it would be SHAC and

the existing -- the existing general partner.  Q.  Okay.  So it wouldn't be owned by a non-profit at

that point; is that right?  A.  At that point it would be owned jointly by a non-profit and a for-

profit.").)

Park drafted the Global Indemnity Agreement in a manner that disguised the substantial

transfer of rights from SHAG to PNCC that it contained.  First, the Global Indemnity Agreement

is drafted less like a contract in which both parties are exchanging consideration, and more like a

guaranty that one party is making for the benefit of the other.  Indeed, SHAG's approval of the

assignment of the Property Management Agreements pursuant to the merger—which Park

described as the *principal consideration* SHAG was providing under the Global Indemnity

Agreement, Pettit Decl., Ex. G (Park Dep. Tr. at 262:2-24)—is not even *mentioned* in the Global

**Boies Schiller Flexner LLP**
725 South Figueroa Street, 31st Floor
Los Angeles, CA 90017-5524
Phone: (213) 629-9040
Fax: (213) 629-9022

Indemnity Agreement.  The Global Indemnity Agreement's preamble, moreover, states that the "Indemnity Agreement" is "made . . . by [PNCC], and the undersigned affiliates of PNCC, *in favor of [SHAG] and [SHAC]*."  (Dkt. # 90-1, Ex. U (GIA) at 1 (emphasis added).)  Similarly, on the signature page of the Global Indemnity Agreement, after the signatures from PNCC and its affiliates, there is the following heading before Jim Sullivan's signatures on behalf of SHAG and SHAC:  "ACKNOWLEDGMENT AND ACCEPTANCE BY SHAG AND SHAC."  (*Id.* at 6.) The only reason to include such a header before the signature blocks for SHAG and SHAC is to indicate that SHAG and SHAC were intended to be beneficiaries under the Global Indemnity Agreement, not counterparties with corresponding obligations.

Second, the description of SHAG's ROFR in the Global Indemnity Agreement is confusing as to who actually holds it.  Specifically, in the "WHEREAS" clause addressing the ROFR, the Global Indemnity Agreement does not identify SHAG as the holder of the ROFR, but instead states that "the General Partners of the Project Partnerships and Developers of the Facilities have been granted certain rights of first refusal (the "ROFR")…."  (*Id.* at 1.)  This characterization of who holds the ROFR is at best misleading, particularly given that later in the same clause the term "Developers" is used to refer to for-profit affiliates of PNCC (i.e., entities controlled by Park).  (*Id.*)  Coupled with the fact that it was not reviewed at any Board meeting, the misleading drafting and confusing language suggest that SHAG may not have fully understood what it was giving up by executing the Global Indemnity Agreement.

That SHAG did not initially understand or appreciate the implications of the Global Indemnity Agreement on its ROFR was confirmed by the deposition testimony of the current chair of SHAG's Board (who was on SHAG's Board at the time the Global Indemnity Agreement was executed), as well as the former chair of SHAG's Board (who actually signed the Global Indemnity Agreement on behalf of SHAG and SHAC).  SHAG's current chair, Jeffry Melville, testified that he did not believe that the Global Indemnity Agreement had any impact on SHAG's ROFR.  (*See* Pettit Decl., Ex. H (Melville Dep. Tr. at 88:21-90:6) (testifying that the

**Boies Schiller Flexner LLP**
725 South Figueroa Street, 31st Floor
Los Angeles, CA 90017-5524
Phone: (213) 629-9040
Fax: (213) 629-9022

1
2
3
4
5
6
7
8
9

Global Indemnity Agreement "didn't change the underlying ROFR that's in the partnership agreement.").) And SHAG's former chair, Jim Sullivan, testified to his understanding that it was the Global Indemnity Agreement, and not the ROFR, that conveyed to SHAG the right to remain involved in the Projects. (*See id.*, Ex. I (Sullivan Dep. Tr. at 99:14-22) ("What I recalled was that [the Global Indemnity Agreement] had the potential to help us maintain continuous control over housing projects that, again, were serving the purpose that we -- that we were trying to serve, and that is to provide affordable housing for seniors, and that this would give us the a -- the potential ability to continue projects as part of the SHAG organization that might possibly otherwise get lost to the -- to the open market.").)

10
11
12
13

Even as late as October of 2013, SHAG's Executive Director Jay Woolford had no idea that the Global Indemnity Agreement transferred benefits arising from the ROFR from SHAG to for-profit entities controlled by Park. In response to an email in which Woolford noted SHAG's "very favorable right of refusal for Auburn Court and Lakewood," Park wrote:

14
15
16
17
18
19

> SHAG does not have the right to acquire those properties outright for its own account. The exercise of the options/rights of first refusal are subject to the direct and indirect economic ownership interests of the general partner and/or developer reflected in the Partnership Agreement, the developer note, the interest rate swap agreement, etc. The end result is that SHAG would acquire the economic interest of the Investor Limited Partner, and the developer/general partner would retain its existing economic interest. The Investor's economic interest is essentially 10% and the developer/general partner's economic interest is essentially 90%. SHAG does not get to buyout the developer/general partner's interests. Did you think that they did?

20
21
22
23
24
25

(Dkt. # 90-1, Ex. J at 1.) In response, Woolford stated that he "was under the impression that SHAG did have the right to acquire the properties," but admitted that "there are pieces to the puzzle, or documents that I am missing that clarify our options," and requested a discussion with Park "that clarifies these opportunities or how we potentially participate." (*Id.*) Park followed up by sending Woolford a copy of the Global Indemnity Agreement. (*See* Pettit Decl., Ex. J, Proposed Ex. A0062 (10/22/2013 Park email forward to Jay Woolford).)

26

**Boies Schiller Flexner LLP**
725 South Figueroa Street, 31st Floor
Los Angeles, CA 90017-5524
Phone: (213) 629-9040
Fax: (213) 629-9022

1    Finally, that SHAG never took the steps necessary to gain an understanding of the Global

2    Indemnity Agreement is confirmed by the fact that the indemnifications that PNCC and its

3    affiliates purported to provide in the Global Indemnity Agreement either (a) were duplicative of

4    indemnities provided in earlier Indemnity Agreements, Project Management Agreements, or

5    related transactional documents, or (b) indemnified SHAG and SHAC against potential liabilities

6    that did not exist.  (*See, e.g.*, *id.*, Ex. K, Proposed Ex. A-0150 (11/7/00 Indemnity Agreement by

7    PNCC "in favor of" SHAC); Dkt. # 90-1, Ex. T (10/1/97 Project Management Agreement

8    between SHAC and PNCC affiliate Fox Housing Enterprises, Inc.) § 4 ("Financial Support and

9    Performance Guarantees"); *Id.*, Ex. L, Proposed Ex. A-0153 (12/7/01 Property Management

10   Agreement between SHAG and PNCC affiliate Independent Living).)

11   The existence of the Global Indemnity Agreement and the relationship it created between

12   SHAG and SHAC, on one hand, and PNCC and its affiliates, on the other, leave no question that

13   Park coopted from SHAG ownership interests that Congress has reserved for certain eligible

14   recipients that do not include for-profit real estate developers.  As explained below, these facts

15   are relevant both to the validity of SHAG's purported exercise of its ROFR, and to the Limited

16   Partners' claim for breach of fiduciary duties and unclean hands affirmative defense.

17           ***3.***     ***The Global Indemnity Agreement Is Relevant to Whether SHAG Can***

18                   ***Exercise its ROFR***

19   As discussed in the Limited Partners' pending motion for summary judgment (Dkt. # 89

20   at 11-12), Section 42(i)(7) of the Internal Revenue Code creates a safe harbor for LIHTC

21   partnerships to grant a below-market ROFR to nonprofit participants and other eligible

22   recipients, which *do not* include for-profit entities such as PNCC or the LLC General Partners.

23   Under the Global Indemnity Agreement, however, upon the purchase of the Projects through the

24   exercise of SHAG's ROFR, the LLC General Partners "will maintain the same direct or indirect

25   economic ownership percentage in each of the Facilities as they enjoyed immediately before the

26   expiration of the 15-year tax credit compliance period and the exercise of the ROFR."  (Dkt. #

**Boies Schiller Flexner LLP**
725 South Figueroa Street, 31st Floor
Los Angeles, CA 90017-5524
Phone: (213) 629-9040
Fax: (213) 629-9022

90-1, Ex. U at 1.)  That "ownership percentage," as Park has acknowledged, is approximately

ninety percent.  (*Id.*, Ex. B at 200:10–21.)  Thus, the Global Indemnity Agreement accomplishes

indirectly what Congress prohibited directly, i.e., the transfer of the Projects to for-profit entities

at substantially below-market prices.

In its motion in limine, the LLC General Partners argue that the Global Indemnity

Agreement does not transfer any rights from SHAG to them because it "only **preserved**

**unchanged** the existing direct or indirect economic interests. . . held by the LLC General

Partners" prior to SHAG's exercise of its ROFR.  (Dkt. # 129 (LLC MIL) at 8-9 (emphasis in

original).)  This argument is specious.  As Park admitted at his deposition, if the Global

Indemnity Agreement did not exist, then the valid exercise of SHAG's ROFR would result in

SHAG's fee simple ownership of the Projects, free from any encumbrances based on the

economic rights of the LLC General Partners as partners in the Project Partnerships that had

previously owned the Projects.  (*See* Pettit Decl., Ex. G (Park Dep.Tr. at 204:25-205:4.))  But

because the Global Indemnity Agreement does exist, the LLC General Partners claim that SHAG

must pay them as much as ninety percent of the future economics of the Projects.  To argue that

the difference between these two scenarios does not demonstrate a substantial transfer of rights

from SHAG to the LLC General Partners strains credulity.

The LLC General Partners also argue in their motion that "[a]n exercise of SHAG's

Special ROFRs would not result in joint ownership of any Project." (LLC MIL at 9 (emphasis in

original).)  As explained above, however, this argument is belied by the plain language of the

Global Indemnity Agreement, which contemplates the LLC General Partners "maintain[ing] the

same direct or indirect economic *ownership* percentage in each of the Facilities" that they held

prior to the exercise (Dkt. # 90-1, Ex. U (GIA) § 3 (emphasis added)), and by Park himself, who

conceded at his deposition that if SHAG exercised its ROFR to purchase a Project, the Project

"would be owned jointly by a non-profit and a for-profit" as a result of the Global Indemnity

Agreement.  (Dkt. # 90-1, Ex. B at 200:20–21.)

**Boies Schiller Flexner LLP**
725 South Figueroa Street, 31st Floor
Los Angeles, CA 90017-5524
Phone: (213) 629-9040
Fax: (213) 629-9022

4.      *The Global Indemnity Agreement Is Relevant to Whether Counter-Defendants Acted in Bad Faith and with Unclean Hands*

In addition to its relevance to the effectiveness of SHAG's attempted exercise of its ROFRs, the Global Indemnity Agreement is also relevant to the Limited Partners' claims for breach of fiduciary duty, as well as their unclean hands affirmative defense.  In particular, evidence concerning the Global Indemnity Agreement establishes the extent to which the LLC General Partners, who owe fiduciary duties to the Limited Partners, are seeking to force the Limited Partners out of the Project Partnerships against their will and at a below-market price based on the LLC General Partners' own secret self-interest, and not the best interests of the Project Partnerships and the Limited Partners.

In their motion, the LLC General Partners argue that the Global Indemnity Agreement is irrelevant to the Limited Partners' fiduciary duty claims because the Limited Partners did not become limited partners in any of the Project Partnerships until December 1, 2001, and, as a result, "SHAG and the LLC General Partners had no duty at all to the [Limited Partners] when they entered the GIA in July of 2001."  (Dkt. #129 (LLC MIL) at 6 (emphasis in original).)  This argument fundamentally misconceives the nature of the Limited Partners' fiduciary duty claims. The Limited Partners are not claiming that the LLC General Partners breached their fiduciary duties by entering into (or having their affiliates enter into) the Global Indemnity Agreement, but rather that the Global Indemnity Agreement—and, as discussed below, the LLC General Partners' efforts to hide its existence—is relevant to the Court's assessment of whether the LLC General Partners' more recent efforts to force the Limited Partners out of the Project Partnerships comported with their fiduciary duties.

5.      *The Limited Partners Should Not Be "Estopped" From Presenting Evidence Relating to the Global Indemnity Agreement*

Finally, the LLC General Partners argue at the end of their brief that, "[s]eparate and apart from the lack of relevance of the [Global Indemnity Agreement]," the Limited Partners

**Boies Schiller Flexner LLP**
725 South Figueroa Street, 31st Floor
Los Angeles, CA 90017-5524
Phone: (213) 629-9040
Fax: (213) 629-9022

1  should be "estopped from offering [Global Indemnity Agreement]-related evidence now"

2  because the Limited Partners were "informed of the substance of the [Global Indemnity

3  Agreement] well before it entered into the Project Partnership Agreements."  (Dkt. # 129 (LLC

4  MIL) at 11.)  The LLC General Partners provide no authority to support raising an estoppel

5  argument in connection with an evidentiary motion, and their argument should be rejected on

6  that basis alone.

7      The LLC General Partners' contention that the Limited Partners were "informed of the

8  substance of the [Global Indemnity Agreement]," moreover, is misleading at best.  To support its

9  claim, the LLC General Partners point to the fact that the operating agreements for three of the

10  LLC General Partners included provisions similar to the language in the Global Indemnity

11  Agreement, and that these operating agreements were included in voluminous closing binders

12  associated with the Limited Partners' investment in the Project Partnerships.  The fact that

13  operating agreements that the Limited Partners were not parties to were included in thousands of

14  pages of due diligence materials that were circulated decades ago and had language buried in

15  them similar to the language in the Global Indemnity Agreement is a far cry from the evidence

16  that would be required to establish that the LLC General Partners fulfilled their fiduciary

17  disclosure obligations relating to the Global Indemnity Agreement.  It is certainly no basis for

18  precluding the Limited Partners from submitting any evidence relating to the Global Indemnity

19  Agreement.

20      Indeed, the undisputed evidence shows that SHAG and Park *actively hid* the Global

21  Indemnity Agreement from the Limited Partners, who only learned of its existence when they

22  accidently received a letter from Woolford to Park that referred to it.  (*See* Dkt. # 91-1, Ex. V

23  (1/15/15 letter from the Limited Partners to Park noting that "the attachment to the December 30

24  Letter is a letter dated December 29, 2014 from SHAG to [PNCC], pertaining to a Global

25  Indemnity Agreement between SHAG and PNCC," and requesting a copy of the Global

26  Indemnity Agreement).)  Despite repeated requests from the Limited Partners (*see, e.g.*, Dkt. #

**Boies Schiller Flexner LLP**
725 South Figueroa Street, 31st Floor
Los Angeles, CA 90017-5524
Phone: (213) 629-9040
Fax: (213) 629-9022

90-1, Ex. W (4/29/16 email exchange between Woolford and Ryan Trane)), SHAG and PNCC refused to provide the Limited Partners with a copy of the Global Indemnity Agreement until *nearly a year and a half later*.  These efforts by SHAG and the LLC General Partners to actively block the Limited Partners' efforts simply to obtain a copy of the Global Indemnity Agreement eviscerate any claim that the Limited Partners had actual notice of the Global Indemnity Agreement or its implications.  Even more importantly, these efforts to hide the Global Indemnity Agreement evidence a breach of Counter-Defendants' fiduciary disclosure duties to the Limited Partners, and establish that SHAG's unclean hands should bar the equitable relief it is seeking from this Court.

## III.    CONCLUSION

For the foregoing reasons, the Limited Partners respectfully request that the Court deny the LLC General Partners' motions in limine in their entirety.

RESPECTFULLY SUBMITTED this 6th day of February, 2019.

**Boies Schiller Flexner LLP**

By:  /s/ Christopher G. Caldwell
Christopher G. Caldwell, admitted *pro hac vice*
Eric S. Pettit, admitted *pro hac vice*
725 S Figueroa Street, 31st Floor
Los Angeles, CA 90017
Telephone:  213 629 9040
Facsimile:  213 629 9022
Email:   ccaldwell@bsfllp.com
         epettit@bsfllp.com

**Perkins Coie LLP**
David J. Burman, WSBA #10611
Steven D. Merriman, WSBA #44035
Mallory Gitt Webster, WSBA #50025
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Telephone:  206.359.8000
Facsimile:  206.359.9000
Email:  DBurman@perkinscoie.com
        SMerriman@perkinscoie.com
        MWebster@perkinscoie.com
Attorneys for the Limited Partners

LIMITED PARTNERS' RESPONSE TO LLC MIL
(No. 2:17-cv-01115-RSM) – 15

**Boies Schiller Flexner LLP**
725 South Figueroa Street, 31st Floor
Los Angeles, CA 90017-5524
Phone: (213) 629-9040
Fax: (213) 629-9022

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**CERTIFICATE OF SERVICE**

On February 6, 2019, I caused a copy of the foregoing document to be electronically filed via the Court's Electronic Case Filing System, which will notify all attorneys of record of the filing.

By:    /s/ Wendy M. Carpenter
       Wendy M. Carpenter

**Boies Schiller Flexner LLP**
725 South Figueroa Street, 31st Floor
Los Angeles, CA 90017-5524
Phone: (213) 629-9040
Fax: (213) 629-9022