THE HONORABLE RICARDO S. MARTINEZ

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

SENIOR HOUSING ASSISTANCE
GROUP,

                Plaintiff,

     v.

AMTAX HOLDINGS 260, LLC, et al.,

                Defendants.

AMTAX HOLDINGS 260, LLC, et al.,

                Counter-Plaintiffs,

     v.

SENIOR HOUSING ASSISTANCE
GROUP, et al.,

                Counter-Defendants.

No. 2:17-cv-01115-RSM

**DEFENDANTS AND COUNTER-PLAINTIFFS' AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

DEFENDANTS AND COUNTER-PLAINTIFFS'
AMENDED PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW
(No. 2:17-cv-01115-RSM) – 1

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

This matter was tried without a jury commencing on March 4, 2019, before the Honorable Ricardo S. Martinez.  Prior to the trial, the Court limited the issues to be tried in the Court's Order re Summary Judgment Motions dated February 19, 2019 (Dkt. # 142), as clarified by the Court's Order Denying Motion for Reconsideration (Dkt. # 147).  At trial, the Court considered exhibits admitted into evidence and/or used for impeachment, and heard testimony from the following witnesses:  Jay Woolford (live), Stephen Smith (by videotaped deposition), and Bryan Park (live) for plaintiff; and Ryan Trane (live) for defendants.

Having heard the testimony of the witnesses and considered the evidence and the arguments of counsel, the Court enters judgment in favor of the defendants based on the following Findings of Fact and Conclusions of Law:

## I.  CREDIBILITY DETERMINATIONS

In a bench trial, the trial court is empowered to judge the credibility of the witnesses.  *See Spokane Arcade, Inc. v. City of Spokane*, 75 F.3d 663, 665 (9th Cir. 1996).  The credibility of each witness who testified at trial—either live or by videotaped deposition—is addressed individually below.

**Jay Woolford**:  The Court finds that it is unnecessary to make any credibility determination with respect to the testimony of Jay Woolford because that testimony, even if accepted as truthful, provides no support for plaintiff's declaratory relief claim, and instead demonstrates that SHAG's rights of first refusal ("ROFR") for the four properties at issue have not been validly triggered or exercised.

**Bryan Park**:  The Court finds that Bryan Park was not a credible witness.  Mr. Park's testimony at trial was evasive and at times inconsistent with earlier testimony or other prior sworn statements, and Mr. Park's demeanor on the witness stand led the Court to conclude that Mr. Park's testimony was not completely truthful.  In addition, Mr. Park's significant economic stake in the outcome of this case supports the Court's conclusion that Mr. Park was motivated to solicit sham offers and later provide false testimony about his actions.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

**Stephen Smith**:  The Court finds that Stephen Smith was not a credible witness.  Mr. Smith's claim that he could not remember the circumstances surrounding his execution of Purchase and Sale Agreements offering to purchase Meridian Court and Auburn Court for a combined $34 million is hard to believe, particularly given Mr. Smith's testimony that it would have been unusual for Mr. Park to ask him to sign an offer that Mr. Park had drafted, and that Mr. Smith typically did not make offers to purchase affordable housing projects that were already developed and operating.  In addition, Mr. Smith's demeanor in the portions of his videotaped deposition testimony that were shown to the Court led the Court to conclude that Mr. Smith's testimony was not completely truthful, and evidence adduced at trial supports the conclusion that Mr. Smith was motivated to sign the PSAs—and later claim not to have any memory of the reasons why he did so—in order to (a) assist his business partners in their efforts to self-trigger SHAG's ROFR, and (b) gain a business advantage for himself in connection with any subsequent redevelopment and/or resyndication of the subject properties following SHAG's successful exercise of its ROFR.

**Ryan Trane**:  The Court finds that Ryan Trane was a credible witness.  Mr. Trane's answers to questions posed by counsel at trial were responsive, consistent, and complete, and his demeanor on the witness stand supports the Court's conclusion that his testimony was truthful. In addition, the Court finds that Mr. Trane's opinions regarding the unattractiveness of terms set forth in the various offers and letters of intent on which SHAG purports to rely to trigger its ROFR were rationally based on Mr. Trane's perception and experience with the four properties at issue, and were helpful to clearly understanding his testimony and to determining a fact in issue (i.e., whether any of the four project partnerships that owned the properties at issue ever formed or expressed a willingness to accept those terms).

## II.     FINDINGS OF FACT

The Court incorporates by reference the facts stated in its Order re: Motions for Summary Judgment (Dkt. # 142), the admitted facts in the Revised Pretrial Order (Dkt. # 149), and the

DEFENDANTS AND COUNTER-PLAINTIFFS'
AMENDED PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW
(No. 2:17-cv-01115-RSM) – 3

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

agreed facts in the Stipulation and Order Regarding Third-Party Offers to Purchase (Dkt. # 77). The following additional findings of fact are based upon a preponderance of the evidence presented at trial and the above credibility analysis.

### A.   Low-Income Housing Tax Credit

1.     The Low-Income Housing Tax Credit ("LIHTC"), 26 U.S.C. § 42 ("Section 42"), is a federal tax credit program designed to promote the development of affordable rental housing for low-income households.

2.     The LIHTC program codified in Section 42 encourages private investment in such housing by providing tax credits to owners of qualifying LIHTC projects over a fifteen-year "Compliance Period."

3.     Section 42 expressly allows owners of LIHTC properties to give nonprofits focused on promoting affordable housing a contractual "right of 1st refusal" to purchase the LIHTC properties at the end of their Compliance Period at a statutory "minimum purchase price" that is often below fair market value and is commonly described as "debt plus exit taxes."

### B.   The Parties

4.     At all times relevant to this action, Plaintiff and Counter-Defendant Senior Housing Assistance Group ("SHAG") was a Puget Sound-based nonprofit with the stated mission of fostering affordable housing, particularly for seniors.

5.     At all times relevant to this action, SHAG was the lessee and operator of LIHTC properties in the State of Washington, including the Meridian Court Apartments Project ("Meridian Court"), the Auburn Court Apartments Project ("Auburn Court"), the Boardwalk Apartments Project ("Boardwalk"), and the WoodRose Apartments Project ("WoodRose").

6.     In its capacity as the lessee and operator of Meridian Court, Auburn Court, Boardwalk, and WoodRose, SHAG held four separate ROFR that, if validly triggered and exercised during a two-year period commencing at the end of the applicable Compliance Period,

DEFENDANTS AND COUNTER-PLAINTIFFS'
AMENDED PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW
(No. 2:17-cv-01115-RSM) – 4

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

permitted SHAG to purchase each of the four properties at contractually defined prices that were based on, and not less than, the statutory "minimum purchase price" set forth in Section 42.

7.     Defendants and Counter-Plaintiffs (collectively, the "AMTAX entities") are special purpose limited partnerships created as vehicles for private investment in LIHTC properties in the State of Washington, including Meridian Court, Auburn Court, Boardwalk, and WoodRose.

8.     The AMTAX entities do not own Meridian Court, Auburn Court, Boardwalk, and WoodRose.  Instead, the AMTAX entities are "Investor Limited Partners" in the limited partnerships that own Meridian Court, Auburn Court, Boardwalk, and WoodRose (collectively, the "Project Partnerships").

9.     Alden Torch Financial LLC ("Alden Torch") is a company based in Denver, Colorado that is charged with managing the AMTAX entities, and in that capacity seeks to protect the interests of the AMTAX entities' own limited partners—investors who are the ultimate recipients of the tax credits and other benefits from the AMTAX entities' investments in the Project Partnerships.  (Ex. 3-29, 3-34, 3-47, 3-48.) (Draft Tr., Day 3, 133:9-134:7, 152:18-153:4.)[1]

10.     As explained below, in addition to being the lessee and operator of all four Project Partnerships, SHAG was the "General Partner" of one of the Project Partnerships (i.e., the owner Auburn Court), and SHAG's wholly-owned subsidiary, Senior Housing Assistance Corporation ("SHAC"), was the General Partner of two more Project Partnerships (i.e., the owners of Boardwalk and WoodRose).

11.     As the General Partners of the Project Partnerships that own Auburn Court, Boardwalk, and WoodRose, SHAG and SHAC exerted significant control over the management

---

[1] All citations to the trial transcript are noted as "Draft Tr., Day [ ], [page and line]." Counsel for Defendants and Counter-Plaintiffs were informed that because of the transcript's length, a final copy could not be prepared until March 25, 2019.  If it would be helpful to the Court, Defendants and Counter-Plaintiffs can further amend this submission to include citations to the final transcripts when they become available.

DEFENDANTS AND COUNTER-PLAINTIFFS'
AMENDED PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW
(No. 2:17-cv-01115-RSM) – 5

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

of those partnerships, including the authority to determine the acceptability of third party purchase offers.  In their capacity as General Partners, SHAG and SHAC owed fiduciary duties to the Project Partnerships and to their Investor Limited Partners (i.e., the AMTAX entities).

### C.    *The Partnership Agreements*

12.    Each of the Project Partnerships is governed by a limited partnership agreement (collectively, the "Partnership Agreements").  (Exs. 1-4.)  The Partnership Agreements describe the respective rights and obligations of the General Partners—including SHAG and SHAC—and the Investor Limited Partners of the Project Partnerships.

13.    Section 7.4 of the Partnership Agreements provides, among other things, various rights relating to the potential disposition of the LIHTC properties owned by the Project Partnerships during a two-year span commencing at the end of the properties' respective Compliance Periods.

14.    First, Section 7.4J gives the General Partners a conditional option to purchase the properties from the Project Partnerships by acquiring the Investor Limited Partners' interests in the Project Partnerships at prices that are not less than fair market value.  (Ex. 3-49.)

15.    Second, Section 7.4K gives the Investor Limited Partners an option to force a sale of the properties by the Project Partnerships, subject to the General Partners' purchase option in Section 7.4J.  (Ex. 3-49.)

16.    Finally, as noted above, Section 7.4L of the Partnership Agreements gives SHAG, in its capacity as lessee and operator of the LIHTC properties, a conditional ROFR that, if validly triggered and timely exercised, permits SHAG to purchase the properties from the Project Partnerships at contractually defined prices that are based on, and not less than, the statutory "minimum purchase price" set forth in Section 42.  (Ex. 3-49.)  If SHAG exercises its ROFR, the result is a sale of the properties, which is a liquidating event that ends the life of the Project Partnerships under Section 2.5A(i) of the Partnership Agreements.

DEFENDANTS AND COUNTER-PLAINTIFFS'
AMENDED PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW
(No. 2:17-cv-01115-RSM) – 6

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

17. Section 7.4K expressly provides that the Investor Limited Partners' exercise of their forced sale rights trigger SHAG's ROFR to purchase the properties at the price defined in Section 7.4L. Section 7.4J, by contrast, does not provide that the General Partners' exercise of their purchase options trigger SHAG's ROFR.

18. Section 7.4 of the Partnership Agreements also confirms the fiduciary duties that the General Partners, including SHAG and SHAC, owe to the Project Partnerships and their Investor Limited Partners. Specifically, Section 7.4F(i) states that the General Partners "shall have fiduciary responsibility for the safekeeping and use of all funds and assets of the Partnership," and Section 7.4G provides that "[n]o General Partner shall contract away the fiduciary duty owed at common law to the Limited Partners." (Ex. 3-47 and 3-48.)

### D.   *The Project Partnerships*

####    1.   **Meridian Court**

19. Meridian Court is a 200-unit LIHTC property located in Federal Way, Washington.

20. The owner of Meridian Court is the Meridian Court Apartments Limited Partnership, a Washington limited partnership (the "Meridian Court Owner").

21. The General Partner of the Meridian Court Owner is Steel Lake Enterprises, LLC ("Steel Lake"). An attorney and certified public accountant named Bryan Park has an indirect ownership interest in Steel Lake, and has at all relevant times been authorized to act on Steel Lake's behalf. Although Steel Lake ostensibly is independent from SHAG, it has entered into various agreements with SHAG and other entities pursuant to which Steel Lake and its affiliates currently receive the vast majority of income generated by Meridian Court, and a document entitled the "Global Indemnity Agreement" (Ex. A-0088) provides that Steel Lake and its affiliates will continue to receive these same economic benefits upon SHAG's successful exercise of its ROFR for Meridian Court. Accordingly, there is little or no independence or separation of interests between SHAG and Steel Lake with respect to that project.

DEFENDANTS AND COUNTER-PLAINTIFFS'
AMENDED PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW
(No. 2:17-cv-01115-RSM) – 7

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

22.     Defendant and Counter-Plaintiff AMTAX Holdings 260, LLC ("AMTAX 260") is the Investor Limited Partner of the Meridian Court Owner.

23.     Defendant and Counter-Plaintiff Protech Holdings W, LLC ("Protech Holdings W") is the "Special Limited Partner" of the Meridian Court Owner.

24.     The Meridian Court Owner is governed by a Second Amended and Restated Agreement of Limited Partnership Dated as of November 12, 2002 (the "Meridian Court LPA"). (Ex. 3.)

25.     The Compliance Period for Meridian Court expired on December 31, 2012, and the last day of the exercise period for SHAG's ROFR for Meridian Court was December 31, 2014.  (Ex. A-0057.)

26.     On December 16, 2014, Bryan Park made a presentation to SHAG's Board of Directors regarding SHAG's ROFR for Meridian Court, and noted that SHAG's ROFR would terminate if not exercised before the end of 2014.  (Ex. A-0018-0001; Draft Tr., Day 1, 142:2-9.) Mr. Park's presentation included an analysis of Meridian Court that placed its value between $12,675,988 and $16,901,317, with a midpoint value of $14,486,843.  (Ex. A-0019-0010.) SHAG's Board did not authorize the exercise of SHAG's ROFR at the December 16, 2014 Board meeting.  (Draft Tr., Day 1, 153:23-24, 154:2-5.)

27.     On December 18, 2014, Mr. Park transmitted a document titled "Real Estate Purchase and Sale Agreement" (the "Meridian PSA") to Stephen Smith of SSRE Development, LLC ("SSRE"), with a cover email stating "Thanks for your help."  (Ex. A-0058-0001.)  The Meridian PSA included an offer by SSRE to purchase Meridian Court for $13 million.  (Ex. A-0058-0004.) (Draft Tr., Day 3, 25:10-15.)  The offer price was at the very low end of the price range established by Mr. Park, and well below the median price that Mr. Park projected.  (Draft Tr., Day 1, 145:11-146:4.)

28.     Mr. Smith is a real estate developer who is a personal friend and business partner of Mr. Park.  (Draft Tr., Day 3, 16:10-14.)  SHAG and SHAC have had and continue to have

DEFENDANTS AND COUNTER-PLAINTIFFS'
AMENDED PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW
(No. 2:17-cv-01115-RSM) – 8

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

multiple ongoing business relationships with Mr. Smith and entities in which Mr. Smith holds a direct or indirect interest, including SSRE and its affiliates.  (Draft Tr., Day 1, 140:2-15; Draft Tr., Day 3, 22:9-15; Ex. A-0001.)

29.  Indeed, as reflected in Schedules K-1 that Mr. Park sent to Mr. Smith in October 2016 and confirmed by Mr. Park at trial, in 2015 entities controlled by Mr. Park distributed more than half a million dollars to entities controlled by Mr. Smith. (Ex. A-0066.)

30.  As a developer, Mr. Smith does not often make offers to purchase LIHTC properties that are already developed and operating, and did not recall ever offering to purchase a developed and operating LIHTC property that was not in some way affiliated with his friend and business partner Mr. Park.  (Draft Tr., Day 2, 105:15-17, 106:2-5.)

31.  Mr. Park prepared the Meridian PSA and asked Mr. Smith to sign it on behalf of SSRE for the purpose of assisting with SHAG's efforts to self-trigger and exercise its ROFR under Section 7.4L of the Meridian Court LPA.  (Draft Tr., Day 1, 150:9-12; Draft Tr., Day 3, 22:16-23:4.)

32.  Mr. Park informed Mr. Smith at the time that SSRE's execution of the Meridian PSA would not result in the sale of Meridian Court to SSRE, but instead would be trumped by SHAG's intended exercise of its below-market ROFR.  (Draft Tr., Day 3, 29:25-30:8.)

33.  To help entice Mr. Smith into signing the Meridian PSA that Mr. Park had prepared, Mr. Park suggested to Mr. Smith that his assistance with SHAG's efforts to self-trigger its ROFR would increase the likelihood that SHAG would invite Mr. Smith to participate in any redevelopment and/or resyndication that SHAG might undertake following the successful exercise of its ROFR.  (Draft Tr., Day 3, 30:9-16.)

34.  Mr. Smith signed and returned the Meridian PSA to Mr. Park less than six hours after receiving it (*compare* Ex. A-0021-0001 *with* Ex. A-0058-0001), but claimed not to have any recollection of the circumstances leading up to or following its execution.  (Draft Tr., Day 2, 100:13-21; 102:7-103:4.)  The Court finds it implausible that Mr. Smith would not have followed

DEFENDANTS AND COUNTER-PLAINTIFFS'
AMENDED PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW
(No. 2:17-cv-01115-RSM) – 9

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1  up on a genuine multi-million offer to purchase real estate, and does not credit Mr. Smith's

2  testimony that he has no recollection of the details of this supposed offer.

3       35.    Based on these circumstances, the Court concludes that Mr. Smith did not have a

4  sincere and genuine interest in purchasing Meridian Court, and complied with Mr. Park's request

5  as a favor to his business partners SHAG and Mr. Park, with the hope it could yield some future

6  benefit to Mr. Smith himself.

7       36.    The Court further concludes that the Meridian PSA was not a bona fide offer to

8  purchase Meridian Court, but instead was a sham tendered solely in an attempt by SHAG and

9  Mr. Park to trigger SHAG's ROFR and compel a sale of Meridian Court to SHAG at a below

10  market price.  (Draft Tr., Day 3, 22:16-23:4, 102:7-103:4; Day 2, 100:13-25.)

11       37.    Mr. Park signed a letter on behalf of Steel Lake and the Meridian Court Owner

12  dated December 29, 2014 that was addressed to AMTAX 260 and Protech Holdings W.  The

13  letter referenced the Meridian PSA, and stated that "[t]he Partnership has no intention of

14  accepting the offer or making a counteroffer at this time."  (Ex. A-0006-0001.)  Steel Lake's

15  letter did not disclose Mr. Smith's business relationship with Mr. Park and SHAG,  and SHAG

16  claimed in sworn interrogatory responses that no such relationship existed until it was forced to

17  admit the extent of its connection with Mr. Smith following his deposition in this action.  (Draft

18  Tr., Day 1, 136:7-139:8.) (Ex. A-0061, A-0062, A-0063.)

19       38.    Steel Lake never obtained an independent appraisal to determine the fair market

20  value of Meridian Court, never evaluated the $13 million purchase offer contained in the

21  Meridian PSA or determined whether it was in the best interest of the Meridian Court Owner to

22  accept it, and never formed or expressed a willingness to accept the Meridian PSA.  (Draft Tr.,

23  Day 3, 26:8-27:13.)

24       39.    On December 29, 2014, Mr. Park sent another letter to AMTAX 260 purporting to

25  exercise Steel Lake's purchase option under Section 7.4J of the Meridian Court LPA, but

26

DEFENDANTS AND COUNTER-PLAINTIFFS'
AMENDED PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW
(No. 2:17-cv-01115-RSM) – 10

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

claiming that Steel Lake's purchase option "is subject and subordinate to" SHAG's ROFR, and that SHAG's ROFR "has priority over" Steel Lake's option.  (Ex. 10.)

40.     On December 30, 2014, SHAG's Executive Director Jay Woolford sent an email to Mr. Park attaching a letter to Paul Scott Price purporting to notify Steel Lake "that SHAG is exercising its right to purchase [Meridian Court] pursuant to the Special ROFR provided in Section 7.4.L of the Agreement at the purchase price described in such section."  (Ex. 11.)

41.     Prior to sending the email attaching the letter to Mr. Price, Mr. Woolford had asked SHAG's Board of Directors to sign a "Unanimous Consent authorizing the execution of the letters to trigger our ROFR for Meridian Court and to negotiate the terms."  (Ex. A-0023-0001; Draft Tr., Day 1, 151:23-152:10.)  The Unanimous Consent stated that the consent resolutions it contained—including consent to "notify the appropriate entities of [SHAG's] intent to exercise" its ROFR—would be effected "pursuant to RCW 24.03.465 on the date that the last Director signed this consent resolution or a duplicate counterpart thereof or sent consent by email."  (Ex. A-0023-0003.)

42.     SHAG's Board of Directors did not fully execute the Unanimous Consent until after SHAG's ROFR terminated on January 1, 2015.  (Ex. A-0050; Draft Tr., Day 1, 40:14-16; 153:10-12, 23-24.)

### 2.     Auburn Court

43.     Auburn Court is a 296-unit LIHTC property located in Auburn, Washington.

44.     The owner of Auburn Court is the Auburn North Associates Limited Partnership, a Washington limited partnership (the "Auburn Court Owner").

45.     SHAG is the General Partner of the Auburn Court Owner.

46.     Defendant and Counter-Plaintiff AMTAX Holdings 259, LLC ("AMTAX 259") is the Investor Limited Partner of the Auburn Court Owner.

47.     Protech Holdings W is the Special Limited Partner of the Auburn Court Owner.

DEFENDANTS AND COUNTER-PLAINTIFFS'
AMENDED PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW
(No. 2:17-cv-01115-RSM) – 11

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

48.     The Auburn Court Owner is governed by a Third Amended and Restated Agreement of Limited Partnership Dated as of November 12, 2002 (the "Auburn Court LPA"). (Ex. 1.)

49.     The Compliance Period for Auburn Court expired on December 31, 2013, and the last day of the exercise period for SHAG's ROFR for Auburn Court was December 31, 2015. (Ex. A-0057.)

50.     On December 10, 2015, Mr. Woolford sent an email to Mr. Park with the subject line "Auburn ROFR" that stated:  "I spoke with Lance about the possibility of SEED making an offer on the Auburn property.  He checked with some of his Board members, and they were not comfortable with the idea.  I have David Peterson working on a PSA, but could use a straw buyer.  Do you have any other thoughts?"  (Ex. A-0032-0001.)   Mr. Woolford admitted at trial that he understood the term "straw buyer" to refer to someone who bids up the price of real estate without any real intention to purchase it.  (Draft Tr., Day 1, 164:2-10.)

51.     Mr. Park responded to Mr. Woolford's December 10, 2015 email the same day, stating "I know that Steve Smith would help us out again.  It would be great if it was another non-profit."  (Ex. A-0032-0001; Draft Tr., Day 1, 164:25-165:3.)

**(a)     Redwood LOI**

52.     On December 10, 2015, Nick Boehm, a Director of Redwood Housing Partners, LLC ("Redwood"), sent an email to Mr. Woolford attaching a Letter of Intent ("LOI") to acquire a different LIHTC property in which SHAG was involved, the Lakewood Meadows Project ("Lakewood Meadows").  (Ex. 15.)

53.     On December 11, 2015, Mr. Woolford sent an email to Bryan Park stating "I just got an unsolicited offer for Lakewood Meadows.  Wish it was for Auburn."  (Ex. A-0033-0001; Draft Tr., Day 1, 167:17-22.)

54.     Also on December 11, 2015, Mr. Woolford communicated via email with David Peterson of Paragon Realty regarding the Redwood LOI that SHAG had received for Lakewood

DEFENDANTS AND COUNTER-PLAINTIFFS'
AMENDED PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW
(No. 2:17-cv-01115-RSM) – 12

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

Meadows.  Mr. Peterson suggested that Mr. Woolford "bait Redwood to writing a LOI on Auburn," and "[t]ell them that you might be more open to selling Auburn and see if they write an LOI."  (Ex. A-0034-0001.)

55.     Mr. Woolford responded to Mr. Boehm's December 10, 2015 email less than a half-hour after Mr. Peterson suggested that SHAG "bait" Redwood into submitting a LOI on Auburn Court.  Mr. Woolford's email to Mr. Boehm stated, in part: "We are not currently considering selling, or re-capitalizing [Lakewood Meadows] as we are still within the 15 year compliance period. We do have a property in Auburn Washington though that has met its 15 year compliance period. I can't say what we plan to do, but if you want to consider a LOI, we will look at it."  (Ex. 16.)

56.     Mr. Boehm responded to Mr. Woolford later that same day. Mr. Boehm wrote that he assumed Mr. Woolford was referring to the Auburn Court Apartments, and Mr. Boehm asked Mr. Woolford if he would share the "most recent audited financials for the property."  (Ex. 16.)

57.     On December 14, 2015, Mr. Woolford responded with an email attaching "a draft audit" for the Auburn North Associates Limited Partnership.  (Ex. 16.)

58.     Mr. Woolford did not have a sincere and genuine interest in selling Auburn Court, and solicited the Redwood LOI solely for the purpose of self-triggering SHAG's ROFR and compelling a sale of Auburn Court to SHAG at a below market price.  (Draft Tr., Day 1, 164:2-10, 167:17-22.)

59.     Later the same day, Mr. Boehm sent Mr. Woolford an email stating that Redwood was "interested in trying to put together a deal that works for you and your team," and attaching a Letter of Intent for Auburn Court (the "Redwood LOI").  (Ex. 17.)  The Redwood LOI contemplated Redwood's potential acquisition of Auburn Court for a purchase price of $21,500,000.  (Ex. 17-5.)

DEFENDANTS AND COUNTER-PLAINTIFFS'
AMENDED PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW
(No. 2:17-cv-01115-RSM) – 13

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

60.     The Redwood LOI included the following language:  "It is to be strictly understood that this proposal is for discussion purposes only, is not intended as, and does not constitute a formal or binding agreement or contract.  Either party fully understands that a transaction of this type involves terms and conditions which have not yet been agreed upon and that this Letter is in no way intended to be a complete or definitive statement of all of the terms and conditions of the proposed transaction, and that no party shall have any legal obligation to the other unless and until a definitive purchase and sale agreement has been executed and delivered by both parties.  Only a fully executed real estate purchase contract shall bind the parties and until a purchase contract is signed, either party is free to terminate negotiations."  (Ex. 18-0006.)

61.     The Redwood LOI was not an enforceable offer to purchase Auburn Court, but instead merely a letter of intent communicating an expression of interest and an invitation to negotiate, as Mr. Woolford acknowledged in his testimony.  (Draft Tr., Day 1, 171:22-172:13.)

### (b)     SSRE Auburn PSA

62.     On December 26, 2015, Stephen Smith sent an email to Bryan Park with the subject line "Purchase offer" that stated:  "Bryan, even though I will be on a cruise ship I can still sign an offer.  My assistant will affix my electronic signature to it.  And I can still receive emails but it may take me a couple of days to get back to you.  It's no trouble at all.  Just let me know. I'm happy to help."  (Ex. 19-0002.)

63.     According to Mr. Park, he discussed Auburn Court with Mr. Smith prior to receiving Mr. Smith's December 26, 2015 email.  As with Meridian Court, Mr. Park claims he told Mr. Smith that (a) SSRE's execution of the Auburn PSA would not result in the sale of Auburn Court to SSRE, but instead would be trumped by SHAG's intended exercise of its below-market ROFR; and (b) Mr. Smith's assistance with SHAG's efforts to self-trigger its ROFR would increase the likelihood that SHAG would invite Mr. Smith to participate in any

DEFENDANTS AND COUNTER-PLAINTIFFS'
AMENDED PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW
(No. 2:17-cv-01115-RSM) – 14

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

redevelopment and/or resyndication that SHAG might undertake following the successful

exercise of its ROFR.  (Draft Tr., Day 3, 104:17-105:23.)

64.     On December 29, 2015, Mr. Park sent an email in response to Mr. Smith's

December 26 email, attaching a purchase and sale agreement for Auburn Court (the "Auburn

PSA") and stating, "[i]f you are able to have your assistant affix your electronic signature to the

attached offer, and then have her forward it back to me, that would be great."  (Ex. 19-0001.)

The Auburn PSA reflected a proposed purchase price of $21 million, which was $500,000 less

than the purchase price set forth in the Redwood LOI that had been received by SHAG over

three weeks earlier.  (*Compare* Ex. 19-5 *with* Ex. 17-5.)

65.     Later that same day, Mr. Smith instructed his assistant to affix his electronic

signature to the Auburn PSA, and Mr. Smith's assistant sent Mr. Park an executed copy of the

Auburn PSA approximately six hours after Mr. Park first transmitted it.  (Ex. 19-0001.)

66.     Mr. Smith did not have a sincere and genuine interest in purchasing Auburn

Court, and complied with Mr. Park's request as a favor to his business partners SHAG and Mr.

Park.

67.     The Auburn PSA was not a bona fide offer to purchase Auburn Court, but instead

was a sham tendered solely in an attempt by SHAG and Mr. Park to trigger SHAG's ROFR and

compel a sale of Auburn Court to SHAG at a below market price.

(c)     **SHAG's Attempt to Exercise Its Auburn Court ROFR**

68.     On December 29, 2015, SHAG forwarded the Redwood LOI to AMTAX 259 and

Protech Holdings W.  (Ex. 18.)

69.     On December 30, 2015, SHAG forwarded SSRE's Auburn PSA to AMTAX 259

and Protech Holdings W.  (Ex. 20.)

70.     On December 30, 2015, SHAG sent AMTAX 259 and Protech Holdings W an

email that attached (1) a December 30, 2015 letter from SHAG to Redwood in which SHAG,

purporting to speak on behalf of the Auburn Court Owner, responded to the Redwood LOI with

DEFENDANTS AND COUNTER-PLAINTIFFS'
AMENDED PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW
(No. 2:17-cv-01115-RSM) – 15

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

"(i) certain counter-offer terms as reflected on the marked, initialed, and executed copy of the original Letter of Intent dated December 14, 2015 and attached hereto, and (ii) certain other conditions as described below in this transmittal letter" (Ex. 21-0005); (2) a December 30, 2015 letter from SHAG to SSRE in which SHAG, purporting to speak on behalf of the Auburn Court Owner, stated that it was "rejecting [SSRE's] offer at this time, as set forth in [SSRE's] Real Estate Purchase and Sale Agreement dated December 29, 2015 (the "Offer")," and inaccurately stated that SHAG had accepted a different offer when in fact no offer had been accepted (Ex. 21-0017); and (3) a December 30, 2015 letter from SHAG to itself, AMTAX 260, and Protech Holdings W, in which SHAG stated that it was "exercising its right to purchase the Apartment Complex pursuant to the Special ROFR provided in Section 7.4L of the Partnership Agreement at the Purchase Price described therein (and not at the purchase price described in either of the two (2) third party offers)." (Ex. 21-0003.)

71.     While SHAG's letter enclosing the counter-offer to Redwood referenced SHAG's ROFR, it did not disclose that the price SHAG would have to pay upon successful exercise of its ROFR would be drastically less than the $21,500,000 purchase price reflected in the Redwood LOI. (Ex. 21-7 through 21-11.)  Mr. Park proposed the terms of SHAG's counter-offer to Redwood, which included, among other things, an increase of the purchase price from $21,500,000 to $22,000,000. (Ex. 21-12.)

72.     On January 4, 2016, after the two-year exercise period for SHAG's ROFR to purchase Auburn Court had terminated, Mr. Boehm sent an email to Mr. Woolford accepting SHAG's counter-offer to the Redwood LOI, and proposing that a draft purchase and sale agreement be circulated no later than January 14, 2016. (Ex. 24.)

73.     Mr. Woolford forwarded Mr. Boehm's January 4, 2016 email to Mr. Park the same day the Mr. Woolford received it.  Mr. Park responded, "OK.  Now you need to tell them the bad news - - that the ROFR was exercised.  We don't need to tell him that it was you who exercised it." (Ex. A-39-0001.)

DEFENDANTS AND COUNTER-PLAINTIFFS'
AMENDED PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW
(No. 2:17-cv-01115-RSM) – 16

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

74.     Rather than informing Redwood that SHAG had purported to exercise its ROFR to purchase Auburn Court, Mr. Woolford instead sent an email to Mr. Boehm on January 14, 2016 "apologizing for a tardy response" and stating that he was "having a disagreement with a partner that is going to take a little time to work out."  (Ex. 25.)

75.     On February 4, 2016, Mr. Boehm followed up via email regarding the status of Auburn Court, to which Mr. Woolford responded the same day:  "No update on working things out with the LP.  They are in several of our communities, so it may take some time."  (Ex. 26.)

76.     During the time that Mr. Woolford communicated with Mr. Boehm regarding Auburn Court, Mr. Woolford never informed Mr. Boehm or anyone else at Redwood that SHAG had purported to exercise its ROFR under Section 7.4L of the Auburn Court LPA, nor did Mr. Woolford have any discussions with AMTAX 260 regarding a potential sale of Auburn Court to Redwood.  (Draft Tr., Day 2, 29:10-15; Day 3, 160:17-21.)  Mr. Woolford testified that SHAG was potentially interested in future transactions with Redwood following SHAG's exercise of its ROFR, not that the Auburn Court Owner was interested in selling directly to Redwood.  (Draft Tr., Day 2, 29:10-30:15, 33:9-18.)

77.     SHAG never obtained an independent appraisal to determine the fair market value of Auburn Court, never evaluated the terms of the Redwood LOI, and never determined whether it was in the best interest of the Auburn Court Owner to pursue a sale of Auburn Court to Redwood at a purchase price of $21,500,000.  SHAG also never evaluated the $21 million purchase offer contained in SSRE's Auburn PSA, and never determined whether it was in the best interest of the Auburn Court Owner to accept it.  SHAG did not do so because it believed that any such evaluation or determination was unnecessary to trigger SHAG's ROFR, and that the purchase price reflected in any third party offer was "immaterial" in light of SHAG's intention to exercise its ROFR.  (Draft Tr., Day 2, 14:15-15:2, 16:5-12.)  Accordingly, SHAG never formed or expressed a willingness to accept either the Redwood LOI or SSRE's Auburn PSA.

DEFENDANTS AND COUNTER-PLAINTIFFS'
AMENDED PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW
(No. 2:17-cv-01115-RSM) – 17

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

### 3. Boardwalk and WoodRose

78.     Boardwalk is a 284-unit LIHTC property located in Olympia, Washington, and WoodRose is a 197-unit LIHTC property located in Bellingham, Washington.

79.     The owner of Boardwalk is Capitol Way Associates Limited Partnership, a Washington limited partnership (the "Boardwalk Owner"), and the owner of WoodRose is Racine Street Associates Limited Partnership, a Washington limited partnership (the "WoodRose Owner").

80.     SHAG's wholly-owned subsidiary Senior Housing Assistance Corporation ("SHAC") is the General Partner of both the Boardwalk Owner and the WoodRose Owner.  At all relevant times, SHAC's Board of Directors was comprised of the members of SHAG's Board of Directors, plus Mr. Woolford.  (Draft Tr., Day 2, 51:3-15.)

81.     Defendant and Counter-Plaintiff AMTAX Holdings 261, LLC ("AMTAX 261") is the Investor Limited Partner of the Boardwalk Owner, and Defendant and Counter-Plaintiff AMTAX Holdings 258, LLC ("AMTAX 258") is the Investor Limited Partner of the WoodRose Owner.

82.     Protech Holdings W is the Special Limited Partner of both the Boardwalk Owner and the WoodRose Owner.

83.     The Boardwalk Owner is governed by a Third Amended and Restated Agreement of Limited Partnership dated as of November 12, 2002 (the "Boardwalk LPA") (Ex. 2), and the WoodRose Owner is governed by a Second Amended and Restated Agreement of Limited Partnership dated as of November 12, 2002 (the "WoodRose LPA") (Ex. 4).

84.     The Compliance Period for Boardwalk expired on December 31, 2014, and the last day of the exercise period for SHAG's ROFR for Boardwalk was December 31, 2016.  (Ex. A-0057.)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

85. The Compliance Period for WoodRose expired on December 31, 2015, and the last day of the exercise period for SHAG's ROFR for WoodRose was December 31, 2017. (Ex. A-0057.)

(a)     **Reliant LOIs**

86. On January 19, 2016, Sanjiv Kakar, Senior Vice President for Acquisitions for Reliant Group Management, LLC ("Reliant") sent a letter to SHAG expressing Reliant's interest in acquiring Lakewood Meadows. (Ex. 28.)

87. On June 16, 2016, Mr. Kakar met Mr. Woolford over lunch in Seattle, Washington. During this meeting, Mr. Kakar explained Reliant's interests and discussed with Mr. Woolford certain properties that SHAG had expressed interest in selling. (Ex. 32-1; Ex. 33.)

88. On October 12, 2016, Mr. Woolford sent Mr. Kakar an email asking what information Reliant would need in order to evaluate possible offers on Boardwalk and WoodRose. (Ex. 37.)

89. Mr. Woolford did not have a sincere and genuine interest in selling Boardwalk or WoodRose, and solicited Reliant solely for the purpose of self-triggering SHAG's ROFR and compelling the sale of Boardwalk and WoodRose to SHAG at below market prices. (Draft Tr., Day 2, 42:18-43:7.)

90. On November 5, 2016, Mr. Kakar sent Mr. Woolford signed letters of intent to purchase Boardwalk and WoodRose (the "Reliant LOIs") that expired by their terms on November 18, 2016. (Ex. 45, 45-6.)

91. The Reliant LOIs each included the following language: "As noted above, this letter is only intended to establish some of the basic terms of the proposed purchase and is not intended to encompass all of the material terms that will need to be included in a definitive PSA." (Ex. 45-24.)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

92.     The Reliant LOIs were not enforceable offers to purchase Boardwalk and WoodRose, but instead merely letters of intent communicating an expression of interest and an invitation to negotiate.  (Ex. 45-5, 45-6, 45-23 and 45-24.)

93.     Twelve days later, on November 17, 2016, SHAC—in its capacity as General Partner of the Boardwalk Owner and the WoodRose Owner—forwarded the Reliant LOIs to AMTAX 261, AMTAX 258, and Protech Holdings W.  (Ex. 54; Ex. 52.)  This was the first time that SHAC had shared the Reliant LOIs with the Investor Limited Partners of the Boardwalk Owner and the WoodRose Owner.

94.     The letters from SHAC enclosing the Reliant LOIs stated that SHAC—in its capacity as General Partner of the Boardwalk Owner and the WoodRose Owner—believed that the Reliant LOIs were "attractive and worthy of consideration."  The letter went on to note, however, that SHAC understood that SHAG intended to exercise its ROFR to purchase each property, and "request[ed] that SHAG confirm in writing whether SHAG intends to exercise the ROFR."  (Ex. 52-20; Ex. 54-20.)

95.     SHAG sent letters dated November 18, 2016 purporting to exercise SHAG's ROFR for Boardwalk and WoodRose.  (Ex. 55; Ex. 53.)

96.     SHAC never obtained an independent appraisal to determine the fair market value of Boardwalk or WoodRose, never evaluated the terms of the Reliant LOIs, and never determined whether it was in the best interests of the Boardwalk Owner or the WoodRose Owner to pursue a sale of their respective properties at the purchase prices reflected in the Reliant LOIs. SHAC did not do so because it believed that any such evaluation or determination was unnecessary to trigger SHAG's ROFR, and that the purchase price reflected in any third party offer was "immaterial" in light of SHAG's intention to exercise its ROFR.  (Draft Tr., Day 2, 47:4-23.)  Accordingly, SHAG never formed or expressed a willingness to accept either of the Reliant LOIs.

DEFENDANTS AND COUNTER-PLAINTIFFS'
AMENDED PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW
(No. 2:17-cv-01115-RSM) – 20

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

**(b)    SHAG's Subsequent False Statements to Reliant**

97.    Mr. Woolford did not inform Reliant that SHAG had purported to exercise its ROFR for Boardwalk and WoodRose.  On November 22, 2016, Mr. Kakar of Reliant sent a follow up email to Mr. Woolford with the subject line "SHAG deals" that asked whether SHAG had received "[a]ny word back from the LP and partners?"  (Ex. 56.)

98.    Responding to Mr. Kakar's email the same day he received it, Mr. Woolford stated in an email:  "I have not heard back from them yet.  I will keep you posted."  (Ex. 56.)

99.    On February 27, 2017, Mr. Kakar followed up again with Mr. Woolford "to see where you are on your deal," to which Mr. Woolford responded with an email stating: "I hope we will be in a position no later than the early part of Q2 to move on a sale of some assets."  (Ex. 58-4.)

100.    Mr. Kakar and a realtor named Evan Wilson followed up with Mr. Woolford regarding the status of the Reliant LOIs multiple times in 2017.  On June 5, 2017, Mr. Woolford responded with an email stating:  "Sorry to not have gotten back to you.  This is still in my headlight and we are working towards resolution.  A couple of moving pieces, but I hope to have something to report in the next 60 days."  (Ex. 58-2.)

101.    Responding to another follow up inquiry on July 25, 2017, Mr. Woolford falsely stated in an email:  "I wish I could give you a definitive update, but we are still working through the issues.  I hope to know more in the next month or so."  SHAG filed this lawsuit on the same day the Mr. Woolford sent this email, but Mr. Woolford's email made no reference to SHAG's ROFR or the initiation of this action.  (Ex. 58-1.)

102.    During the time that Mr. Woolford was communicating with Mr. Kakar and Mr. Wilson regarding Boardwalk and WoodRose, Mr. Woolford never informed them that SHAG had purported to exercise its ROFR under Sections 7.4L of the Boardwalk LPA and the WoodRose LPA, nor did Mr. Woolford have any discussions with AMTAX 261 or AMTAX 258 regarding a potential sale of Boardwalk and/or WoodRose to Reliant.  Mr. Woolford testified

DEFENDANTS AND COUNTER-PLAINTIFFS'
AMENDED PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW
(No. 2:17-cv-01115-RSM) – 21

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

that SHAG was potentially interested in future transactions with Reliant following SHAG's exercise of its ROFR, not that the Boardwalk Owner and the WoodRose Owner were interested in selling directly to Reliant.  (Draft Tr., Day 2, 48:24-49:25.)

### E.    Efforts to Hide the Global Indemnity Agreement from the AMTAX Entities

103.    On July 12, 2001, SHAG and SHAC entered into a Global Indemnity Agreement with Pacific Northern Construction Company ("PNCC"), an entity controlled and partially owned by Mr. Park.  The Global Indemnity Agreement addresses, *inter alia*, the ownership of certain LIHTC properties, including Meridian Court, Auburn Court, Boardwalk, and WoodRose, following SHAG's exercise of its ROFR for those properties.  (Ex. A-0088.)

104.    Under the Global Indemnity Agreement, PNCC and affiliated entities owned and/or controlled by Mr. Park, including Steel Lake, would maintain their ownership interest in the Project Partnerships upon SHAG's exercise of its ROFR following the end of the applicable Compliance Periods, which would not be the case if (a) the Global Indemnity Agreement did not exist, or (b) the Project Partnerships instead sold the properties to a third party.  (Draft Tr., Day 3, 54:3-8.)  Put another way, in the absence of the Global Indemnity Agreement, entities affiliated with Mr. Park would retain no economic ownership interests in the Project Partnerships following SHAG's successful exercise of its ROFR.

105.    The Global Indemnity Agreement thus provided an incentive for Mr. Park to assist SHAG in its efforts to manufacture "offers" sufficient to trigger SHAG's ROFR to purchase Meridian Court, Auburn Court, Boardwalk, and WoodRose at below market prices.  Indeed, according to Mr, Woolford, SHAG would only be entitled to twenty to forty percent of any economics generated by the properties following SHAG's exercise of its ROFR, and entities affiliated with Mr. Park would be entitled to the remaining sixty to eighty percent.  (Draft Tr., Day 1, 123:13-19.)

106.    On December 30, 2014, Bryan Park sent a letter on behalf of Steel Lake that purported to provide AMTAX 260 with notice of SHAG's putative exercise of its ROFR under

DEFENDANTS AND COUNTER-PLAINTIFFS'
AMENDED PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW
(No. 2:17-cv-01115-RSM) – 22

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

Section 7.4L of the Meridian Court LPA.  (Ex. A-0027.)  Mr. Park's letter attached a copy of another letter dated December 29, 2014 from SHAG to Mr. Park that referenced the Global Indemnity Agreement and stated that, under the Global Indemnity Agreement, "SHAG has certain obligations to PNCC with respect to the ownership structure of [Meridian Court] after the exercise of the Special ROFR."  (Ex. A-0027-0008.)

107.    On January 15, 2015, AMTAX 260's agent, HCP Pacific Asset Management LLC ("Hunt") sent a letter to Mr. Park requesting "a copy of the Global Indemnity Agreement between SHAG and PNCC referenced in the December 30, 2014 Letter as well as any additional information necessary for us to understand the nature of the relationship among PNCC, the General Partner and/or SHAG (or any of their respective affiliates), particularly as it relates to the organizational structure of the direct and indirect owner(s) of the Apartment Complex after the exercise of the Special ROFR."  (Ex. A-0096-0003.)

108.    Mr. Park forwarded AMTAX 260's January 15, 2015 letter to Mr. Woolford at SHAG on the same day he received it.  (Ex. A-0027.)

109.    On February 13, 2015, Hunt sent a follow up letter to request again a copy of the Global Indemnity Agreement and "any additional information necessary for us to understand the nature of the relationships between and among [PNCC], the General Partner and SHAG (including their direct or indirect owners) and SHAG's obligations to PNCC with respect to the ownership structure of the Apartment Complex after the exercise of the ROFR."  (Ex. 13-3.)

110.    Despite Hunt's repeated requests, SHAG and Mr. Park refused to provide AMTAX 260 with a copy of the Global Indemnity Agreement.

111.    On April 23, 2015, Mr. Woolford sent an email to Mr. Park that referenced the two Hunt letters and asked "[w]hat, if any impact does the Global Indemnification agreement have on Hunt's position for Meridian and the other Hunt properties?"  (Ex. A-0028-0001.)  Mr. Woolford sent this email because it was not clear to him at the time what impact the Global

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

Indemnity Agreement would have on concerns the AMTAX entities had raised regarding SHAG's purported exercise of its ROFR.  (Draft Tr., Day 2, 56:19-57:5.)

112.    On July 17, 2015, Mr. Park sent Mr. Woolford an email forwarding a letter from counsel for AMTAX 260 and Protech Holdings W dated July 13, 2015 that again requested a copy of the Global Indemnity Agreement.  (Ex. A-0030.)  Neither Mr. Park nor SHAG ever responded to this letter.

113.    On July 28, 2015, Mr. Park sent an email to Mr. Woolford attaching a draft of a letter to the Washington State Housing Finance Commission ("WSHFC") that Mr. Park had composed in connection with SHAG's request that WSHFC reconfirm SHAG's nonprofit status. Mr. Park included the Global Indemnity Agreement among a list of materials that Mr. Park proposed submitting to WSHFC to facilitate its review.  (Ex. A-0031.)

114.    As Mr. Park confirmed at trial, information relevant to SHAG's nonprofit status would be of legitimate interest to the AMTAX entities.  (Draft Tr., Day 3, 90:13-16.)  SHAG and Mr. Park nonetheless continued to deny the AMTAX entities the opportunity to review the Global Indemnity Agreement.

115.    On April 8, 2016, Mr. Park wrote a letter to counsel for the AMTAX entities in which he purported to describe the substance of the Global Indemnity Agreement, but failed to disclose or identify the provision of the Global Indemnity Agreement that impacts what SHAG and for profit entities controlled by Mr. Park would be entitled to receive upon the successful exercise of SHAG's ROFR.  (Ex. A-0013-0006-07.)

116.    On April 27, 2016, the AMTAX entities' agent Ryan Trane from Alden Torch sent an email to Mr. Woolford stating "that it would be beneficial if I could review the indemnity agreement to familiarize myself with the deals."  (Ex. A-0014.)  Mr. Trane was seeking a copy of the Global Indemnity Agreement because the AMTAX entities had a legitimate desire to determine whether the terms of the Global Indemnity Agreement had any implications on SHAG's attempts to exercise its ROFR, or in any way jeopardized or impacted the LIHTC that

had been delivered to the AMTAX entities by virtue of their more than 99% ownership interest in the Project Partnerships.  (Draft Tr., Day 3, 153:17-154:14, 155:5-156:19; Ex. A-0060-0002.)  Mr. Trane and Alden Torch accordingly were trying to protect the interests of the AMTAX entities' own limited partners—investors who were the ultimate recipients of the LIHTC and other benefits from the AMTAX entities' investments in the Project Partnerships—and requested a copy of the Global Indemnity Agreement in furtherance of that objective.  (Draft Tr., Day 3, 157:24-158:5.)

117.    Mr. Woolford responded to Mr. Trane's request with an email stating: "Not sure what document you are referring to?"  When he sent this email, Mr. Woolford knew that Mr. Trane was referring to the Global Indemnity Agreement.  Mr. Woolford then forwarded his response to Mr. Park, stating, "I think they are playing cute."  (Ex. A-0014-0001.)

118.    Mr. Trane responded to Mr. Woolford by email the next day, stating, "[i]t is my understanding that there is a global indemnity agreement between SHAG and Bryan Park's entities."  (Ex. A-0015-0002.)  Mr. Woolford again forwarded Mr. Trane's email to Mr. Park, this time stating, "I like your idea of attaching their indemnity."  (Ex. A-0042-0001.)

119.    Mr. Woolford responded to Mr. Trane's email on April 28, 2016, but his response did not reference the Global Indemnity Agreement or respond to Mr. Trane's request for a copy.  (Ex. A-0015-0001-02.)

120.    In response to Mr. Woolford's email, Mr. Trane wrote:  "Without the Global Indemnity Agreement I am not permitted to have a conversation or negotiation about the portfolio.  Once we have that Agreement we can begin the process of working towards a solution."  Mr. Woolford again forwarded Mr. Trane's email to Mr. Park, this time with the message:  "As I expected."  (Ex. A-0015-0001.)

121.    The AMTAX entities were not provided with a copy of the Global Indemnity Agreement until June 10, 2016, approximately a year and a half after the AMTAX entities had first requested a copy.  (Ex. A-0098.)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

## III.   CONCLUSIONS OF LAW

### A.   *Jurisdiction*

1.   This Court has jurisdiction over this case under 28 U.S.C. §§ 1332, 2201 and 2202.

### B.   *Whether SHAG's Rights of First Refusal Were Triggered*

2.   As the Plaintiff, SHAG bears the burden of establishing that the ROFR it seeks to enforce through this action were properly triggered and exercised.  *See Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 57 (2005).

3.   In order for each of SHAG's ROFR to be triggered, the owner of the property at issue must receive "a bona fide offer from a third party, acceptable to the property owner." *Matson v. Emory*, 36 Wn. App. 681, 683, 676 P.2d 1029 (1984) (citing *Bennett Veneer Factors, Inc. Brewer*, 73 Wn.2d 849, 856, 441 P.2d 128 (1968)); *see also* Order Re: Motions For Summary Judgment, Dkt. # 142 at 11 ("'The right of first refusal requires the landowner to first get an offer to purchase from a third party, that the seller is willing to accept.'") (quoting *Kelly v. Ammex Tax & Duty Free Shops W., Inc.*, 162 Wn. App. 825, 830-32, 256 P.3d 1255 (2011)). Thus, it is not enough for the owner to have a general desire to sell; instead the owner must be willing to sell on specific offered terms in order for a ROFR to be triggered.

4.   To be bona fide, an offer must be "made in good faith; without fraud or deceit," and must be "sincere" and "genuine."  Black's Law Dictionary (10th ed. 2014); *see also ABCDW LLC v. Banning*, 241 Ariz. 427, 438, 388 P.3d 821 (2016) ("'A third-party offer is bona fide if it was made honestly and with serious intent, that is, if the offeror genuinely intends to bind itself to pay the offered price.'") (quoting *Uno Rests., Inc. v. Boston Kenmore Realty Corp.*, 441 Mass. 376, 805 N.E.2d 957, 962 (2004)) (internal quotation marks and citations omitted).

5.   Even where a third party's interest in the property is genuine, to constitute an offer, the communication in question must be enforceable and not merely an expression of interest or invitation to negotiate.  *See Rennick v. O.P.T.I.O.N. Care, Inc.*, 77 F.3d 309, 315 (9th

DEFENDANTS AND COUNTER-PLAINTIFFS'
AMENDED PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW
(No. 2:17-cv-01115-RSM) – 26

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

Cir. 1996) ("A manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent.") (quoting Restatement (Second) of Contracts § 26 (1981)).  A mere letter of intent thus does not constitute an offer.  *See Leibsohn Prop. Advisors Inc. v. Colliers Int'l Realty Advisors (USA), Inc.*, 177 Wn. App. 1021 n.28 (2013) (unpublished) ("But a letter of intent is not an offer.");  *Pac. Cascade Corp. v. Nimmer*, 25 Wn. App. 552, 556, 608 P.2d 266 (1980) ("[A]n intention to do a thing is not a promise to do it. . . .  It is evidence of a future contractual intent, not the present contractual intent essential to an operative offer.") (internal citations and quotation marks omitted).

6.      In addition, an offer to purchase real estate is enforceable only if it includes all material terms.  *See Sea-Van Investments Associates v. Hamilton,* 125 Wn.2d 120, 128-29, 881 P.2d 1035 (1994) (holding that a real estate contract was unenforceable because, *inter alia*, the purported offer did not contain all material terms).

7.      Notwithstanding the authority cited above, SHAG has cited to several cases to argue that, under Washington law, an offer need not be enforceable or acceptable to the owner in order to trigger a right of first refusal.  As a threshold matter, the cases on which SHAG relies that do not involve disputes over real property are of limited significance, as contracts involving real property have specific requirements and remedies that are inapplicable in other contexts. *See Sea-Van Investment Associates*, 125 Wn.2d at 128; *Crafts v. Pitts*, 161 Wn.2d 16, 25-26, 162 P.3d 382 (2007).

8.      Moreover, none of the cases on which SHAG relies are inconsistent with the proposition that an offer must be enforceable and acceptable to the seller in order to trigger a right of first refusal under Washington law.  Both *Bennett Veneer Factors, Inc. v. Brewer* and *Dalton v. Balum* hold that a seller's obligations to the ROFR-holder are satisfied by offering the ROFR-holder the property on terms that are equivalent to those on which the property is ultimately sold to a third party.  *See Bennett Veneer Factors, Inc. v. Brewer*, 73 Wn.2d 849, 855-

DEFENDANTS AND COUNTER-PLAINTIFFS'
AMENDED PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW
(No. 2:17-cv-01115-RSM) – 27

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

56, 441 P.2d 128 (1968); *Dalton v. Balum*, 13 Wn. App. 160, 534 P.2d 56 (1975).  While both cases address the less conventional circumstance—not present here—in which the ROFR-holder is offered the property *before* there is a third-party offer (*see Dalton*, 13 Wn. App. at 162 (contrasting case before the court with "the usual situation in which a third party has made an offer to the owner to sell the property")), the principle that the seller must be willing to accept the terms of an enforceable offer for the ROFR to be triggered remains true regardless of (a) whether the seller or third-party buyer initiates the offer, or (b) whether the ROFR-holder is given the opportunity to meet the terms of the enforceable offer before or after the offer is made to a third party.

9.      Indeed, both cases on which SHAG relies confirm that "[t]he rule in Washington is that the owner of a right of first refusal is entitled to the opportunity to buy the subject property on the same terms contained in a bona fide offer from a third party acceptable to the owner." *Dalton*, 13 Wn. App. at 58; *see also Bennett*, 73 Wn.2d at 856 ("[T]he owner of [a ROFR] is entitled to the opportunity to buy the subject property on the same terms contained in a bona fide offer from a third party acceptable to the owner of the goods.").

10.     In *Bennett*, for example, the plaintiff had a ROFR to purchase all logs produced by the defendant.  *Bennett*, 73 Wn.2d at 845.  The *Bennett* court held that a ROFR is extinguished when the ROFR-holder declines to purchase on terms at least as favorable as those that are ultimately accepted by the seller.  *Id.* at 855-56.  In that case, the defendant in fact sold its logs to the third-party buyer, and thus there was no question that there was an enforceable third-party offer that was acceptable to the seller.  *Id.*

11.     Similarly, in *Dalton*, the plaintiff tenant had a ROFR to purchase a farm, which the court held was extinguished when he declined to purchase the farm for the same price that the property was ultimately sold to a third party.  *Dalton*, 13 Wn. App. at 163-64.  Again, the third-party sale had been consummated, and thus there was no question that it arose out of an enforceable offer that was acceptable to the seller.

DEFENDANTS AND COUNTER-PLAINTIFFS'
AMENDED PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW
(No. 2:17-cv-01115-RSM) – 28

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

12.     As explained below, the testimony and documentary evidence in this case does not establish that the Project Partnerships received bona fide and enforceable third-party offers to purchase Meridian Court, Auburn Court, Boardwalk, or WoodRose that were acceptable to the owners of those properties.

### 1.     Meridian Court

13.     There was no bona fide and enforceable offer to purchase Meridian Court that was acceptable to the Meridian Court Owner.  The Meridian PSA signed by Stephen Smith on behalf of SSRE was not made in good faith and was not sincere or genuine, but was instead a sham tendered solely in an attempt by SHAG and Mr. Park to trigger SHAG's ROFR and compel a sale of Meridian Court to SHAG at a below market price.

14.     Even if the Meridian PSA had been a bona fide, good faith offer, that offer was deemed unacceptable by the Project Partnership, as evidenced by a letter in which Steel Lake, in its capacity as General Partner, stated that the Meridian Court Owner had no intention of accepting the Meridian PSA.  This evidence demonstrates that the Meridian Court Owner never formed or expressed a willingness to accept the Meridian PSA, and SHAG was unable to adduce any evidence to suggest otherwise.  The Meridian PSA therefore did not trigger SHAG's ROFR to purchase Meridian Court.

15.     In addition, Steel Lake's purported exercise of its purchase option pursuant to Section 7.4J of the Meridian LPA was not a bona fide third party offer, and did not trigger SHAG's ROFR.

16.     First, the exercise of an option does not constitute an offer to purchase subject to rejection, but instead is a self-executing acceptance of a preexisting offer to sell the property on terms set forth in the Meridian LSA.  *See Hopkins v. Barlin*, 31 Wn.2d 260, 267, 196 P.2d 347 (1948) (noting that "an option is a continuing offer and, when supported by valuable consideration, in itself imports irrevocability during the time specified therein").

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

17.     Second, Steel Lake is not a third party, but rather the General Partner of the Meridian Court Owner.

18.     Third, the language of the Meridian LPA confirms that Steel Lake's purported exercise of its purchase option under Section 7.4J did not trigger SHAG's ROFR under Section 7.4L.  As discussed above, Section 7.4K of the Meridian LPA specifically states that the exercise of the Investor Limited Partner's forced sale right triggers SHAG's ROFR, but Section 7.4J contains no such provision.  This demonstrates that when the parties wanted the exercise of some other right to trigger SHAG's ROFR, they said so affirmatively, and that the absence of such affirmative language indicated a contrary intent.

## 2.     Auburn Court

19.     There was no bona fide and enforceable offer to purchase Auburn Court that was acceptable to the Auburn Court Owner.

20.     The Redwood LOI was not bona fide, as it was solicited by Mr. Woolford in an attempt to trigger SHAG's ROFR, after Mr. Woolford told Mr. Park that he "could use a straw buyer" and after Mr. Park responded: "I know that Steve Smith would help us out again.  It would be great if it was another non-profit."  Indeed, Redwood initially expressed interest in purchasing a different LIHTC project, Lakewood Meadows, and only submitted the Redwood LOI after Mr. Woolford deliberately made misleading statements to Redwood in order to induce the Redwood LOI as part of SHAG's secret effort to self-trigger its ROFR.

21.     The Redwood LOI, which expressly stated that it "is not intended as, and does not constitute a formal or binding agreement or contract," also was not an enforceable offer, but rather a mere letter of intent.

22.     Nor was the Redwood LOI acceptable to the Auburn Court Owner.  Rather, SHAG, in its capacity as General Partner of the Auburn Court Owner, countered Redwood's proposed terms, including material terms such as price, which establishes that the Auburn Court Owner never formed a willingness to accept the terms in the Redwood LOI.  *See Rorvig v.*

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

*Douglas*, 123 Wn.2d 854, 858, 873 P.2d 492 (1994); *Sea-Van Investments Associates,* 125 Wn.2d at 126 ("Generally, a purported acceptance which changes the terms of the offer in any material respect operates only as a counteroffer, and does not consummate the contract").

23.      The Auburn PSA signed by SSRE was not bona fide, as  Mr. Smith's execution of the Auburn PSA at the behest of Mr. Park was not made in good faith and was not sincere or genuine.  Instead, the Auburn PSA was a sham tendered solely in an attempt by SHAG and Mr. Park to trigger SHAG's right of first refusal and compel a sale of Auburn Court to SHAG at a below market price.

24.      Nor is there any evidence that the Auburn Court Owner ever formed or expressed a willingness to accept the Auburn PSA.  To the contrary, SHAG indicated in a letter to SSRE that the Auburn Court Owner was rejecting the Auburn PSA.

25.      SHAG's ROFR to purchase Auburn Court therefore was not triggered.

### 3.      Boardwalk and WoodRose

26.      There were no bona fide and enforceable offers to purchase Boardwalk or WoodRose that were acceptable to the Boardwalk Owner or the WoodRose Owner, respectively. The Reliant LOIs were not bona fide as they were solicited by Mr. Woolford in an attempt to trigger SHAG's ROFR and compel a sale of Boardwalk and Wood Rose to SHAG at below market prices, not because SHAC was genuinely interested in selling Boardwalk or WoodRose to a third party.  Indeed, Reliant initially expressed interest in purchasing a different LIHTC project, Lakewood Meadows, and only submitted the Reliant LOIs after Mr. Woolford deliberately made misleading statements to Reliant in order to induce the Reliant LOIs as part of SHAG's secret effort to self-trigger its ROFR.

27.      The Reliant LOIs, each of which expressly states, "this letter is only intended to establish some of the basic terms of the proposed purchase and is not intended to encompass all of the material terms that will need to be included in a definitive PSA," also were not enforceable offers, but rather mere letters of intent. *See Sea-Van Investments Associates,* 125 Wn.2d at 128-

DEFENDANTS AND COUNTER-PLAINTIFFS'
AMENDED PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW
(No. 2:17-cv-01115-RSM) – 31

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

29 (holding that a real estate contract was unenforceable because, *inter alia*, the purported offer did not contain all material terms).

28.     Nor did the Boardwalk Owner or the WoodRose Owner ever form or express a willingness to accept the Reliant LOIs.  Although SHAC did not affirmatively reject the Reliant LOIs, SHAC only stated that they were "worthy of consideration."  SHAC never stated that the terms of the Reliant LOIs were acceptable to the Boardwalk Owner or the WoodRose Owner.  Indeed, the evidence shows that SHAC never even evaluated—let alone made any determinations—regarding the proposed terms in the Reliant LOIs because it believed that those terms were "immaterial."

29.     The Court does not agree with SHAG's argument that the terms of the third party offers were immaterial, or that SHAG can simply ignore the common law requirement that the owner of a property subject to a ROFR must be willing to accept a third party offer in order for the ROFR to be triggered.  While the Court found in its summary judgment order that the AMTAX entities had contracted away *their* consent rights in connection with SHAG's exercise of its ROFR, the Court also upheld the distinction between a ROFR and an option, and confirmed that SHAG could only exercise its ROFR if all of the elements necessary to trigger the ROFR under common law had been satisfied.  Taken to its logical conclusion, SHAG's argument that the terms of the third party offer are immaterial would mean that even an offer for one dollar would be sufficient to trigger SHAG's ROFR, which would functionally eviscerate the substantive distinction between a ROFR and an option.

30.     SHAG's argument also ignores its dual roles as the holder of the below market ROFR and as General Partner—either directly or through its wholly-owned subsidiary, SHAG— of three out of the four Project Partnerships at issue.  While SHAG may have the right to exercise its ROFR after it has been properly triggered, it may not ignore its fiduciary duty to evaluate third party offers on their merits simply because of the existence of that ROFR.  Rather, SHAG must be cognizant of its conflicts of interest, and evaluate the merits of any offer

DEFENDANTS AND COUNTER-PLAINTIFFS'
AMENDED PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW
(No. 2:17-cv-01115-RSM) – 32

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

objectively based on the best interest of the Project Partnership, and not based on its own selfish motivation to trigger its right to purchase the properties at prices that are millions of dollars below their market value.  Only if SHAG first determines in its capacity as General Partner that the terms of a bona fide, enforceable offer are in the best interests of the Project Partnership to accept can SHAG then exercise its contractual purchase right.  SHAG accepted this dual role when it agreed to serve as a fiduciary, and may not shirk its responsibilities as General Partner to facilitate the exercise of its ROFR.  This same principle also applies to Steel Lake's role as the General Partner of the Meridian Court Owner because, as explained above, Steel Lake's economic interests were inextricably tied to SHAG's exercise of its ROFR to purchase Meridian Court.

31.     For these reasons, the Court concludes that SHAG's ROFR to purchase Boardwalk and WoodRose were not triggered.

### C.     Whether SHAG Properly Exercised Its Rights of First Refusal

32.     Because SHAG's ROFR were not triggered for any of the Project Partnerships, none of those rights were properly exercised.  With respect to Meridian Court, SHAG's ROFR was not properly exercised for the separate, independent reason that the purported exercise was not timely.  SHAG's Board of Directors did not fully execute the "Unanimous Consent authorizing the execution of the letters to trigger our ROFR for Meridian Court and to negotiate the terms" until after the termination of SHAG's ROFR on January 1, 2015 pursuant to Section 7.4L of the Meridian Court LPA.  *See* Wash. Rev. Code § 24.03.465 ("Any action required by this chapter to be taken at a meeting of the members or directors of a corporation, or any action which may be taken at a meeting of the members or directors, may be taken without a meeting if a consent in the form of a record, setting forth the action so taken, shall be executed by *all of the members entitled to vote* with respect to the subject matter thereof, *or all of the directors*, as the case may be.") (emphases added).

DEFENDANTS AND COUNTER-PLAINTIFFS'
AMENDED PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW
(No. 2:17-cv-01115-RSM) – 33

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1

### D.  *Whether SHAG's Claim Is Equitable in Nature*

2   33.   In the parties' Proposed Revised Pretrial Order, SHAG asked the Court to declare

3   that: (1) "SHAG's Special ROFRs for Meridian Court, Auburn Court, Boardwalk, and

4   WoodRose were triggered"; and (2) "SHAG has properly and effectively exercised its Special

5   ROFRs for Meridian Court, Auburn Court, Boardwalk, and WoodRose." (Dkt. # 149 at 2.)

6   Throughout this litigation, SHAG has never asked the Court for damages or monetary relief of

7   any kind.  Indeed, SHAG's complaint only requested a declaratory judgment (Dkt. # 3-1 at 26-

8   27), and SHAG agreed that this action was not appropriate for a jury trial (Dkt. # 117 at 2).

9   During trial and in its trial brief, however, SHAG belatedly argued for the first time that

10  Defendants and Counter-Plaintiffs' unclean hands affirmative defense was unavailable because

11  SHAG's declaratory relief claim concerns a contract and thus, according to SHAG, is legal in

12  nature.  (Dkt. # 155 at 24.)

13  34.   To determine whether an action for declaratory relief is equitable or legal in

14  nature, courts consider whether the plaintiff would have sought an equitable or legal remedy in

15  the absence of a declaratory judgment. *See Simler v. Conner*, 372 U.S. 221, 222-23 (1963).

16  SHAG cites to *Transamerica Occidental Life Ins. Co. v. DiGregorio*, 811 F.2d 1249, 1251 (9th

17  Cir. 1987) for the proposition that a contract dispute where declaratory relief is sought is legal

18  rather than equitable in nature.  (Dkt. # 155 at 24.)  The *Transamerica* court, however,

19  considered a contractual dispute arising under ERISA, not a real property dispute.  This

20  distinction is material because the remedy in a real property dispute, where money damages are

21  typically deemed inadequate, is presumed to be equitable.  *See Crafts*, 161 Wn.2d at 25-26.

22  35.   Accordingly, a declaratory judgment claim in a real property dispute is equitable

23  in nature.  *See, e.g. Owens-Illinois, Inc. v. Lake Shore Land Co., Inc.*, 610 F.2d 1185, 1189-90

24  (3d Cir. 1979) (concluding that plaintiff did not ask for damages or other legal remedy in a

25  contract dispute where plaintiff asked the court for a declaratory judgment establishing its right

26  under an option agreement to compel the conveyance of real property); *see also BioMed Realty,*

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

*L.P. v. 700 Dexter, LLC*, No. C15-0930-JCC, 2016 WL 6595939, at *5-*6 (W.D. Wash. Nov. 8, 2016) (granting specific performance in a real estate contract dispute after rejecting, among others, an unclean hands defense).

36.     SHAG is asking this Court to declare that its ROFR on the four disputed properties have already been triggered and validly exercised, and that SHAG accordingly is entitled to purchase the properties at the below market prices set forth in Section 7.4L of the Partnership Agreements.  (Dkt. # 149 at 2.)  Should the Court so declare, it will follow that SHAG will obtain the disputed properties.  In other words, the remedy SHAG will receive is specific performance of a contract relating to the ownership of real property.  *See Crafts*, 161 Wn.2d at 23-24 (recognizing specific performance as an equitable remedy).  Accordingly, SHAG's claim for declaratory relief is equitable in nature, and the AMTAX entities are entitled to present an affirmative defense of unclean hands.

### E.     Whether SHAG's Claim Is Barred By the Doctrine of Unclean Hands

37.     A party that acts with unclean hands cannot recover in equity.  *J. L. Cooper & Co. v. Anchor Sec. Co.*, 9 Wn.2d 45, 71-72, 113 P.2d 845 (1941).  A party has unclean hands when it has engaged in unjust, inequitable, bad faith, or unconscionable conduct in connection with the transaction at issue.  *Id.* at 72-73; *see also Hallas v. Ameriquest Mortg. Co.*, 280 F. App'x 667, 668 (9th Cir. 2008); *cf. Dollar Sys., Inc. v. Avcar Leasing Sys., Inc.*, 890 F.2d 165, 173 (9th Cir.1989) ("Bad intent is the essence of the defense of unclean hands.") (applying California law) (citing *Wells Fargo & Co. v. Stagecoach Props., Inc.*, 685 F.2d 302, 308 (9th Cir.1982)).  The testimony and documentary evidence demonstrates that SHAG acted with unclean hands in connection with its attempted exercise of its ROFR for Meridian Court, Auburn Court, Boardwalk, and WoodRose.

38.     SHAG engaged in inequitable, bad faith, and unjust conduct when it secretly colluded with Mr. Park to procure sham offers from straw buyers for Meridian Court and Auburn Court.  SHAG successfully procured a sham offer from Mr. Smith (a personal friend and

DEFENDANTS AND COUNTER-PLAINTIFFS'
AMENDED PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW
(No. 2:17-cv-01115-RSM) – 35

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

business partner of Mr. Park with ongoing business relationships with SHAG and SHAC) on behalf of SSRE.  SHAG was unsuccessful in its solicitation of another potential straw buyer, SEED, who declined to participate in a sham offer because some of its Board members were not comfortable with the idea.

39.    SHAG also engaged in inequitable, bad faith, and unjust conduct when it misled buyers interested in Lakewood Meadows by intentionally steering them instead to Auburn Court, Boardwalk, and WoodRose solely to trigger SHAG's ROFR and compel a sale of those properties to SHAG at below market prices, knowing that the Project Partnerships had no intention of accepting the buyers' offers.  In so doing, SHAG was able to induce the Redwood LOI and the Reliant LOIs.  In order to maintain the charade that the LOIs were legitimately being considered, SHAG further misled Redwood and Reliant, falsely stating that SHAG was working through some issues with its limited partners and implying that SHAG remained interested in potentially pursuing third party sales of the properties to Redwood and Reliant. SHAG made these representations even though SHAG had already purported to exercise its ROFR, a fact that it hid from Redwood and Reliant.

40.    SHAG also engaged in inequitable, bad faith, and unjust conduct when, in connection with its attempted exercise of its ROFR, SHAG hid from the AMTAX entities the Global Indemnity Agreement, which addresses the ownership of Meridian Court, Auburn Court, Boardwalk, and WoodRose, following SHAG's exercise of its ROFR.  The AMTAX entities first requested a copy of the Global Indemnity Agreement in January 2015 in order to analyze whether SHAG's purported exercise of its ROFR for Meridian Court was valid, but were not provided with a copy of the Global Indemnity Agreement until June 10, 2016, after their multiple later requests for the document were ignored or rejected.  Hiding the Global Indemnity Agreement from the AMTAX entities undermined the AMTAX entities' legitimate desire to evaluate the potential tax consequences to its investor limited partners of the sale of the LIHTC properties to SHAG pursuant to the exercise of its ROFR.  Hiding the Global Indemnity

DEFENDANTS AND COUNTER-PLAINTIFFS'
AMENDED PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW
(No. 2:17-cv-01115-RSM) – 36

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1  Agreement from the AMTAX entities also interfered with and delayed efforts by the AMTAX

2  entities to negotiate a resolution to this dispute.

3       41.    SHAG's conduct violated the fiduciary duties of care and loyalty that, as General

4  Partners of the Project Partnerships, SHAG and SHAC owed to the Project Partnerships and to

5  the limited partners, the AMTAX entities. *See* Wash. Rev. Code § 25.10.441(1); *Obert v. Envtl.*

6  *Research & Dev. Corp.*, 112 Wn.2d 323, 337, 771 P.2d 340 (1989) (noting that general partners

7  owe limited partners a fiduciary duty described as "*the highest standard of conduct*") (quoting

8  *Bassan v. Investment Exch. Corp.*, 83 Wn.2d 922, 928, 524 P.2d 233 (1974)) (emphasis in

9  *Obert*).  While "[a] general partner does not violate a duty or obligation under this chapter or

10  under the partnership agreement *merely* because the general partner's conduct furthers the

11  general partner's own interest" (Wash. Rev. Code § 25.10.441(5) (emphasis added)), the general

12  partner must "refrain from dealing with the limited partnership in the conduct or winding up of

13  the limited partnership's activities as or on behalf of a party having an interest adverse to the

14  limited partnership." Wash. Rev. Code § 25.10.441(2)(b). Thus, while SHAG, SHAC, and Steel

15  Lake do not need to ignore or abnegate their own interests, they cannot use their positions of

16  authority as General Partners to advance those interests in a manner that is adverse to the Project

17  Partnerships.

18       42.    These duties are confirmed by the Partnership Agreements for the Project

19  Partnerships, which provide in Section 7.4F(i) that each General Partner "shall have fiduciary

20  responsibility for the safekeeping and use of all funds and assets of the Partnership," and state in

21  Section 7.4G that "[n]o General Partner shall contract away the fiduciary duty owed at common

22  law to the Limited Partners." SHAG breached its fiduciary duties by placing its own interests

23  above the interests of the Project Partnerships and by concealing from the AMTAX entities the

24  Global Indemnity Agreement in connection with its purported exercise of its ROFR.

25

26

DEFENDANTS AND COUNTER-PLAINTIFFS'
AMENDED PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW
(No. 2:17-cv-01115-RSM) – 37

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

43.     The AMTAX entities therefore have established an unclean hands defense to SHAG's claim for declaratory relief, which bars SHAG's claim even if SHAG had established it, which, for the reasons stated above, SHAG has not.

**IV.   ORDER**

44.     Based upon the foregoing Findings of Fact and Conclusions of Law, it is hereby ORDERED, ADJUDGED AND DECREED as follows:

1.   SHAG has failed to carry its burden of proving that it is entitled to any of the declaratory relief it seeks;

2.   SHAG's claim for declaratory relief is barred by the doctrine of unclean hands;

3.   The AMTAX entities are entitled to a declaration that SHAG's ROFR for Meridian Court, Auburn Court, Boardwalk, and WoodRose were neither triggered nor validly exercised.

45.     The Clerk shall enter judgment in favor of the AMTAX entities in accordance with these findings and conclusions, with costs awarded to the AMTAX entities.


DATED this __ day of _____, 2019.


_____
Honorable Ricardo S. Martinez
CHIEF UNITED STATES DISTRICT COURT JUDGE


RESPECTFULLY SUBMITTED this 15th day of March, 2019.


**Boies Schiller Flexner LLP**

By:  /s/ Christopher G. Caldwell
Christopher G. Caldwell, admitted *pro hac vice*
Eric S. Pettit, admitted *pro hac vice*
725 S Figueroa Street, 31st Floor
Los Angeles, CA 90017

DEFENDANTS AND COUNTER-PLAINTIFFS'
AMENDED PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW
(No. 2:17-cv-01115-RSM) – 38

1

Telephone:  213 629 9040
Facsimile:  213 629 9022

2

Email:   ccaldwell@bsfllp.com
            epettit@bsfllp.com

3

4

**Perkins Coie LLP**

5

By:  /s/ Steven D. Merriman
David J. Burman, WSBA #10611

6

Steven D. Merriman, WSBA #44035
Mallory Gitt Webster, WSBA #50025

7

1201 Third Avenue, Suite 4900

8

Seattle, WA  98101-3099
Telephone:  206.359.8000

9

Facsimile:  206.359.9000
Email:   DBurman@perkinscoie.com

10

            SMerriman@perkinscoie.com
            MWebster@perkinscoie.com

11

12

Attorneys for the Investor Limited Partners

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DEFENDANTS AND COUNTER-PLAINTIFFS'
AMENDED PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW
(No. 2:17-cv-01115-RSM) – 39

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**CERTIFICATE OF SERVICE**

On March 15, 2019, I caused a copy of the foregoing document to be electronically filed via the Court's Electronic Case Filing System, which will notify all attorneys of record of the filing.

By:  *s/ Steven D. Merriman*
Steven D. Merriman

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000