UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

SENIOR HOUSING ASSISTANCE
GROUP,

                    Plaintiff,

        v.

AMTAX HOLDINGS 260, LLC, et al.,

                    Defendants.

Case No. C17-1115 RSM

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

AMTAX HOLDINGS 260, LLC, et al.,

                    Counter-Plaintiffs,

        v.

SENIOR HOUSING ASSISTANCE
GROUP, et al.,

                    Counter-Defendants.

## I.    INTRODUCTION

A bench trial was held in this matter on March 4, 2019, with live testimony and exhibits submitted by both parties. The Court heard testimony from the following witnesses: Jay Woolford (live), Stephen Smith (by videotaped deposition), and Bryan Park (live) for Plaintiff Senior Housing Assistance Group ("SHAG"); and Ryan Trane (live) for Defendants (the

"AMTAX" entities). Prior to the trial, the Court limited the issues to be tried in the Court's Order re Summary Judgment (Dkt. # 142), as clarified by the Court's Order Denying Motion for Reconsideration (Dkt. # 147).

The key issues of law at trial were: 1) whether the third party offers obtained by the various property Partnerships were legally sufficient to trigger SHAG's Section 7.4L Right of First Refusal ("ROFR") for each project and 2) whether SHAG is precluded from exercising its ROFRs under the doctrine of unclean hands.

## II.    CREDIBILITY OF THE WITNESSES

"In an action tried on the facts without a jury... the court must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a). The trial court is empowered to judge the credibility of the witnesses. *See Spokane Arcade, Inc. v. City of Spokane*, 75 F.3d 663, 665 (9th Cir. 1996); *Zivkovic v. S. Cal. Edison Co.*, 105 Fed. Appx. 892, 893 at n.1 (9th Cir. 2004) (citing *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575, 84 L. Ed. 2d 518, 105 S. Ct. 1504 (1985)).

The Court specifically finds that the witnesses Bryan Park and Stephen Smith were not credible. Their answers during testimony were incomplete and evasive, and their demeanor leads the Court to conclude that they were untruthful about their own experiences and observations. In addition, Mr. Park's significant economic stake in the outcome of this case supports the Court's conclusion that Mr. Park was motivated to solicit sham offers and later provide false testimony about his actions. Other evidence at trial supports the Court's conclusion that Mr. Smith had a financial motivation to assist Mr. Park in this case, including being unable to remember circumstances surrounding his execution of Purchase and Sale Agreements offering to purchase Meridian Court and Auburn Court. The witnesses Jay

Woolford and Ryan Trane were generally credible in their testimony based on the above factors.

## III.    FINDINGS OF FACT

The Court incorporates by reference the facts as detailed in its Order re: Motions for Summary Judgment (Dkt. #142), the admitted facts in the Revised Pretrial Order (Dkt. #149), and the agreed facts in the Stipulation and Order Regarding Third-Party Offers to Purchase (Dkt. #77).  The following additional findings of fact are made by the Court and are based upon a preponderance of the evidence presented at trial and the above credibility analysis.

1.    The Low-Income Housing Tax Credit ("LIHTC"), 26 U.S.C. § 42 ("Section 42"), is a federal tax credit program designed to promote the development of affordable rental housing for low-income households.

2.    The LIHTC program codified in Section 42 encourages private investment in such housing by providing tax credits to owners of qualifying LIHTC projects over a fifteen-year "Compliance Period."

3.    Section 42 expressly allows owners of LIHTC properties to give nonprofits focused on promoting affordable housing a contractual "right of 1st refusal" to purchase the LIHTC properties at the end of their Compliance Period at a statutory "minimum purchase price" that is often below fair market value and is commonly described as "debt plus exit taxes."

4.    At all times relevant to this action, Plaintiff/Counter-Defendant Senior Housing Assistance Group ("SHAG") was a Puget Sound-based nonprofit with the stated mission of fostering affordable housing, particularly for seniors.

5.    At all times relevant to this action, SHAG was the lessee and operator of LIHTC properties in the State of Washington, including the Meridian Court Apartments Project

("Meridian Court"), the Auburn Court Apartments Project ("Auburn Court"), the Boardwalk Apartments Project ("Boardwalk"), and the WoodRose Apartments Project ("WoodRose").

6.       As the lessee and operator of Meridian Court, Auburn Court, Boardwalk, and WoodRose, SHAG held four separate ROFRs that, if validly triggered and exercised during a two-year period commencing at the end of the applicable Compliance Period, permitted SHAG to purchase each of the four properties at contractually defined prices that were based on, and not less than, the statutory "minimum purchase price" set forth in Section 42.

7.       Defendants and Counter-Plaintiffs (collectively, the "AMTAX entities") are special purpose limited partnerships created as vehicles for private investment in LIHTC properties including Meridian Court, Auburn Court, Boardwalk, and WoodRose.

8.       The AMTAX entities do not own Meridian Court, Auburn Court, Boardwalk, and WoodRose.  Instead, the AMTAX entities are "Investor Limited Partners" in the limited partnerships that own Meridian Court, Auburn Court, Boardwalk, and WoodRose (collectively, the "Project Partnerships").

9.       As explained below, in addition to being the lessee and operator of all four Project Partnerships, SHAG was the "General Partner" of Auburn Court and SHAG's wholly-owned subsidiary, Senior Housing Assistance Corporation ("SHAC"), was the General Partner of Boardwalk and WoodRose.

10.      As the General Partners of the Project Partnerships that own Auburn Court, Boardwalk, and WoodRose, SHAG and SHAC exerted significant control over the management of those partnerships, including the authority to determine the acceptability of third party purchase offers.  In their capacity as General Partners, SHAG and SHAC owed fiduciary duties to the Project Partnerships and to their Investor Limited Partners the AMTAX entities.

11.     Each of the Project Partnerships is governed by a limited partnership agreement (collectively, the "Partnership Agreements").   The Partnership Agreements describe the respective rights and obligations of the General Partners—including SHAG and SHAC—and the Investor Limited Partners of the Project Partnerships.

12.     Section 7.4 of each of the Partnership Agreements provides, among other things, various rights of the parties relating to the potential sale of the LIHTC properties during a two-year span after the end of the properties' fifteen-year Compliance Periods.

13.     First, Section 7.4J gives the General Partners a conditional "option" to purchase the properties from the Project Partnerships by acquiring the Investor Limited Partners' interests in the Project Partnerships at prices that are not less than fair market value.

14.     Second, Section 7.4K gives the Investor Limited Partners an option to force a sale of the properties by the Project Partnerships, subject to the General Partners' purchase option in Section 7.4J.

15.     Finally, as noted above, Section 7.4L of the Partnership Agreements gives SHAG, in its capacity as lessee and operator of the LIHTC properties, a conditional "Right of First Refusal" that, if validly triggered and timely exercised, permits SHAG to purchase the properties from the Project Partnerships at contractually defined prices that are based on, and not less than, the statutory "minimum purchase price" set forth in Section 42.   If SHAG exercises its ROFR, the result is a sale of the properties, which is a liquidating event that ends the life of the Project Partnerships under Section 2.5A(i) of the Partnership Agreements.

16.     Section 7.4K expressly provides that the Investor Limited Partners' exercise of their forced sale rights trigger SHAG's ROFR to purchase the properties at the price defined in

Section 7.4L. Section 7.4J, by contrast, does not provide that the General Partners' exercise of their purchase options trigger SHAG's ROFR.

17. Section 7.4 of the Partnership Agreements also confirms the fiduciary duties that the General Partners, including SHAG and SHAC, owe to the Project Partnerships and their Investor Limited Partners. Specifically, Section 7.4F(i) states that the General Partners "shall have fiduciary responsibility for the safekeeping and use of all funds and assets of the Partnership," and Section 7.4G provides that "[n]o General Partner shall contract away the fiduciary duty owed at common law to the Limited Partners."

**Meridian Court**

18. Meridian Court is a 200-unit LIHTC property located in Federal Way, Washington.

19. The owner of Meridian Court is the Meridian Court Apartments Limited Partnership, a Washington limited partnership (the "Meridian Court Owner").

20. The General Partner of the Meridian Court Owner is Steel Lake Enterprises, LLC ("Steel Lake"). An attorney and certified public accountant named Bryan Park has an indirect ownership interest in Steel Lake, and has at all relevant times been authorized to act on Steel Lake's behalf. Although Steel Lake ostensibly is independent from SHAG, it has entered into various agreements with SHAG indicating that Steel Lake and its affiliates will continue to receive economic benefits upon SHAG's successful exercise of its ROFR for Meridian Court. Evidence at trial indicated there is little or no independence or separation of interests between SHAG and Steel Lake with respect to that project.

21. Defendant and Counter-Plaintiff AMTAX Holdings 260, LLC ("AMTAX 260") is the Investor Limited Partner of the Meridian Court Owner.

22. Defendant and Counter-Plaintiff Protech Holdings W, LLC ("Protech Holdings W") is the "Special Limited Partner" of the Meridian Court Owner.

23. The Meridian Court Owner is governed by a Second Amended and Restated Agreement of Limited Partnership dated November 12, 2002 (the "Meridian Court LPA").

24. The Compliance Period for Meridian Court expired on December 31, 2012, and the last day of the exercise period for SHAG's ROFR for Meridian Court was December 31, 2014.

25. On December 16, 2014, Bryan Park made a presentation to SHAG's Board of Directors regarding SHAG's ROFR for Meridian Court, and noted that the ROFR would terminate if not exercised by the end of 2014. Mr. Park's presentation included an analysis of Meridian Court that placed its value between $12,675,988 and $16,901,317, with a midpoint value of $14,486,843. SHAG's Board did not authorize the exercise of the ROFR.

26. On December 18, 2014, Mr. Park transmitted a document titled "Real Estate Purchase and Sale Agreement" (the "Meridian PSA") to Stephen Smith of SSRE Development, LLC ("SSRE"), with a cover email stating "[t]hanks for your help." The Meridian PSA included an offer by SSRE to purchase Meridian Court for $13 million. This offer price was at the low end of the price range established by Mr. Park at the SHAG board meeting, and well below the median price that Mr. Park projected.

27. Mr. Smith is a real estate developer who is a personal friend and business partner of Mr. Park. SHAG and SHAC have had multiple ongoing business relationships with Mr. Smith and entities in which Mr. Smith holds a direct or indirect interest, including SSRE and its affiliates.

28.     As a developer, Mr. Smith does not often make offers to purchase LIHTC properties that are already developed and operating, and did not recall ever offering to purchase a developed-and-operating LIHTC property that was not in some way affiliated with his friend and business partner Mr. Park.

29.     Mr. Park prepared the Meridian PSA and asked Mr. Smith to sign it on behalf of SSRE for the purpose of assisting with SHAG's efforts to self-trigger and exercise its ROFR under Section 7.4L of the Meridian Court LPA.

30.     Mr. Park informed Mr. Smith at the time that SSRE's execution of the Meridian PSA would not result in the sale of Meridian Court to SSRE, but instead would be trumped by SHAG's intended exercise of its below-market ROFR.

31.     To help entice Mr. Smith into signing the Meridian PSA, Mr. Park suggested to Mr. Smith that his assistance with SHAG's efforts to self-trigger its ROFR would increase the likelihood that SHAG would invite Mr. Smith to participate in any redevelopment and/or resyndication of the property that SHAG might undertake following the successful exercise of its ROFR.  Mr. Park referred to this at trial as helping Mr. Smith "get an oar in the water."

32.     Mr. Smith signed and returned the Meridian PSA to Mr. Park less than six hours after receiving it.  He has claimed to not have any recollection of the circumstances leading up to or following its execution.

33.     Based on these circumstances, the Court concludes Mr. Smith did not have a sincere and genuine interest in purchasing Meridian Court, and complied with Mr. Park's request as a favor to his business partners SHAG and Mr. Park, with the hope it could yield some future financial benefit to Mr. Smith.

34.     Mr. Park signed a letter on behalf of Steel Lake and the Meridian Court Owner dated December 29, 2014, that was addressed to AMTAX 260 and Protech Holdings W.  The letter referenced the Meridian PSA, and stated that "[t]he Partnership has no intention of accepting the offer or making a counteroffer at this time."

35.     Steel Lake never obtained an independent appraisal to determine the fair market value of Meridian Court, never evaluated the $13 million purchase offer contained in the Meridian PSA or determined whether it was in the best interest of the Meridian Court Owner to accept it, and never formed or expressed a willingness to accept the Meridian PSA.

36.     On December 29, 2014, Mr. Park sent another letter to AMTAX 260 purporting to exercise Steel Lake's purchase option under Section 7.4J of the Meridian Court LPA, but claiming that Steel Lake's purchase option "is subject and subordinate to" SHAG's ROFR, and that SHAG's ROFR "has priority over" Steel Lake's option.

37.     On December 30, 2014, SHAG's Executive Director Jay Woolford sent an email to Mr. Park attaching a letter to Paul Scott Price purporting to notify Steel Lake "that SHAG is exercising its right to purchase [Meridian Court] pursuant to the Special ROFR provided in Section 7.4.L of the Agreement at the purchase price described in such section."

38.     Prior to sending the email attaching the letter to Mr. Price, Mr. Woolford had asked SHAG's Board of Directors to sign a "Unanimous Consent authorizing the execution of the letters to trigger our ROFR for Meridian Court and to negotiate the terms."  The Unanimous Consent stated that the consent resolutions it contained—including consent to "notify the appropriate entities of [SHAG's] intent to exercise" its ROFR—would be effected "pursuant to RCW 24.03.465 on the date that the last Director signed this consent resolution or a duplicate counterpart thereof or sent consent by email."

39.     SHAG's Board of Directors did not fully execute the Unanimous Consent until after SHAG's ROFR terminated on January 1, 2015.

**Auburn Court**

40.     Auburn Court is a 296-unit LIHTC property located in Auburn, Washington.

41.     The owner of Auburn Court is the Auburn North Associates Limited Partnership, a Washington limited partnership (the "Auburn Court Owner").

42.     SHAG is the General Partner of the Auburn Court Owner.

43.     Defendant and Counter-Plaintiff AMTAX Holdings 259, LLC ("AMTAX 259") is the Investor Limited Partner of the Auburn Court Owner.

44.     Protech Holdings W is the Special Limited Partner of the Auburn Court Owner.

45.     The Auburn Court Owner is governed by a Third Amended and Restated Agreement of Limited Partnership Dated as of November 12, 2002 (the "Auburn Court LPA").

46.     The Compliance Period for Auburn Court expired on December 31, 2013, and the last day of the exercise period for SHAG's ROFR was December 31, 2015.

47.     On December 10, 2015, Mr. Woolford sent an email to Mr. Park with the subject line "Auburn ROFR" that stated: "I spoke with Lance about the possibility of SEED making an offer on the Auburn property.  He checked with some of his Board members, and they were not comfortable with the idea.  I have David Peterson working on a PSA, but could use a straw buyer.  Do you have any other thoughts?"  Mr. Woolford admitted at trial that he understood the term "straw buyer" to refer to someone who bids up the price of real estate without any real intention to purchase it.

48.     Mr. Park responded to Mr. Woolford's December 10, 2015, email the same day, stating "I know that Steve Smith would help us out again.  It would be great if it was another non-profit."

49.     On December 10, 2015, Nick Boehm, a Director of Redwood Housing Partners, LLC ("Redwood") sent an email to Mr. Woolford attaching a Letter of Intent ("LOI") to acquire a different LIHTC property in which SHAG was involved, the Lakewood Meadows Project ("Lakewood Meadows").

50.     On December 11, 2015, Mr. Woolford sent an email to Bryan Park stating "I just got an unsolicited offer for Lakewood Meadows.  Wish it was for Auburn."

51.     Also on December 11, 2015, Mr. Woolford communicated via email with David Peterson of Paragon Realty regarding the Redwood LOI that SHAG had received for Lakewood Meadows.  Mr. Peterson suggested that Mr. Woolford "bait Redwood to writing a LOI on Auburn," and "[t]ell them that you might be more open to selling Auburn and see if they write an LOI."

52.     Mr. Woolford responded to Mr. Boehm's December 10, 2015, email less than a half-hour after Mr. Peterson suggested that SHAG "bait" Redwood into submitting a LOI on Auburn Court.  Mr. Woolford's email to Mr. Boehm stated, in part: "We are not currently considering selling, or re-capitalizing [Lakewood Meadows] as we are still within the 15 year compliance period. We do have a property in Auburn Washington though that has met its 15 year compliance period. I can't say what we plan to do, but if you want to consider a LOI, we will look at it."

53. Mr. Boehm responded to Mr. Woolford later that same day. Mr. Boehm wrote that he assumed Mr. Woolford was referring to the Auburn Court Apartments, and Mr. Boehm asked Mr. Woolford if he would share the "most recent audited financials for the property."

54. On December 14, 2015, Mr. Woolford responded with an email attaching "a draft audit" for the Auburn North Associates Limited Partnership.

55. Mr. Woolford did not have a sincere and genuine interest in selling Auburn Court to a third party, and solicited the Redwood LOI solely for the purpose of self-triggering SHAG's ROFR and compelling a sale of Auburn Court to SHAG at a below market price.

56. Later the same day, Mr. Boehm sent Mr. Woolford an email stating that Redwood was "interested in trying to put together a deal that works for you and your team," and attaching a Letter of Intent for Auburn Court (the "Redwood LOI"). The Redwood LOI contemplated Redwood's potential acquisition of Auburn Court for a purchase price of $21,500,000.

57. The Redwood LOI included the following language: "It is to be strictly understood that this proposal is for discussion purposes only, is not intended as, and does not constitute a formal or binding agreement or contract. Either party fully understands that a transaction of this type involves terms and conditions which have not yet been agreed upon and that this Letter is in no way intended to be a complete or definitive statement of all of the terms and conditions of the proposed transaction, and that no party shall have any legal obligation to the other unless and until a definitive purchase and sale agreement has been executed and delivered by both parties. Only a fully executed real estate purchase contract shall bind the parties and until a purchase contract is signed, either party is free to terminate negotiations."

58.     The Redwood LOI was not an enforceable offer to purchase Auburn Court, but merely a letter of intent communicating an expression of interest and an invitation to negotiate, as Mr. Woolford acknowledged in his testimony.

59.     On December 26, 2015, Stephen Smith sent an email to Bryan Park with the subject line "Purchase offer" that stated: "Bryan, even though I will be on a cruise ship I can still sign an offer.  My assistant will affix my electronic signature to it.  And I can still receive emails but it may take me a couple of days to get back to you.  It's no trouble at all.  Just let me know.  I'm happy to help."

60.     According to Mr. Park, he discussed Auburn Court with Mr. Smith prior to receiving Mr. Smith's December 26, 2015, email.  As with Meridian Court, Mr. Park claims he told Mr. Smith that (a) SSRE's execution of the Auburn PSA would not result in the sale of Auburn Court to SSRE, but instead would be trumped by SHAG's intended exercise of its below-market ROFR; and (b) Mr. Smith's assistance with SHAG's efforts to self-trigger its ROFR would increase the likelihood that SHAG would invite Mr. Smith to participate in any redevelopment and/or resyndication that SHAG might undertake following the successful exercise of its ROFR.

61.     On December 29, 2015, Mr. Park sent an email in response to Mr. Smith's December 26 email, attaching a purchase and sale agreement for Auburn Court (the "Auburn PSA") and stating, "[i]f you are able to have your assistant affix your electronic signature to the attached offer, and then have her forward it back to me, that would be great."  The Auburn PSA reflected a proposed purchase price of $21 million, which was $500,000 less than the purchase price set forth in the Redwood LOI that had been received by SHAG over three weeks earlier.

62.     Later that same day, Mr. Smith instructed his assistant to affix his electronic signature to the Auburn PSA, and Mr. Smith's assistant sent Mr. Park an executed copy of the Auburn PSA approximately six hours after Mr. Park first transmitted it.

63.     Given all of the above, Mr. Smith did not have a sincere and genuine interest in purchasing Auburn Court.  Mr. Smith complied with Mr. Park's request as a favor to his business partners SHAG and Mr. Park, and with the hope it could yield some future financial benefit to Mr. Smith.

64.     On December 29, 2015, SHAG forwarded the Redwood LOI to AMTAX 259 and Protech Holdings W.

65.     On December 30, 2015, SHAG forwarded SSRE's Auburn PSA to AMTAX 259 and Protech Holdings W.

66.     On December 30, 2015, SHAG sent AMTAX 259 and Protech Holdings W an email that attached (1) a December 30, 2015, letter from SHAG to Redwood in which SHAG, purporting to speak on behalf of the Auburn Court Owner, responded to the Redwood LOI with "(i) certain counter-offer terms as reflected on the marked, initialed, and executed copy of the original Letter of Intent dated December 14, 2015 and attached hereto, and (ii) certain other conditions as described below in this transmittal letter"; (2) a December 30, 2015, letter from SHAG to SSRE in which SHAG, purporting to speak on behalf of the Auburn Court Owner, stated that it was "rejecting [SSRE's] offer at this time, as set forth in [SSRE's] Real Estate Purchase and Sale Agreement dated December 29, 2015 (the "Offer")," and inaccurately stated that SHAG had accepted a different offer when in fact no offer had been accepted; and (3) a December 30, 2015, letter from SHAG to itself, AMTAX 260, and Protech Holdings W, in which SHAG stated that it was "exercising its right to purchase the Apartment Complex

pursuant to the Special ROFR provided in Section 7.4L of the Partnership Agreement at the Purchase Price described therein (and not at the purchase price described in either of the two (2) third party offers)."

67.     SHAG never obtained an independent appraisal to determine the fair market value of Auburn Court, never evaluated the terms of the Redwood LOI, and never determined whether it was in the best interest of the Auburn Court Owner to pursue a sale of Auburn Court to Redwood at a purchase price of $21,500,000.  SHAG also never evaluated the $21 million purchase offer contained in SSRE's Auburn PSA, and never determined whether it was in the best interest of the Auburn Court Owner to accept it.  SHAG did not do so because it believed that any such evaluation or determination was unnecessary to trigger SHAG's ROFR, and that the purchase price reflected in any third-party offer was "immaterial" given SHAG's intention to exercise its ROFR.  Accordingly, SHAG never formed or expressed a willingness to accept either the Redwood LOI or SSRE's Auburn PSA.

**Boardwalk and WoodRose**

68.     Boardwalk is a 284-unit LIHTC property located in Olympia, Washington, and WoodRose is a 197-unit LIHTC property located in Bellingham, Washington.

69.     The owner of Boardwalk is Capitol Way Associates Limited Partnership, a Washington limited partnership (the "Boardwalk Owner"), and the owner of WoodRose is Racine Street Associates Limited Partnership, a Washington limited partnership (the "WoodRose Owner").

70.     SHAG's wholly-owned subsidiary SHAC is the General Partner of both the Boardwalk Owner and the WoodRose Owner.  At all relevant times, SHAC's Board of Directors was comprised of the members of SHAG's Board of Directors, plus Mr. Woolford.

71.     Defendant and Counter-Plaintiff AMTAX Holdings 261, LLC ("AMTAX 261") is the Investor Limited Partner of the Boardwalk Owner, and Defendant and Counter-Plaintiff AMTAX Holdings 258, LLC ("AMTAX 258") is the Investor Limited Partner of the WoodRose Owner.

72.     Protech Holdings W is the Special Limited Partner of both the Boardwalk Owner and the WoodRose Owner.

73.     The Boardwalk Owner is governed by a Third Amended and Restated Agreement of Limited Partnership dated as of November 12, 2002 (the "Boardwalk LPA"), and the WoodRose Owner is governed by a Second Amended and Restated Agreement of Limited Partnership dated as of November 12, 2002 (the "WoodRose LPA").

74.     The Compliance Period for Boardwalk expired on December 31, 2014, and the last day of the exercise period for SHAG's ROFR for Boardwalk was December 31, 2016.

75.     The Compliance Period for WoodRose expired on December 31, 2015, and the last day of the exercise period for SHAG's ROFR for WoodRose was December 31, 2017.

76.     On January 19, 2016, Sanjiv Kakar, Senior Vice President for Acquisitions for Reliant Group Management, LLC ("Reliant") sent a letter to SHAG expressing Reliant's interest in acquiring Lakewood Meadows.

77.     On June 16, 2016, Mr. Kakar met Mr. Woolford over lunch in Seattle, Washington.  During this meeting, Mr. Kakar explained Reliant's interests and discussed with Mr. Woolford certain properties that SHAG had expressed interest in selling.

78.     On October 12, 2016, Mr. Woolford sent Mr. Kakar an email asking what information Reliant would need to evaluate possible offers on Boardwalk and WoodRose.

79. Mr. Woolford did not have a sincere and genuine interest in selling Boardwalk or WoodRose to a third party, and solicited Reliant solely for the purpose of self-triggering SHAG's ROFR and compelling the sale of Boardwalk and WoodRose to SHAG at below market prices.

80. On November 5, 2016, Mr. Kakar sent Mr. Woolford signed letters of intent to purchase Boardwalk and WoodRose (the "Reliant LOIs") that expired by their terms on November 18, 2016.

81. The Reliant LOIs each included the following language: "[a]s noted above, this letter is only intended to establish some of the basic terms of the proposed purchase and is not intended to encompass all of the material terms that will need to be included in a definitive PSA."

82. Twelve days later, on November 17, 2016, SHAC—in its capacity as General Partner of the Boardwalk Owner and the WoodRose Owner—forwarded the Reliant LOIs to AMTAX 261, AMTAX 258, and Protech Holdings W. This was the first time that SHAC had shared the Reliant LOIs with the Investor Limited Partners of the Boardwalk Owner and the WoodRose Owner.

83. The letters from SHAC enclosing the Reliant LOIs stated that SHAC—in its capacity as General Partner of the Boardwalk Owner and the WoodRose Owner—believed that the Reliant LOIs were "attractive and worthy of consideration." The letter went on to note, however, that SHAC understood that SHAG intended to exercise its ROFR to purchase each property, and "request[ed] that SHAG confirm in writing whether SHAG intends to exercise the ROFR."

84.     SHAG sent letters dated November 18, 2016, purporting to exercise SHAG's ROFR for Boardwalk and WoodRose.

85.     SHAC never obtained an independent appraisal to determine the fair market value of Boardwalk or WoodRose, never evaluated the terms of the Reliant LOIs, and never determined whether it was in the best interests of the Boardwalk Owner or the WoodRose Owner to pursue a sale of the properties at the purchase prices reflected in the Reliant LOIs. SHAC did not do so because it believed that any such evaluation or determination was unnecessary to trigger SHAG's ROFR, and that the purchase price reflected in any third-party offer was "immaterial" in light of SHAG's intention to exercise its ROFR. Accordingly, SHAG never formed or expressed a willingness to accept either of the Reliant LOIs.

**The Global Indemnity Agreement**

86.     On July 12, 2001, SHAG and SHAC entered into a Global Indemnity Agreement with Pacific Northern Construction Company ("PNCC"), an entity controlled and partially owned by Mr. Park. The Global Indemnity Agreement addresses, *inter alia*, the ownership of certain LIHTC properties, including Meridian Court, Auburn Court, Boardwalk, and WoodRose, following SHAG's exercise of its ROFR for those properties.

87.     Under the Global Indemnity Agreement, PNCC and affiliated entities owned and/or controlled by Mr. Park, including Steel Lake, would maintain their ownership interest in the Project Partnerships upon SHAG's exercise of its ROFR following the end of the applicable Compliance Periods, which would not be the case if (a) the Global Indemnity Agreement did not exist, or (b) the Project Partnerships instead sold the properties to a third party. Put another way, in the absence of the Global Indemnity Agreement, entities affiliated with Mr. Park would

retain no economic ownership interests in the Project Partnerships following SHAG's successful exercise of its ROFR.

88.     By Mr, Woolford's estimation, under the Global Indemnity Agreement SHAG would only be entitled to twenty to forty percent of any economics generated by the properties following SHAG's exercise of its ROFR, and entities affiliated with Mr. Park would be entitled to the remaining sixty to eighty percent.

89.     There was thus a financial incentive for Mr. Park to assist SHAG in its efforts to trigger SHAG's ROFR to purchase Meridian Court, Auburn Court, Boardwalk, and WoodRose at below market prices.

## IV.     CONCLUSIONS OF LAW

1.     The Court has jurisdiction over the parties and this dispute under federal law.

2.     The Court adopts its previous legal rulings as detailed in its Court's Order re Summary Judgment (Dkt. # 142), as clarified by the Court's Order Denying Motion for Reconsideration (Dkt. # 147).

**Whether SHAG's Rights of First Refusal Were Triggered**

3.     As the Plaintiff, SHAG bears the burden of establishing that the ROFR it seeks to enforce through this action were properly triggered and exercised. *See Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 57 (2005).

4.     For each of SHAG's ROFRs to be triggered, the owner of the property at issue must receive "a bona fide offer from a third party, acceptable to the property owner." *Matson v. Emory*, 36 Wn. App. 681, 683, 676 P.2d 1029 (1984) (citing *Bennett Veneer Factors, Inc. Brewer*, 73 Wn.2d 849, 856, 441 P.2d 128 (1968)); *see also* Order Re: Motions For Summary Judgment, Dkt. # 142 at 11 ("'The right of first refusal requires the landowner to first get an

offer to purchase from a third party, that the seller is willing to accept.'") (quoting *Kelly v. Ammex Tax & Duty Free Shops W., Inc.*, 162 Wn. App. 825, 830-32, 256 P.3d 1255 (2011)).

5.      To be bona fide, an offer must be "made in good faith; without fraud or deceit," and must be "sincere" and "genuine."  Black's Law Dictionary (10th ed. 2014).

6.      Even if a third party's interest in the property is genuine, to constitute an offer the communication in question must be enforceable and not merely an expression of interest or invitation to negotiate.  *See Rennick v. O.P.T.I.O.N. Care, Inc.*, 77 F.3d 309, 315 (9th Cir. 1996) ("A manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent.") (quoting Restatement (Second) of Contracts § 26 (1981)).  In addition, an offer to purchase real estate is enforceable only if it includes all material terms.  *See Sea-Van Investments Associates v. Hamilton,* 125 Wn.2d 120, 128-29, 881 P.2d 1035 (1994) (holding that a real estate contract was unenforceable because, *inter alia*, the purported offer did not contain all material terms).

**Meridian Court**

7.      Given the above findings of fact, the Court concludes there was no bona fide and enforceable offer to purchase Meridian Court that was acceptable to the Meridian Court Owner.  The Meridian PSA signed by Stephen Smith on behalf of SSRE was not made in good faith and was not sincere or genuine, but was instead a sham offer orchestrated by Mr. Park to trigger SHAG's ROFR and tendered by Mr. Smith solely as a business favor that could pay dividends in future business dealings.

8.      Even if the Meridian PSA had been a bona fide, good faith offer, that offer was deemed unacceptable by the Project Partnership, as evidenced by a letter in which Steel Lake,

in its capacity as General Partner, stated that the Meridian Court Owner had no intention of accepting the Meridian PSA. This evidence demonstrates that the Meridian Court Owner never formed or expressed a willingness to accept the Meridian PSA. The Meridian PSA therefore did not trigger SHAG's ROFR to purchase Meridian Court.

9.      In addition, Steel Lake's purported exercise of its purchase option pursuant to Section 7.4J of the Meridian LPA was not a bona fide third party offer, and did not trigger SHAG's ROFR. The exercise of an option does not constitute an offer to purchase subject to rejection, but instead is a self-executing acceptance of a preexisting offer to sell the property. *See Hopkins v. Barlin*, 31 Wn.2d 260, 267, 196 P.2d 347 (1948). In any event, Steel Lake is not a third party, but rather the General Partner of the Meridian Court Owner.

10.      SHAG's ROFR to purchase Meridian Court therefore was not triggered.

**Auburn Court**

11.      Given the above findings of fact, the Court concludes there was no bona fide and enforceable offer to purchase Auburn Court that was acceptable to the Auburn Court Owner.

12.      The Redwood LOI was not bona fide, as it was solicited by Mr. Woolford in an attempt to trigger SHAG's ROFR, after Mr. Woolford told Mr. Park that he "could use a straw buyer" and after Mr. Park responded: "I know that Steve Smith would help us out again. It would be great if it was another non-profit." Redwood only submitted its LOI after Mr. Woolford deliberately made misleading statements to Redwood in order to induce the Redwood LOI as part of SHAG's secret effort to self-trigger its ROFR.

13.      The language of the Redwood LOI makes clear it is not an enforceable offer, but merely a letter of intent.

14.     The Redwood LOI was not acceptable to the Auburn Court Owner.  Rather, SHAG, in its capacity as General Partner of the Auburn Court Owner, countered Redwood's proposed terms, including material terms such as price, which establishes that the Auburn Court Owner never formed a willingness to accept the terms in the Redwood LOI.  *See Rorvig v. Douglas*, 123 Wn.2d 854, 858, 873 P.2d 492 (1994); *Sea-Van Investments Associates,* 125 Wn.2d at 126 ("Generally, a purported acceptance which changes the terms of the offer in any material respect operates only as a counteroffer, and does not consummate the contract").

15.     The Auburn PSA signed by SSRE was also not bona fide, as Mr. Smith's execution of the Auburn PSA at the behest of Mr. Park was not made in good faith and was not sincere or genuine.  The Auburn PSA was instead a sham offer orchestrated by Mr. Park to trigger SHAG's ROFR and tendered by Mr. Smith solely as a business favor that could pay dividends in future business dealings.  The Auburn Court Owner never formed or expressed a willingness to accept the Auburn PSA.

16.     SHAG's ROFR to purchase Auburn Court therefore was not triggered.

**Boardwalk and WoodRose**

17.     Given the above findings of fact, the Court concludes there were no bona fide and enforceable offers to purchase Boardwalk or WoodRose that were acceptable to the Boardwalk Owner or the WoodRose Owner.

18.     The Reliant LOIs were not bona fide as they were solicited by Mr. Woolford in an attempt to trigger SHAG's ROFR and compel a sale of Boardwalk and WoodRose to SHAG at below market prices, not because SHAC was genuinely interested in selling Boardwalk or WoodRose to a third party.  Reliant initially expressed interest in purchasing a different LIHTC project, Lakewood Meadows, and only submitted the Reliant LOIs after Mr. Woolford

deliberately made misleading statements to Reliant in order to induce the Reliant LOIs as part of SHAG's secret effort to self-trigger its ROFR.

19.     The Reliant LOIs, each of which expressly states, "this letter is only intended to establish some of the basic terms of the proposed purchase and is not intended to encompass all of the material terms that will need to be included in a definitive PSA," also were not enforceable offers, but rather letters of intent.  *See Sea-Van Investments Associates,* 125 Wn.2d at 128-29.

20.     The Boardwalk Owner and the WoodRose Owner never formed or expressed a willingness to accept the Reliant LOIs.  Although SHAC did not affirmatively reject the Reliant LOIs, SHAC only stated that they were "worthy of consideration."  SHAC never stated that the terms of the Reliant LOIs were acceptable to the Boardwalk Owner or the WoodRose Owner. Indeed, the evidence shows that SHAC never even evaluated—let alone made any determinations—regarding the proposed terms in the Reliant LOIs because it believed that those terms were "immaterial."

21.     The Court does not agree with SHAG's argument at trial that the terms of the third-party offers were immaterial, or that SHAG can simply ignore the common law requirement that the owner of a property subject to a ROFR must be willing to accept a third party offer for the ROFR to be triggered.  While the Court found in its summary judgment order that the AMTAX entities had contracted away *their* consent rights as limited partners in connection with SHAG's exercise of its ROFR, the Court also upheld the distinction between a ROFR and an option, and confirmed that SHAG could only exercise its ROFR if all of the elements necessary to trigger the ROFR under common law had been satisfied.  Taken to its logical conclusion, SHAG's argument that the terms of the third-party offer are immaterial

would mean that even an offer for one dollar would be sufficient to trigger SHAG's ROFR, which would functionally eliminate the distinction between a ROFR and an option.

22. Given all of the above, the Court concludes that SHAG's ROFR to purchase Boardwalk and WoodRose were not triggered.

**Whether SHAG's Claim Is Barred by the Doctrine of Unclean Hands**

23. The Court has already concluded that SHAG has not properly exercised its ROFRs. To the extent necessary, the Court will also rule on AMTAX's affirmative defense of unclean hands.

24. In the parties' Proposed Revised Pretrial Order, SHAG asked the Court to declare that: (1) "SHAG's Special ROFRs for Meridian Court, Auburn Court, Boardwalk, and WoodRose were triggered"; and (2) "SHAG has properly and effectively exercised its Special ROFRs for Meridian Court, Auburn Court, Boardwalk, and WoodRose." Dkt. # 149 at 2. Throughout this litigation, SHAG has never asked the Court for damages or monetary relief. During trial and in its trial brief, however, SHAG argued that Defendants and Counter-Plaintiffs' unclean hands affirmative defense was unavailable because SHAG's declaratory relief claim concerns a contract and thus, according to SHAG, is legal in nature. *See* Dkt. # 155 at 24.

25. To determine whether an action for declaratory relief is equitable or legal in nature, courts consider whether the plaintiff would have sought an equitable or legal remedy in the absence of a declaratory judgment. *See Simler v. Conner*, 372 U.S. 221, 222-23 (1963). SHAG cites to *Transamerica Occidental Life Ins. Co. v. DiGregorio*, 811 F.2d 1249, 1251 (9th Cir. 1987) for the proposition that a contract dispute where declaratory relief is sought is legal rather than equitable in nature. Dkt. # 155 at 24. The *Transamerica* court, however,

considered a contractual dispute arising under ERISA, not a real property dispute. This distinction is material because the remedy in a real property dispute, where money damages are typically deemed inadequate, is presumed to be equitable. *See Crafts v Pitts*, 161 Wn.2d 16, 25-26, 162 P.3d 382 (2007). Accordingly, a declaratory judgment claim in a real property dispute may be equitable in nature.

26.     SHAG is asking this Court to declare that its ROFR on the four disputed properties have already been triggered and validly exercised, and that SHAG accordingly is entitled to purchase the properties at the below market prices set forth in Section 7.4L of the Partnership Agreements. *See* Dkt. # 149 at 2. Should the Court so declare, it will follow that SHAG will obtain the disputed properties. In other words, the remedy SHAG will receive is specific performance of a contract relating to the ownership of real property. *See Crafts*, 161 Wn.2d at 23-24. This strikes the Court as seeking equitable relief.

27.     A party that acts with unclean hands cannot recover in equity. *J. L. Cooper & Co. v. Anchor Sec. Co.*, 9 Wn.2d 45, 71-72, 113 P.2d 845 (1941). A party has unclean hands when it has engaged in unjust, inequitable, bad faith, or unconscionable conduct in connection with the transaction at issue. *Id.* at 72-73; *see also Hallas v. Ameriquest Mortg. Co.*, 280 F. App'x 667, 668 (9th Cir. 2008).

28.     Given the findings of fact above, the Court finds that SHAG acted with unclean hands in connection with its attempted exercise of its ROFR for Meridian Court, Auburn Court, Boardwalk, and WoodRose. SHAG engaged in inequitable, bad faith, and unjust conduct when it secretly colluded with Mr. Park to procure sham offers from straw buyers for Meridian Court and Auburn Court. SHAG also engaged in inequitable, bad faith, and unjust conduct when it misled buyers interested in Lakewood Meadows by intentionally steering them instead to

Auburn Court, Boardwalk, and WoodRose solely to trigger SHAG's ROFR and compel a sale of those properties to SHAG at below market prices, knowing that the Project Partnerships had no intention of accepting the buyers' offers. In so doing, SHAG was able to induce the Redwood LOI and the Reliant LOIs. The Court need not consider other evidence of unclean hands submitted by AMTAX to reach this conclusion. SHAG would thus be barred from seeking equitable relief in this case, even if the Court had not otherwise found against SHAG on its claim.

29. Based upon the foregoing Findings of Fact and Conclusions of Law, SHAG has failed to carry its burden of proving that it is entitled to any of the declaratory relief it seeks. AMTAX is entitled to a declaration that SHAG's ROFRs for Meridian Court, Auburn Court, Boardwalk, and WoodRose were neither triggered nor validly exercised.

30. The Clerk shall enter judgment in favor of the AMTAX entities in accordance with these findings and conclusions, with costs awarded to the AMTAX entities.

31. This matter is now CLOSED.


DATED this 29th day of March 2019.


RICARDO S. MARTINEZ
CHIEF UNITED STATES DISTRICT JUDGE